**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DA LESHA ALLEN; and
CHARMAINE CASSIE,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

      Defendant.

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiffs Da Lesha Allen and Charmaine Cassie, by and through their counsel, David A. Lane and Liana Orshan of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Complaint and Jury Demand as follows:

### I. INTRODUCTION

1.      Since its inception, the Denver Fire Department ("DFD") has engaged in the widespread practice of discriminating against African-American and female firefighters.

2.      This practice is not a relic of the past, but rather remains rooted in the fabric of the department.

3.      The continued existence of this practice is no more evident than in DFD's discriminatory and retaliatory treatment of Plaintiffs Da Lesha Allen and Charmaine Cassie, both African-American women.

4.      The severe and pervasive hostile work environment to which DFD subjected Plaintiffs because of their race and sex made it all but impossible for them to succeed; DFD continually treated Plaintiffs differently and worse than their male and/or Caucasian colleagues and hyper-scrutinized their performance.

5.      After Plaintiffs complained to DFD about the discrimination, Denver refused to remedy the situation, despite evidence of numerous blatantly racist and sexist comments to Plaintiffs by their DFD supervisors.

6.      DFD continued to harass Plaintiffs because of their race and sex, and retaliated against Plaintiffs for complaining, even going so far as to terminate Ms. Allen's employment.

7.      As a result of Defendant's illegal conduct, Plaintiffs have suffered significant damages and losses.

8.      Plaintiffs bring this action against the City and County of Denver, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983, and the Colorado Anti-Discrimination Act ("CADA"), as well as unlawful retaliation for complaints of discrimination..

## II.  JURISDICTION AND VENUE

9.      This action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. §§ 1981 and 1983. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

10.     Jurisdiction supporting Plaintiffs' claims for attorney's fees and costs is conferred by 42 U.S.C. §§ 2000e-5(k) and 1988.

11.     This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the District of Colorado.

### III.  ADMINISTRATIVE PREREQUISITES

13.     Plaintiffs timely filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Thus, all administrative prerequisites have been met or soon will be met.[1]

### IV.  PARTIES

14.     Plaintiff Da Lesha Allen is a resident of, and domiciled in, the State of Colorado. At all times relevant to this Complaint, she was employed by Defendant City and County of Denver.

15.     Plaintiff Allen is an African-American woman and thus a member of the classes of persons protected by Title VII, Sections 1981 and 1983, and CADA at all relevant times.

16.     Plaintiff Charmaine Cassie is a resident of, and domiciled in, the State of Colorado. At all times relevant to this Complaint, she was employed by Defendant City and County of Denver.

17.     Plaintiff Cassie is an African-American woman and thus a member of the classes of persons protected by Title VII, Sections 1981 and 1983, and CADA at all relevant times.

---

[1] Upon receipt of Plaintiffs' notice of right to sue on their charges, all administrative prerequisites will have been met.  For the sake of judicial efficiency, and to place Defendant on clear notice of the scope of this action, the factual and legal support for the Title VII and CADA claims are set forth herein.  If necessary, these claims could be stayed until the EEOC issues the administrative notices of right to sue.

18.     Defendant City and County of Denver ("Denver") is a political subdivision of the State of Colorado and is responsible for the supervision, training, official policies, customs, and actual practices of the Denver Fire Department ("DFD"). Denver has continuously been an "employer" within the meaning of Title VII and CADA at all times relevant to this Complaint.

## V.   FACTUAL ALLEGATIONS

### _DFD harassed and discriminated against Ms. Allen because of her race and sex._

19.     Ms. Allen joined the DFD in early 2019, starting at the DFD Academy on January 22, 2019.

20.     Starting before she began the Academy and continuing throughout her attendance, DFD employees repeatedly harassed and discriminated against Ms. Allen because of her race, sex, and/or sex-plus-race.

21.     For example, before Ms. Allen began the Academy, the Denver civil service detective assigned to do her background check told her that DFD was concerned about someone of her background joining the Academy because of the "myth" that she was not "moldable." She asked him if he meant her having a "black attitude," and he responded, "you know what they say." Ms. Allen understood the officer to be referring to the myth of the "angry black woman." He never denied that he was referencing this myth, and in response to her inquires, merely just kept repeating, "well, you know."

22.     Then, beginning almost immediately at the Academy, Ms. Allen's instructors consistently subjected her to hyper-scrutiny, targeting her for write-ups based on conduct for which her classmates were not disciplined.

4

23.     For instance, Ms. Allen's instructors issued her multiple write-ups for "donning" (putting on protective gear such as fire resistant jackets, trousers, and boots) too slowly, but some of her classmates who struggled with the same issue never received write-ups; those classmates were all Caucasian and/or male.

24.     Consistently, Ms. Allen would do an exercise with another recruit in which the other recruit would be less proficient but she would be written up and they would not be.

25.     As an example, a Caucasian male recruit, Mr. McMann, was much slower with donning than Ms. Allen when they were partnered for an exercise, yet the instructor, DFD Lieutenant Hamilton, wrote up Ms. Allen and not him. The reason given by Lieutenant Hamilton was that Mr. McMann "got lucky" because Lieutenant Hamilton conveniently forgot to start his stopwatch when it was Mr. McMann's turn.

26.     Lieutenant Hamilton often spoke to Ms. Allen in an aggressive and hostile manner; she never observed him be aggressive in the same way with male and/or Caucasian recruits.

27.     When Ms. Allen's male and/or Caucasian classmates struggled with a task, the Academy instructors provided guidance and instruction for improvement—as well as respect—none of which were provided to Ms. Allen when she struggled. Instead, her DFD instructors merely wrote her up without affording her the opportunity to improve first.

28.     For example, when Anna Mattson, a Caucasian female recruit struggled, the instructors would provide advice and assistance; when Ms. Allen struggled, she was written up.

29.     When Ms. Allen injured her foot, DFD Lieutenant Fornay told Ms. Allen she did not believe she was injured and had gotten the doctor to lie for her. In comparison, when a

Caucasian male recruit, Mr. Durrell, got injured, the Academy instructors treated him with nothing but respect.

30.     Ms. Allen's instructors set her up to fail evolutions (skills training drills) that her classmates passed by forcing her to complete the evolution in a more difficult manner or by not allowing her the same accommodation they provided everyone else.

31.     DFD also subjected Ms. Allen to sexist and racist comments by her instructors.

32.     For instance, a DFD employee who was either a chief or a captain told Ms. Allen that he knew how "you people like to put all them things in your hair," but she needed to figure out how to put her hair in her helmet—even though she did not have anything in her hair. His comments were a reference to stereotypes about how African-American women styled their hair.

33.     On or around February 5, 2019, one of her instructors, DFD Captain Stuart (now known as Captain Kamstra), told Ms. Allen, in the presence of another instructor, DFD Lieutenant Radke, something to the effect of Captain Stuart did not know why Ms. Allen was in the Academy and maybe Ms. Allen instead "should just focus on being a mom." Captain Stuart added that Ms. Allen only "wanted to be a firefighter to collect a check for her kids." Captain Stuart concluded by saying that Ms. Allen should "just think about it" and "consider finding something else," as being a firefighter is "not for everyone." Captain Stuart's comments carried racist connotations related to the negative stereotypes of African-American women with children.

34.     Ms. Allen never overheard or heard of any of her instructors telling a Caucasian female firefighter or a male firefighter anything similar, and given the obvious sexist

connotations, it is extremely unlikely that any male DFD firefighter has ever been sent the same message.

35.     Lieutenant Burke also treated Ms. Allen pursuant to stereotypes about African Americans; for instance, once when Ms. Allen was finishing up a one-on-one drill with Captain Stuart, Lieutenant Burke told the other recruits that Ms. Allen was probably taking so long because she was "lazy." There is a consistent negative stereotype of black people as lazy.

36.     On another occasion, on or around May 21, 2019, Ms. Allen went to meet with her instructors in a conference room. Because she did not see a chair at the conference table, and so that she was out of the way of the other people who were leaving the room at the same time, she leaned against the wall about three or four feet behind Captain Stuart, who was sitting at the table along with several lieutenants, including Lieutenant Radke. Captain Stuart turned around and yelled at Ms. Allen to "get the fuck out from behind [her]," to never "fucking stand behind [her]," and to "have a fucking seat," while pushing a chair at Ms. Allen and snapping her fingers.

37.     Ms. Allen also experienced other occasions when Captain Stuart yelled at her or otherwise communicated with her in an aggressive and humiliating manner while in front of others. Ms. Allen never witnessed Captain Stuart using this sort of language and tone with any male and/or Caucasian recruits.

38.     Captain Stuart's treatment of Ms. Allen epitomized the humiliation Ms. Allen consistently experienced at the hands of her Academy instructors, causing her to constantly feel like she was worth less than her colleagues—the quintessential feeling experienced by those victim to race or sex discrimination.

39.     Discriminatory attitudes toward Ms. Allen did not stop after she graduated the Academy. Her DFD supervisors continually targeted her for criticism and discipline, held her to higher standards than her peers, and required her to do more tasks than her peers to succeed.

40.     It was clear that Ms. Allen's supervisors from the Academy essentially "warned" her new supervisors in the field about Ms. Allen, negatively coloring their opinions about her before she even began working with them.

41.     For instance, Ms. Allen's husband, who is a DFD firefighter, heard a Captain from DFD Station 1 refer to Ms. Allen (the Captain did not realize he was speaking in front of her husband), stating, "that pain-in-the-ass no one wants is going to [DFD Station] 4." The Captain, who never worked with Ms. Allen or at the same station as her, would not have had any basis for making the comment had Ms. Allen's instructors and supervisors not been speaking about her disparagingly.

42.     In fact, one of Ms. Allen's supervisors at Station 4, DFD Captain Schauer, confirmed that Ms. Allen's Academy instructors had spread word of her: he told Ms. Allen during the first shift she had with him that training staff said she was "weak," he "didn't like [her] attitude," and he "believed in tradition."

43.     Ms. Allen continued to endure discriminatory comments from DFD supervisors as a probationary firefighter.

44.     One of her DFD supervisors told her that she needed to cut her hair or thin it out, but the supervisor did not require any of the Caucasian females to do the same even though Ms. Allen's hair fit under her helmet to the same degree as her Caucasian female colleagues' hair.

45.     Ms. Allen's DFD supervisors continued to hold her to higher standards and asked her to complete additional and harder tasks than her Caucasian and/or male peers.

### *DFD terminated Ms. Allen's employment after she complained about discrimination.*

46.     On September 18, 2019, Ms. Allen's attorneys sent a letter on her behalf to Denver. The letter included numerous examples of discrimination to which she had been subjected by DFD.

47.     On October 4, 2019, a DFD internal affairs ("IA") investigator interviewed Ms. Allen regarding her complaints of discrimination. During the interview, Ms. Allen reiterated the examples of discrimination her attorneys had previously shared with DFD and also shared other examples of discriminatory treatment she had experienced by her DFD supervisors both when she was participating in the Academy and as a probationary firefighter.

48.     Ms. Allen's complaints were allegedly investigated and Denver determined they were unfounded.

49.     Apparently, Denver does not have a problem with blatantly racist, sexist, racially-stereotyping comments such as those made to Ms. Allen. Denver's ratification of and explicit support for these comments demonstrates the large extent to which racism and sexism is tolerated and fostered by DFD.

50.     On October 22, 2019, DFD informed Ms. Allen it was placing her on Administrative Leave, effective immediately.

51.     Denver terminated Ms. Allen's employment with DFD on October 24, 2019.

52.     Denver fired Ms. Allen because of her race and sex and in retaliation for her complaints of discrimination and retention of legal representation.

***DFD harassed and discriminated against Ms. Cassie, and continues to discriminate and retaliate against her.***

53.     Ms. Cassie has been a dedicated firefighter for DFD since she started with the DFD Academy as a recruit in July 2018.

54.     Immediately upon joining DFD, Ms. Cassie was targeted for negative treatment by DFD because of her sex and/or race and was subjected to hyper-scrutiny by her Academy instructors. This included discipline for the same conduct for which male and/or Caucasian recruits were not disciplined. This hyper-scrutiny has continued throughout her employment.

55.     For example, when male and/or Caucasian classmates were injured, Academy staff supported and encouraged them.

56.     In July 2018, when Earl Storm, a Caucasian male classmate, had an injured shoulder, the Academy staff vocally rooted him on, including Lieutenant Burke telling Mr. Storm during a training exercise to "keep up the good work" and not to quit "even if [he was] last."

57.     Conversely, when Ms. Cassie injured her shoulder during an Academy drill in October 2018, her instructors, including Lieutenant Burke, offered very little, if any, in the way of support. Instead, they yelled at her that she was "not prepared," was "not ready," did not "want to be there," and was "not trying."

58.     Lieutenant Burke did not yell at or single out any of the other recruits in the way.

59.     Then, in February 2019, despite Ms. Cassie having orders from her doctor to avoid certain physical exercises so her shoulder injury would not worsen, Lieutenant Burke issued Ms. Cassie a write-up for her inability to pass a 20-pound ball around while running.

60.     Lieutenant Burke told Ms. Cassie she was an "extra load" on Lieutenant Burke's class.

61.     Adding insult to injury, other instructors of Ms. Cassie at DFD Academy, including Chief Fulton, Captain Moeder, and Lieutenant Radke, prohibited her from completing certain drills for which her doctor had given her no restrictions, unnecessarily putting her further behind her Academy class.

62.      After Ms. Cassie's shoulder injury, her DFD Academy supervisors decided, before her doctor had made a determination whether and when she could return to full duty, that she would not graduate with her Academy class and would need to repeat the Academy—even though she had completed fourteen weeks of eighteen weeks of the Academy before her injury. Lieutenant Radke told Ms. Cassie that even if the doctor cleared her to return to duty, she was not going to be able to continue with her class.

63.     Conversely, two other Caucasian and/or male recruits in the same situation were told that DFD would wait to hear from their doctors before determining whether or not they would continue with their Academy class.

64.     Another recruit, Kristine Suddath, a Latina woman, who also missed some Academy time due to injury, was similarly not allowed to graduate with the class. Like Ms. Cassie, Ms. Suddath instead was required by DFD to return for the January 2019 Academy class, and she ultimately resigned because she felt she was treated unfairly.

65.     On the other hand, several Caucasian recruits who attended 2018 and 2019 Academies but also missed Academy time due to injuries were allowed to graduate with their

classes. In fact, one Caucasian recruit whose injury required them to miss four (4) consecutive weeks of the Academy was still allowed to graduate.

66.     In the September 2019 Academy, two male Caucasian recruits who missed significant time due to injury were allowed to graduate without repeating the Academy—including Michael Kencht, who missed the same, if not more, Academy time than Ms. Cassie did in her initial Academy.

67.     When Ms. Cassie was released to begin the January 2019 class, her doctor believed she would attend an abbreviated Academy, as that is what her instructors had told her. Her instructors later told her, however, that she would need to repeat the full Academy because they were not confident in her ability to perform the job. Once she was re-injured in early 2019, and was informed by DFD that she would need to complete the full Academy again, she returned to light duty because her doctor did not believe she would be able to complete consecutive eighteen (18) weeks—versus the eight (8) weeks  she would have completed in the abbreviated Academy—without risking a more serious injury that would require injury and possibly cause permanent injury.

68.     At the end of May 2019, Ms. Cassie told her supervisors she was released from light duty to full duty. Yet again, however, her supervisors inexplicably decided to hold her back; she was informed that DFD Assistant Chief ("AC") Carly Helwick decided that rather than allowing Ms. Cassie to join the lateral recruits in the June 2019 Academy, she needed to join the new recruits in the September 2019 Academy and repeat a full Academy rather than the shorter Academy for the lateral recruits.

69.     The same day she was informed she needed to repeat the full Academy, Ms. Cassie met with AC Helwick and Chief Fulton. Apparently understanding that she was unhappy with their decision, AC Helwick said, "You know it's not that people mean to, but when you have one thing that's not like the other, it's just certainly going to be singled out. You know, looked at differently. Plus, you're female so you will get singled out." Chief Fulton then added, "It's just human nature for people to be like that. I don't think we mean anything by it but it happens. People are always going to single others out, especially when they are different." Chief Fulton also said that Ms. Cassie "did not look like us." Ms. Cassie understood AC Helwick and Chief Fulton's comments to be directed at the fact Ms. Cassie is African American and a woman.

70.     Ms. Cassie's Academy instructors' disparate treatment of her was not limited to their decision that she needed to repeat the Academy. For instance, during an October 2018 drill involving lifting a ladder, Ms. Cassie was paired with a Caucasian recruit who struggled maintaining the ladder stable while Ms. Cassie lifted it. The instructor, Lieutenant Hamilton, yelled at Ms. Cassie for struggling to lift the ladder, but encouraged the other recruit to keep doing what she was doing, even though the other recruit's struggles made it almost impossible for Ms. Cassie to do her part. Lieutenant Hamilton's manner and tone toward the other recruit, Natasha Torkilson, was markedly different and more respectful than his manner and tone toward Ms. Cassie.

71.     Far from being respectful, Ms. Cassie's Academy instructors, including AC Helwick and Lieutenant Burke, constantly berated her with questions such as, "why are you even here [at DFD]?"

72.     Despite being required to complete the Academy again, and pass drills and evaluations that she had already successfully completed, Ms. Cassie graduated from the Academy and began work as a probationary firefighter.

73.     After she graduated from the Academy, DFD continued to subject Ms. Cassie to hyper-scrutiny.

74.     For example, DFD imposed written discipline in February 2020 against Ms. Cassie based on an unidentified co-worker's completely unsubstantiated story that she engaged in a public display of affection with a male colleague while on duty—an act in which Ms. Cassie, who is married, would never engage.

75.     DFD also subjected Ms. Cassie to racist and sexist comments.

76.     As an example, a DFD captain told Ms. Cassie that she was going to have problems getting through the Academy just because of DFD culture, so "she should keep her head down and act like a slave" in order to do so.

77.     In February 2019, when Ms. Cassie was leaving the office after she had been called in to discuss her performance, she was instructed to send in another female recruit who was waiting outside. As she was leaving, AC Helwick commented to the other officer present, "Why in the hell am I having to speak to all the females?" AC Helwick then turned to Ms. Cassie and asked her, "Why, Cassie?"

78.     Similarly, when AC Helwick saw Ms. Cassie with her hair straightened rather than braided in the way many African-American women style their hair, she told Ms. Cassie that Ms. Cassie actually "look[ed] like a human" without the "Academy braids," and "hav[ing] those things in [her] hair."

79.     In June 2019, while Ms. Cassie was helping Lieutenant Burke carry a weight rack, Ms. Cassie carried it behind her and briefly used her butt as a shelf on which to rest the rack. Lieutenant Burke then said, "that thing's gotta be good for something." This was not the first time Lieutenant Burke commented on Ms. Cassie having a "big butt." The sexist and racist connotations of the remark were extremely painful to Ms. Cassie.

80.     Ms. Cassie made an internal complaint of discrimination (via her lawyers) to DFD in September 2019.

81.     The Internal Affairs ("IA") investigation DFD initiated in response to the complaint was not conducted in good faith. Denver has never shared the results of the IA investigation with Ms. Cassie or her attorneys, but Denver apparently determined that Ms. Cassie's complaints were unsubstantiated.

82.     Denver clearly does not have a problem with blatantly racist, sexist, racial-stereotyping comments such as those made to Ms. Cassie. Denver's ratification of and support for these comments shows the large extent to which racism and sexism is tolerated by DFD.

### ***DFD has a long history of sex and racial discrimination, which continues to persist today.***

83.     Plaintiffs' experiences are representative of how DFD treats its female and minority firefighters and trainees, especially women of color. For decades, DFD has made its ranks unwelcome to women and minorities, a practice brought to its attention repeatedly and yet unchanged.

84.     DFD has a long history of discrimination against women.  Remarkably, Denver did not even hire its first female firefighter until 1985. According to U.S. Census Bureau Statistics, in 2000, female firefighters comprised 4.02% of the workforce at the DFD, even

though the available work force percentage for the Denver metropolitan area was 50.58% women. From 2002 to 2006, only 1 percent of candidates were African-American. Based on this very data, in 2007, the City's Diversity in Safety Task Force recommended that the DFD implement an affirmative action program which used the race and gender of an applicant as a plus factor when choosing among similarly-qualified applicants.

85.     Five years later, however, DFD's mostly white, male workforce was still so lacking in diversity that it continued to garner both internal and public outcry. The 2012 demographic breakdown of the DFD revealed its continuing hostility toward women and minorities, especially African Americans: in addition to the Caucasian male chief of the department, out of six division chiefs, two were Hispanic males, one was female, and three were Caucasian males. Below that group were 32 assistant chiefs, all of whom were male, and all but five were Caucasian—out of those five, four were Latino and only one was African American.

86.     In a 2013 case, Charles McMillian (who retired in 2010 as the Division Chief of Administration) testified that African Americans and women were made to feel unwelcome by DFD.

87.     In 2015, Camilla VonBurkhardt, then a DFD recruit, faced pervasive sexual harassment and gender discrimination by DFD. Ultimately, Ms. VonBurkhardt was forced to resign because the sexual harassment and discrimination she experienced was so severe. At that time, 30 years after DFD had hired its first female firefighter, women still comprised just over 4% of DFD's workforce. This was eight years after the recommendation that DFD take affirmative steps to increase the representation of women at DFD. After she filed a charge with the EEOC, DFD agreed to pay Ms. VonBurkhardt $75,000 to settle her claim.

88.     In January 2019, a federal jury awarded former DFD Captain Colley Fisher $146,000 in compensatory damages on a claim of retaliation; the jury found that DFD terminated Ms. Fisher because of her complaints about gender discrimination, sexual harassment, and the "boys club" atmosphere within the DFD; evidence at trial showed that sexism was systematic within the Department. Ms. Fisher ultimately obtained $1.2 million in damages, which included attorney's fees and other costs in addition to economic damages. Denver later settled the case for almost $1 million.

89.     Today, nothing has changed with DFD's treatment of women and minorities. Statistics showing recent demographic breakdowns establish that the representation of women and African Americans in the DFD has not increased in the last decades. From 2016 through 2019, on average, approximately only 5% of DFD employees were African-American. Only between 4.6% and 5.4% of DFD employees were women. While in each year DFD had a total of approximately 1,000 employees, only 2 or 3 employees each year were black women, between 0.2% and 0.3% of all DFD firefighters.

90.     Recent DFD Academies fared no better. For instance, in the four Academies between April 2016 and August 2017, on average, 92% of the recruits were men, with only 8% women.

91.     In February 2020, Eric Tade, who was then the Chief of the DFD, resigned from his position after a firefighters' ball that featured sexual humor and innuendo. It was the second year in a row that jokes about sex toys were featured at the event.

92.     The inappropriate behavior at one of the parties also disparaged Latinx firefighters. Per the Colorado Latino Forum, Chief Tade's resignation was the culmination of DFD's long history of discrimination.

93.     However, Chief Tade was allowed to remain an Assistant Chief, showing, as one city council member stated, that "the culture [at DFD] hasn't changed" at all.

94.     It is clear that despite repeated issues, complaints, and legal filings, DFD has made little, if any, effort to rectify its problems with discrimination and harassment against women and/or African Americans.

### *DFD's discrimination against Plaintiffs was based on the intersection of their race and sex.*

95.     DFD discriminated against Plaintiffs because they are both simultaneously African American and female.

96.     The term "intersectionality" was coined to provide a framework to articulate the experience of individuals who are members of more than one protected class. Intersectional discrimination occurs when the defendant "treat[s] the plaintiff disparately because she belong[s] simultaneously to two or more protected classes*." Osman v. Bimbo Bakeries USA, Inc.*, No. 14-cv-03281-MEH-CBS, 2016 U.S. Dist. LEXIS 5313, at *28 (D. Colo. Jan. 15, 2016).

97.     As the Tenth Circuit recently stated, "[r]ecognizing claims for 'intersectional' discrimination best effectuates congressional intent to prohibit discrimination based on stereotypes." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1049 (10th Cir. 2020). "If both black men and white women are considered to be within the same protected class as black females…, no remedy will exist for discrimination which is directed only toward black females." *Id.* at 1049 (citation omitted).

98.     Because DFD discriminated against Plaintiffs based on their sex, race, and/or the combination of their sex and race, Plaintiffs have claims against Denver under Title VII, 42 U.S.C. § 1981, the Equal Protection Clause via 42 U.S.C. § 1983, and CADA, as well as claims for retaliation.

## VI.  STATEMENT OF CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment's Equal Protection Clause

99.     Plaintiffs hereby incorporate all paragraphs of this Compliant as though fully set forth herein.

100.    Plaintiffs are African-American women.

101.    Defendant was acting under color of state law in its actions and inactions at all relevant times.

102.    Defendant terminated Ms. Allen's employment, unjustifiably delayed Ms. Cassie's graduation from DFD Academy, and took other adverse employment actions against Plaintiffs because of their race, sex, and/or sex-plus-race and such actions were not taken against similarly-situated Caucasian and/or male DFD employees.

103.    Additionally or alternatively, Defendant created abusive working conditions for Plaintiffs due to harassment based on their race, sex, and/or sex-plus-race where such conditions were not present for similarly-situated Caucasian and/or male DFD employees.

104.    The harassment based on sex and/or race to which Defendant subjected Plaintiffs was pervasive and/or severe enough to alter the terms, conditions, or privileges of their employment and create a hostile or abusive work environment.

105.     Defendant had no compelling governmental interest in discriminating against Plaintiffs on the basis of their race, sex, and/or sex-plus-race.

106.     The acts and omissions of Defendant were engaged in pursuant to the policies, customs, and practices of the DFD, which treats African-American, female employees less favorably than Caucasian and/or male DFD employees.

107.     At all relevant times, DFD's discrimination against African Americans and women was a persistent or widespread practice that constitutes the standard operating procedure of Defendant, and sex and race discrimination and harassment was so widespread within the DFD so as to constitute a custom or usage with the force of law.

108.     Defendant knew or should have known of DFD's widespread and pervasive discrimination against African Americans and women; in light of this knowledge, Defendant could have and should have changed its policies and/or pursued reasonable methods for training, supervising, and disciplining DFD staff regarding race and sex discrimination, but made a deliberate choice not to do so.

109.     Defendant's failure to sustain any of Plaintiffs' complaints of discrimination during the internal affairs' "investigation" thereof demonstrates that DFD's discriminatory and harassing conduct against Plaintiffs was carried out pursuant to the customs, policies, practices, and regiment of training of Denver, and that such conduct is customary within DFD.

110.     Because Denver created and tolerated a custom discrimination and harassment based on race and sex, and failed, despite the obvious need to do so, to adequately train, discipline, and supervise staff in this area, individuals including Plaintiffs have repeatedly been subjected to violations of their constitutional and statutory rights.

111.   As a direct and proximate result of Defendant's discriminatory treatment, Plaintiffs have suffered significant injuries, damages, and losses.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Race Discrimination in Violation of 42 U.S.C. § 1981

112.   Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

113.   Plaintiffs are African American, and thus members of a protected class under 42 U.S.C § 1981.

114.   Plaintiffs were, and have at all relevant times been, qualified to perform their job responsibilities as DFD employees, and performed their jobs satisfactorily at all relevant times.

115.   Plaintiffs' employment relationship with DFD encompassed sufficient contractual rights to support a section 1981 claims for race discrimination.

116.   Defendant denied Plaintiffs the protections against race discrimination provided by 42 U.S.C § 1981 in the terms and conditions of their employment by denying them the same benefits, privileges, and terms and conditions of their contractual employment relationship that their white counterparts enjoyed by, including but not limited to, terminating Ms. Allen's employment, unjustifiably delaying Ms. Cassie's graduation from DFD Academy, and taking other adverse employment actions against Plaintiffs because of their race where such actions were not taken against similarly-situated Caucasian DFD employees.

117.   Additionally or alternatively, Defendant created abusive working conditions for Plaintiffs due to harassment based on their race where such conditions were not present for similarly-situated Caucasian DFD employees.

118.     The harassment based on race to which Defendant subjected Plaintiffs was pervasive and/or severe enough to alter the terms, conditions, or privileges of their employment and create a hostile or abusive work environment.

119.     Plaintiffs' race was a but-for cause of Defendant's adverse actions and harassment against Plaintiffs.

120.     Defendant engaged in race discrimination against Plaintiffs pursuant to its custom, policy, or practice to treat more favorably Caucasian DFD employees versus African-American DFD employees.

121.     Defendant was on notice of DFD's defective customs, policies, and practices well before its discriminatory treatment and harassment against Plaintiffs, and it deliberately failed to remedy the serious deficiencies of which it was aware.

122.     As a direct and proximate result of Defendant's discriminatory treatment, Plaintiffs have suffered significant injuries, damages, and losses.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Retaliation in Violation of 42 U.S.C § 1981**

123.     Plaintiffs hereby incorporate all allegations contained in this Complaint as though fully set forth herein.

124.     Plaintiffs believed in good faith that Defendant discriminated against them on the basis of their race.

125.     Plaintiffs engaged in activities and speech in opposition to discrimination by objecting to and reporting discrimination and retaliation to the DFD Fire Chief, the Denver

Department of Public Safety Executive Director, the DFD internal affairs division, and other Denver employees, as well as the EEOC.

126.     Because of Plaintiffs' objections to discrimination, Defendant subjected them to actions which a reasonable employee would have found materially adverse, including but not limited to requiring them to work in a hostile work environment which materially and adversely affected the terms and conditions of their employment, subjecting them to adverse treatment and harassment to which their similarly situated counterparts were not subject, terminating Ms. Allen's employment, and unjustifiably delaying Ms. Cassie's graduation from the Academy, among other materially adverse actions.

127.     Defendant engaged in unlawful retaliation against Plaintiffs pursuant to its custom, policy, or practice to take materially adverse actions against employees who voiced opposition to discrimination or harassment based on race.

128.     Defendant's retaliation against Plaintiffs arose out of, was caused by, and was like and related to the race discrimination Plaintiffs opposed.

129.     Defendant's retaliation against Plaintiffs was the direct and proximate cause of Plaintiffs' significant injuries, damages, and losses.

### FOURTH CLAIM FOR RELIEF
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e,** *et seq.*
**Discrimination Based on Sex, Race, and/or Sex-Plus-Race**

130.     Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

131.     As African-American women, Plaintiffs are members of protected classes under Title VII.

132.    At all relevant times, Plaintiffs performed the functions of their job satisfactorily and were qualified for their positions.

133.    Defendant subjected Plaintiffs to adverse treatment in the terms and conditions of their employment because of their race, sex, and/or sex-plus-race.

134.    Defendant treated Plaintiffs less favorably than their similarly situated Caucasian and/or male counterparts by terminating Ms. Allen's employment, unjustifiably delaying Ms. Cassie's graduation from DFD Academy, and taking other adverse employment actions against Plaintiffs because of their race, sex, and/or sex-plus-race where such actions were not taken against similarly situated Caucasian and/or male DFD employees.

135.    Additionally or alternatively, Defendant created abusive working conditions for Plaintiffs due to harassment based on their race, sex, and/or sex-plus-race where such conditions were not present for similarly situated Caucasian and/or male DFD employees.

136.    The harassment based on sex and/or race to which Defendant subjected Plaintiffs was pervasive and/or severe enough to alter the terms, conditions, or privileges of their employment and create a hostile or abusive work environment.

137.    Defendant intended to discriminate against Plaintiffs because of their race, sex, and/or sex-plus-race in taking adverse employment actions against them.

138.    Defendant permitted, tolerated, and ratified remarks made by Plaintiffs' colleagues and supervisors that reflected a discriminatory animus.

139.    Plaintiffs' race, sex, and/or sex-plus-race were motivating factors in Defendant's taking adverse employment actions against Plaintiffs, and Defendant took such actions because of Plaintiffs' race, sex, and/or sex-plus-race.

140.     Defendant's asserted reasons for taking adverse employment actions against Plaintiffs were mere pretext for illegal discrimination and did not actually motivate such actions.

141.     Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly or by and through its agents, discriminated against Plaintiffs on the basis of their race, sex, and/or sex-plus-race, and directly and proximately caused their injuries, damages, and losses.

## FIFTH CLAIM FOR RELIEF
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.***
**Retaliation**

142.     Plaintiffs hereby incorporate all of the paragraphs of this Complaint as though fully set forth herein.

143.     At all relevant times, Plaintiffs were qualified to perform their job responsibilities and satisfactorily performed the duties of their positions.

144.     Plaintiffs believed in good faith that Defendant discriminated against them on the basis of their race, sex, and/or sex-plus-race.

145.     Plaintiffs opposed activities prohibited by Title VII by objecting to and reporting discrimination and retaliation against them and other DFD employees to the DFD Fire Chief, the Denver Department of Public Safety Executive Director, the DFD internal affairs division, other Denver employees, and EEOC, and participating in the internal affairs' investigation regarding complaints of discrimination.

146.     As a direct result of Plaintiffs' opposition to activities prohibited by Title VII, Defendant subjected them to actions which a reasonable employee would have found materially adverse, including but not limited to requiring them to work in a hostile work environment which

materially and adversely affected the terms and conditions of their employment, subjecting them to heightened scrutiny, subjecting them to adverse treatment and harassment to which their similarly situated counterparts were not subject, terminating Ms. Allen's employment, and unjustifiably delaying Ms. Cassie's graduation from the Academy, among other materially adverse actions.

147.    Defendant's retaliation against Plaintiffs arose out of, was caused by, and was like and related to the discrimination Plaintiffs opposed.

148.    Defendant treated Plaintiffs more adversely than their similarly situated counterparts who did not voice their opposition to Defendant's discrimination.

149.    Defendant's asserted reasons for taking adverse actions against Plaintiffs were pretext for illegal retaliation and did not actually motivate Defendant's actions.

150.    Defendant is liable for the acts and omissions of its agents and employees.

151.    Defendant, either directly or by and through its agents unlawfully retaliated against Plaintiffs, which directly and proximately caused them severe injuries, damages, and losses.

**SIXTH CLAIM FOR RELIEF**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-301 *et seq*.**
**Discrimination Based on Race, Sex, and/or Sex-Plus-Race**

152.    Plaintiff hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

153.    Plaintiffs are African-American women and is thus a member of multiple protected classes under the Colorado Anti-Discrimination Act ("CADA").

154.     At all relevant times, Plaintiffs performed the functions of their job satisfactorily and were qualified for their positions.

155.     Defendant subjected Plaintiffs to adverse treatment in the terms, conditions, or privileges of their employment because of their race, sex, and/or sex-plus-race.

156.     Defendant treated Plaintiffs less favorably than their similarly situated Caucasian and/or male counterparts by terminating Ms. Allen's employment, unjustifiably delaying Ms. Cassie's graduation from DFD Academy, and taking other adverse employment actions against Plaintiffs because of their race, sex, and/or sex-plus-race where such actions were not taken against similarly situated Caucasian and/or male DFD employees.

157.     Additionally or alternatively, Defendant created abusive working conditions for Plaintiffs due to harassment based on their race, sex, and/or sex-plus-race where such conditions were not present for similarly situated Caucasian and/or male DFD employees.

158.     The harassment based on sex and/or race to which Defendant subjected Plaintiffs was pervasive and/or severe enough to alter the terms, conditions, or privileges of their employment and create a hostile or abusive work environment.

159.     Plaintiffs filed a complaint of discrimination and harassment based on sex, race, and/or sex-plus-race with the appropriate authority at DFD, and DFD failed to initiate a reasonable investigation of the complaint and/or to take prompt remedial action in response to the complaint.

160.     Defendant intended to discriminate against Plaintiffs because of their race, sex, and/or sex-plus-race in taking adverse employment actions against them.

161.     Defendant permitted, tolerated, and ratified remarks made by Plaintiffs' colleagues and supervisors that reflected a discriminatory animus.

162.     Plaintiffs' race, sex, and/or sex-plus-race were motivating factors in Defendant's taking adverse employment actions against Plaintiffs, and Defendant took such actions because of Plaintiffs' race, sex, and/or sex-plus-race.

163.     Defendant's asserted reasons for taking adverse employment actions against Plaintiffs were mere pretext for illegal discrimination and did not actually motivate such actions.

164.     Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly or by and through its agents, discriminated against Plaintiffs on the basis of their race, sex, and/or sex-plus-race, and directly and proximately caused their injuries, damages, and losses.

165.     As a consequence of Defendant's illegal conduct, Plaintiffs have sustained injuries, damages, and losses.

**SEVENTH CLAIM FOR RELIEF**
**Colorado Anti-Discrimination Act, C.R.S. § 24-42-301,** *et seq*.
**Retaliation**

166.     Plaintiffs hereby incorporate all allegations contained in this Complaint as though fully set forth herein.

167.     At all relevant times, Plaintiffs performed the functions of their job satisfactorily and were qualified for their positions.

168.     Defendant discriminated against Plaintiffs on the basis of their race, sex, and/or race-plus-sex, as described herein.

169.     Plaintiffs opposed the discrimination, as described herein.

170.     As a direct result of Plaintiffs' opposition to activities prohibited by CADA, Defendant subjected them to actions which a reasonable employee would have found materially adverse.

171.     Defendant treated Plaintiffs more adversely than their similarly situated counterparts who did not voice their opposition to Defendant's discrimination.

172.     Defendant's retaliation against Plaintiffs arose out of, was caused by, and was like and related to the discrimination Plaintiffs opposed.

173.     Defendant's retaliation included, but was not limited to, subjecting Plaintiffs to heightened scrutiny, requiring them to work in a hostile work environment which materially and adversely affected the terms and conditions of their employment, subjecting them to adverse treatment and harassment to which their similarly situated counterparts were not subject, terminating Ms. Allen's employment, and unjustifiably delaying Ms. Cassie's graduation from the Academy, among other materially adverse actions.

174.     Defendant's asserted reasons for taking adverse employment actions against Plaintiffs were mere pretext for illegal retaliation and did not actually motivate such actions.

175.     Defendant is liable for the acts and omissions of its agents and employees.

176.     Defendant's conduct was the direct and proximate cause of Plaintiffs' injuries, damages, and losses.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

    a.   Declaratory relief and injunctive relief, as appropriate;

    b.   Actual economic damages as established at trial;

    c.   Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

    d.   Pre-judgment and post-judgment interest at the highest lawful rate;

    e.   Attorney's fees and costs; and

    f.   Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 30th day of September 2020.

KILLMER, LANE & NEWMAN, LLP

_s/ David A. Lane_
David A. Lane
Liana Orshan
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000

*Attorneys for Plaintiffs*