IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-02952-MEH

DA LESHA ALLEN and
CHARMAINE CASSIE,

     Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

     Defendant has filed a Motion for Summary Judgment. ECF 45. It is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication. For the following reasons and based on the submitted record, the Motion is granted.

## <u>BACKGROUND</u>

I.    **Claims for Relief**

     Both Da Lesha Allen and Charmaine Cassie sued Defendant for alleged unlawful employment practices. Although they are litigating this civil action as Co-Plaintiffs there is a substantial difference in their respective grievances. They were on different academy tracks, and their employment ended at different times (with Charmaine Cassie being terminated after commencing this lawsuit). Charmaine Cassie includes a disability discrimination claim which Da Lesha Allen does not. The procedural postures of their respective cases also differ. Charmaine Cassie has been administratively exhausting claims with the EEOC during the pendency of this

lawsuit. She intends to ask the Court for leave to add new claims and to reopen discovery. Consequently, summary judgment is not presently appropriate for the claims brought by Plaintiff Cassie.

The Court limits this ruling to Ms. Allen's case. For ease of reference, the following discussion's use of the singular "Plaintiff" means Da Lesha Allen.

Defendant employed Plaintiff as a probationary firefighter in the Denver Fire Department ("DFD"). By a written Departmental Order dated October 24, 2019, Mary J. Dulacki as Deputy Director of Defendant's Department of Public Safety terminated Plaintiff's employment. ECF 45-15. Plaintiff alleges that Defendant fired her from her job as a probationary firefighter out of discriminatory animus. She makes at least some reference to a hostile work environment. Plaintiff furthers that Defendant fired her in retaliation for complaining about discrimination.

## II.    Scope of the Record

Although Plaintiff was fired as a DFD probationary firefighter, the Court includes for consideration evidence from her preceding time at DFD's firefighting academy ("Academy") through graduation. To begin, contrary to the argument Plaintiff makes in her Response (ECF 55 at ¶ 8), Defendant did *not* stipulate to the irrelevance of her Academy performance. ECF 64-3 at 13. Second, the record establishes that prior Academy performance is a generally relevant aspect of probationary performance. Plaintiff concedes that "probationary firefighters are still evaluated on training tasks" that began in the Academy. ECF 55 at 27, ¶ 56. Her termination letter discussed her Academy performance at length. ECF 45-15. Third, Plaintiff herself relies on evidence concerning the Academy and her performance there to support her theories of unlawful termination. For example, she alleges that "Academy command staff . . . required [her DFD] probationary instructors to [report back to them after] every shift she worked as a probationary

firefighter." ECF 55 at 22, ¶ 38. Plaintiff assumes that those communications also "could [have

been] forwarded up the [DFD] chain of command, to the Department Chief." *Id*. She alleges that

poor performance reports from her time in the Academy "were a significant cause of the different

treatment [she] received after she graduated the Academy and when she first was assigned to a

firehouse as a probationary firefighter." ECF 55 at 2-3, ¶ 3. Plaintiff adds that she experienced

discriminatory treatment during her time at the Academy. ECF 45-3 at 14.

Both Plaintiff's own arguments and the very nature of how Defendant evaluates

probationary firefighter performance strongly suggest that prior Academy performance remains a

relevant factor. In other words, the mere fact that a recruit graduated from the Academy does not

mean her pre-graduation Academy performance lends no insight to the termination decision. The

Court does not find appropriate, as Plaintiff requests in her Response (ECF 55 at n.2), either (1) "a

status conference to discuss options that would allow Plaintiff to attempt to mitigate the prejudice"

from not holding Defendant to its purported stipulation, or (2) to supplement the record (with

unspecified information) even though she regards this alternative option as inadequate to "fully

alleviate the prejudice." The Court deems "admitted" all of Defendant's Statements of Undisputed

Material Fact to which Plaintiff raises the purported stipulation as her only objection.

Many of Plaintiff's arguments concern conduct by and actions concerning her classmates

and colleagues. Because they are third parties to this lawsuit, this Court refers to them by their

initials rather than their full names (except for those who submitted Declarations into the record).

The record contains at ECF 55-41 a list of the classmates' full names and demographic

information.

Plaintiff describes herself as "an African-American woman" in her Complaint (ECF 1 at ¶ 15) and as "Black and female" in her Response (ECF 55). The Court follows her preferred terminology for purposes of this discussion.

## III. Statement of Undisputed Material Facts ("SUMF")

1.      A person who seeks employment as a DFD firefighter first must pass a written test[1] and a rigorous physical examination. The person then enters the Academy as a recruit. Plaintiff participated in the Academy's standard eighteen-week training program. A recruit must pass the Fire Fighter I test (both written and practical) and obtain emergency medical technician ("EMT") and HAZMAT Operations certifications. After the Academy, a recruit spends nine months as a probationary firefighter during which time she works at different fire stations. To complete probation, a recruit must pass the Fire Fighter II examination (written and practical) and a DFD-specific examination. ECF 45-1.

2.      Recruits receive and sign a manual which governs the Academy. ECF 45-1; ECF 45-2; ECF 45-5.

3.      The manual explains what a Deficiency Report ("DR") is. A DR is a tool used to correct below-standard performance of skills and tasks or to document a safety violation. A DR has no direct disciplinary or personnel purpose. ECF 45-2 at 2, 8. Plaintiff herself describes a DR as a means "to let you know what you're doing wrong and see if you have a plan to correct it." ECF 45-3 at 3.

4.      However, DRs do play an indirect role in disciplinary matters. The accumulation of a certain number of DRs can trigger disciplinary action. Seven DRs result in a written notice for

---

[1] At her deposition, Plaintiff estimated that she first had taken the entrance test ten years earlier. During the five to six years preceding her entry into the Academy, she had taken preparatory classes at Classique. ECF 55-3 at 3.

failure to meet standards and the creation of an action plan. After thirteen DRs, the recruit receives a second written notice for the failure to meet standards and the scheduling of a coaching and counseling session. A final formal written notice is issued upon the eighteenth DR. Termination becomes a possibility upon the thirteenth DR; strongly considered at the fourteenth to seventeenth DR level; and recommended upon the eighteenth DR. ECF 45-2 at 3-4, 9.

5.      Recruits sign and initial each DR to verify their understanding of the matter being taught. A recruit also may use the DR to request clarification; to express comfort with working in drill teams; and to ask any questions. ECF 45 -1; ECF 45-5; ECF 45-6.

6.      A DFD firefighter must be able to don within one minute and forty-five seconds her personal protective equipment ("PPE") or "bunker gear" (including boots, pants, jacket, gloves, hood, and helmet); a self-contained breathing apparatus ("SCBA"); and "go on air." No skin should be showing after donning the gear. ECF 45-5.

7.      Plaintiff entered the Academy on January 22, 2019. ECF 45-2 at 11.

8.      Plaintiff received a DR on February 5, 2019 for chainsaw use. Plaintiff wrote a corrective action plan to improve those skills. She stated that she would practice both putting the saw together and starting it more quickly and efficiently. ECF 45-6 at 1. She concedes the propriety of that DR. ECF 45-3; ECF 45-6 at 1-2. Plaintiff identifies three other classmates who also received a DR for failing this training—E.D., E.G., and Aaron.M.—all of whom are white males. ECF 45-5 at ¶ 6. Plaintiff was unaware that those three men also received DRs on the same day for failing the same chainsaw test. ECF 45-3 at 8.

9.     Plaintiff received a DR on February 6, 2019 for not keeping pace with her class during a fitness run.[2] ECF 45-6 at 3. Plaintiff was unable "to maintain a similar level of work as [her] classmates," which placed "additional strain on the remainder of the class" who had to accommodate her to keep the group together.  The expectation was performance at a level which allows the workload to be "shared evenly across the team." *Id*. In response, Plaintiff said she would exercise more to increase her cardio endurance. *Id*. Plaintiff concedes the correctness of the DR, and she denies that it was issued because of her race or gender. ECF 45-3 at 6.

10.     Plaintiff agrees with the basis of the DR issued on February 7, 2019 for not bringing a required piece of her SCBA equipment (the mask) to a training drill. ECF 45-3 at 7. Plaintiff did not know where her mask was, and it was noted that "[t]his [was] not the first time Recruit Allen has left her mask somewhere." ECF 45-6 at 4. The need to "hav[e] all PPE at every station every day" was stressed. *Id*. Plaintiff expressed awareness of the "need to pay attention to detail" and to "double check[] all my equipment before I leave each station." *Id*. Her classmate S.D. (a white male) also received a DR for forgetting to bring all PPE to a training drill. ECF 45-5 at ¶ 7.

11.     Later that same day, Plaintiff received another DR, this time for not donning her SCBA equipment (along with the mask) and going "on air" in forty-five seconds. ECF 45-6 at 5. It took Plaintiff almost three minutes to perform this task. It was a skill that had "been practiced numerous times" beforehand, and the rest of the class "regularly demonstrates proficiency." Plaintiff explained that she was having trouble moving her hood forward and would try different techniques to complete the donning process efficiently. This skill was important for safety and operational effectiveness, and Plaintiff was encouraged to practice during her spare time. *Id*.

---

[2] Plaintiff's husband, Karlos Allen, described her as a life-long athlete who was in shape and did not find the physical demands of a firefighter "really that hard." ECF 55-7 at 7. Plaintiff served as a coach for a non-profit track club before she entered the Academy. ECF 45-3 at 20.

Plaintiff's classmate Z.D. (Hispanic male) received a similar DR on February 5, 2019. ECF 45-6 at ¶ 8.

12.     On February 8, 2019, Plaintiff received a DR for starting a drill session without a full tank of oxygen. This was another matter that raised concerns about Plaintiff's ability to use PPE in a safe and operationally effective way. ECF 45-6. The instructor planned a personal, "hands on" training session to improve her SCBA/PPD operation and donning skills. *Id*. Plaintiff agreed to check her oxygen tank for proper operation, and she added that several firefighters had helped her practice donning her hood. *Id*. Plaintiff admits that she properly received this DR. ECF 45-3 at 7.

13.     Plaintiff failed a physical fitness test on February 11, 2019, and she agrees with the DR that was issued as a result. ECF 45-3 at 10. Retesting was planned for six weeks later, and Plaintiff agreed to exercise to increase her physical performance in preparation for it. ECF 45-6 at 9.

14.     On February 11, 2019, Captain Sarah Stewart wrote a formal DR memorandum to Assistant Chief Carly Helwick (both with DFD's Safety and Training Division) regarding Plaintiff's performance to date and her Academy standing. The memo identified several areas in which she had fallen behind her class's progress. The deficiencies created a safety concern. Noncompletion of the required skills would subject Plaintiff to possible dismissal. ECF 45-6 at 11. Plaintiff does not dispute the memoran's contents, and she does not believe it was issued because of her race or gender. ECF 45-3 at 3.[3]

---

[3] Defendant does not cite to the full deposition transcript that supports this assertion, but Plaintiff does not dispute the statement's accuracy.

15.     Plaintiff received a DR on February 13, 2019 for not donning equipment in a timely fashion. She was advised to find a donning system that will work for her "with safety as a priority." Plaintiff said she would practice at home.[4] ECF 45-6 at 12.  Plaintiff does not dispute the DR and does not believe her race or gender motivated it. ECF 45-3 at 4. Eight other classmates received DRs on this day for similar deficiencies. Seven of them—W.C., J.G., E.G., N.M., Aaron.M., T.B., and A.T.—are white males, and the eighth classmate, Anna.M., is a white female.

16.     The Academy issued to Plaintiff a DR for slow donning on February 15, 2019. The DR emphasized how "[t]his skill has been taught, demonstrated, and practiced during the Academy and [that] expectations have been clearly stated" as well as the skill's importance to safety and operational effectiveness. ECF 45-6 at 14. A one-on-one personal training session was planned at which Plaintiff could ask questions and demonstrate ability, but she preferred to practice at home with her family's help. *Id*. Plaintiff denies that this DR was improper or issued because of her race or gender. ECF 45-3 at 4. Eight fellow recruits received similar DRs on the same day. ECF 45-5 at ¶ 9.

17.     In total, Plaintiff received three DRs for not meeting the donning standard. ECF 45-5 at ¶ 10. Five classmates each received four donning-related DRs. *Id*.

18.     On February 15, 2019, Plaintiff received a DR for not going "on air" before entering a simulated building fire. ECF 45-6 at 16. She does not dispute making the mistake. ECF 45-3 at 12. Because she entered the building properly on a second attempt, this DR resulted in no loss of points. ECF 45-6 at 16. Three classmates also received DRs on this day for the same deficiency. ECF 45-5 at ¶ 11.

---

[4] The Court notes that both Plaintiff's father (Alphonso Kelly) and husband (Karlos Allen) are Denver firefighters. ECF 45-3 at 4, 17, 21-22; ECF 55-6; ECF 55-7 at 3.

19.     Plaintiff received another DR on February 15, 2019, this one for inadequately connecting her breathing regulator. This was a continuing error despite repeat in-class and in-person training sessions. It was stressed to Plaintiff that the gear-related safety deficiencies could not continue given "how far along we are in the Academy and how close we are to working in [more dangerous] environments." Plaintiff stated she would pay closer attention to equipment connection details and would continue to practice at home. ECF 45-6 at 18. Plaintiff does not dispute the accuracy of the information reported in this DR (ECF 45-3 at 10, 11), although she feared that it was issued out of retaliation for complaining (ECF 45-3 at 11). Four of her classmates also received DRs for breathing regulator equipment issues. ECF 45-5 at ¶ 12.

20.     The record contains a DR dated March 1, 2019 for not raising a ladder within the required time limit. The instructor offered additional practice sessions. ECF 45-6 at 20. Plaintiff does not contest its issuance. ECF 45-3 at 12-13. A fellow classmate, Tamara Cowgill (white female) received the same DR. ECF 45-5 at ¶ 13.

21.     Plaintiff received a DR on March 5, 2019 for not properly sealing her face mask and leaving skin exposed. Plaintiff stated that she would practice at home. ECF 45-6 at 22. Plaintiff confirms the DR's correctness and denies a racial and gender motivation behind it. ECF 45-3 at 5. Two white female classmates—Tamara Cowgill and Anna.M.—received DRs on this day for the same reason. ECF 45-5 at ¶ 14.

22.     Plaintiff admits her unsafe use of a ladder on March 6, 2019 that resulted in a DR. ECF 45-3 at 13; ECF 45-6 at 24. Plaintiff said she would pay more careful attention to her tools when climbing a ladder. ECF 45-6. A DR was issued to classmates M.C. and Tamara Cowgill (both white females) for the same reason. ECF 45-5 at ¶ 15.

23.     Plaintiff's SCBA equipment ran out of air during an evaluation on March 6, 2019. ECF 45-6 at 26. She agrees that she ran out of air, but she blames the classmate with whom she partnered for the exercise—C.M. (white male)—for not helping her. Moreover, she had become upset "[b]ecause [C.M.] was cussing me out, calling me out [by] my name, calling me," and the instructor did not stop "him from talking to me and degrading me like that." ECF 45-3 at 13. Her partner, C.M., also received a DR for running out of air during the same exercise as did three other classmates (Tamara Cowgill, A.B., E.G., and Anna.M.). ECF 45-5 at ¶ 16.

24.     On March 15, 2019, Lieutenant Jon Radke wrote a formal DR memorandum to Assistant Chief Helwick after Plaintiff failed a required written "IFSTA" test. ECF 45-6 at 28. Plaintiff does not dispute failing the test. ECF 45-3 at 13. Plaintiff's classmates J.W. (white male) and Z.D. (Hispanic male) received the same DR. ECF 45-5 at ¶ 17.

25.     An issue arose on April 16, 2019 regarding the connection of Plaintiff's respiratory regulator to her face piece. Plaintiff was advised to continue practicing donning the equipment to ensure that she is both ready for future exercises and able to quickly remedy any attachment problems. ECF 45-6 at 30. Plaintiff denied that her race or gender was the reason she received the resulting DR. ECF 45-3 at 6. Classmate J.G. (white male) received the same DR two days later. ECF 45-5 at ¶ 18. N.M. (white male) receive a DR on March 7, 2019 for incorrectly donning his regulator. *Id*.

26.     Plaintiff received a DR on April 16, 2019 when she conducted a forced entry exercise with an unattached air regulator. Proper respiratory equipment connections are an important safety measure for entering a smoke or fire-filed space, it was explained. The seriousness of the mistake and the risk of injuries that could occur were emphasized to Plaintiff. ECF 45-6.

Earlier, on March 11, 2019, C.M. (white male) received a DR for an improperly fastened regulator, and on April 16, 2019, G.P. (white male) received a DR for the same reason. ECF 45-5 at ¶ 19.

27.    Plaintiff received three DRs on April 19, 2019. The first was for unsafe chainsaw operation. ECF 45-6 at 33. Plaintiff does not dispute the DR's description of the incident, adding that she "stay[ed] after with Lieutenant Little to work on it." ECF 45-3 at 9. Only three recruits in Plaintiff's class finished the Academy with no chainsaw evaluation errors. ECF 45-5 at ¶ 20.

28.    The second DR on April 19, 2019 was for failing hose maze training and running out of air during the exercise. She made the errors of leaving her hose line, following the wrong one, and not checking couplings. She spent too much time in one particular spot during which her air supply began to run low. She did not call out a "MAYDAY" when her low-air alarm activated or follow other procedures to inform others of her distress. Plaintiff concedes failing the evaluation. ECF 45-3 at 14. However, she complained about confusion caused by the instruction not to let the hose go no matter what happened. ECF 45-3 at 14. Plaintiff testified at her deposition that up to this point, she had refrained from disagreeing with her DRs because she felt pressured to accept them. However, she began to resist them on April 19, 2019 because she now felt under scrutiny. Plaintiff complains that her DR disagreements were perceived as being combative. ECF 45-3 at 14.

29.    The third DR issued after she twice dropped an axe from a ladder. ECF 45-6 at 37. Plaintiff does not question the motive behind the DR. ECF 45-3 at 15. Z.D. (Hispanic male) received a DR for letting a trash hook fall off his ladder, and Anna.M. (white female) received one for dropping a pike pole from the roof. ECF 45-5 at ¶ 21.

30.    Recruits were required to pass the "high-rise" evaluation which tests the ability to climb the stairs of a tall building at a pace of thirty seconds per floor while wearing PPE and

carrying additional equipment. At the top of the building the recruit then must conduct a fire attack and perform a dummy rescue while on air. Plaintiff's class performed this test at a particular building in Denver on Broadway, starting in the basement and ending at the twenty-eighth floor. Although the high-rise evaluation is generally regarded as a required element of training, a recruit did not need to pass it *before* Academy graduation. A recruit could wait until the probationary firefighter employment period to do so. ECF 45-1 at ¶ 6; ECF 45-2 at 7. According to the manual, the failure to complete the high-rise test is grounds for a dismissal recommendation. ECF 45-2 at 7.

31.     Plaintiff did not complete the high-rise test. That deficiency was subject of a DR dated May 2, 2019. ECF 45-6 at 39.

32.     Five of her classmates—Z.D. (Hispanic male), E.G. (white male), Anna.M. (white female), N.M. (white male), and G.P. (white male)—received a total of seven DRs at the Academy. Tamara Cowgill (white female) received thirteen. Plaintiff was subject of nineteen DRs, the most in her class. ECF 45-5 at ¶ 22.

33.     Plaintiff was in the 19-01 Academy class.  She graduated on May 24, 2019.

34.     Plaintiff's employment as a probationary firefighter started two months later on August 9, 2019. She was assigned to Fire Station 4 under the supervision of Captain Jon Schauer. After each 24-hour shift, probationary firefighters receive a daily summation of their performances. ECF 45-7. Captain Schauer stated in Plaintiff's first daily summation report that she required practice with gas cylinder use and dumpster fire skills. Plaintiff was unable to do a particular throw activity, although the uphill grade at the site made that task extra difficult. Captain Schauer was unable to evaluate her medical care skills because she lacked EMT certification. ECF 45-8 at 14-15.

35.     Captain Schauer's summation report for August 12, 2019 identified several areas of below-standard performance. ECF 45-8 at 16. She left a tool on top of the engine rig. Before the crew departed, Captain Schauer asked her if all tools were accounted for. Plaintiff incorrectly answered yes. *Id*. She scored an eighty-one percent on a test of Downtown Denver's streets. *Id*. She scored a fifty percent on a natural gas test. *Id*. Plaintiff admitted that natural gas was one of several topics which she had to learn and for which she would be tested over the course of her probationary period. ECF 45-3 at 18. However, she had not yet studied natural gas when Captain Schauer tested her on it on this day. *Id*. Although Captain Schauer graded her tool knowledge as adequate, he nonetheless flagged it as an area for improvement. ECF 45-8 at 16. Captain Schauer made several positive comments about areas of performance that met or exceeded performance expectations. *Id*.

36.     On August 15, 2019, Captain Schauer rated Plaintiff as "Below Standard" on a range of subjects: tool knowledge, proper PPE at the scene of a call (wearing medical rather than leather gloves for an auto extraction), failing the natural gas protocol and downtown street quizzes, untimely donning, and running at an emergency scene (a safety violation). ECF 45-8 at 18-19. Plaintiff agreed with those performance deficiencies. ECF 45-3 at 18-19. Plaintiff "seemed to be frustrated at times during the shift" and testing. Captain Schauer was unable to test her medical care skills because she was not yet EMT certified and not confident in her ability to take vitals. ECF 45-8 at 18-19.

37.     Assistant Chief Drapeau and Captain Schauer met with Plaintiff on August 16, 2019[5] to inquire if she had a personal learning style by which to better teach her the natural gas

---

[5] The Court notes that the next day's summation report (dated August 18, 2019) was overall positive. ECF 45-8 at 20-21. Defendant cites to the August 18, 2019 report in footnote 1 to Paragraph 38 of its SUMF. ECF 45 at 9. Plaintiff does not object to the existence of the report or

protocols. Plaintiff identified none. They encouraged her to contact them on- or off-duty if she needed help. ECF 45-7 at ¶ 5. In his Declaration, Captain Schauer refers to a Performance Concerns memorandum that recounts Plaintiff's expressions of frustration at the meeting. ECF 45-8 at 5. Plaintiff felt pre-judged because of her academy DRs, and she identified the distractions of family responsibilities including homeschooling her children and running a non-profit organization. *Id*. At her deposition, Plaintiff confirmed the occurrence of the conversation, the officers' offer of assistance, and her expressions of frustration. ECF 45-3 at 20. She complained about "Captain Schauer being aggressive towards me, yelling at me, just things like that"; "raising his voice, the tone, me not feeling like I can go to him and talk to him without discord, basically"; and "yelling and cussing at me over the speaker in front of everybody, and how I felt about him humiliating me." *Id*. at 20-21. She confirmed informing Captain Schauer and Assistant Chief Drapeau of homeschooling her children and running a nonprofit—but at a different time. Plaintiff added that it was her understanding before the meeting that she could study for her EMT certification before taking the street quizzes. *Id*. at 20. Plaintiff confirmed that she did not ask for any special learning help, attributing her difficulty instead to Captain Schauer's teaching style. She preferred to seek help from her father and other firefighters. *Id*. at 21.

38.    In her summation report for August 21, 2019,[6] Captain Schauer noted that Plaintiff "required constant instruction and supervision during training" in mechanical skills. She also used an excessive amount of effort handling extraction tools and a ladder. ECF 45-8 at 22-23.

---

its contents. She only objects to the page citation that Defendant gives for it, but this Court was able to find it in the record.

[6] Defendant cites to the next daily summation report for August 24, 2019 in footnote 1 to Paragraph 38 of its SUMF. ECF 45 at 9. The August 24, 2019 report contains two areas of below-standard performance. ECF 45-8 at 24-25. Plaintiff does not object to the existence of the report or its

39.    Captain Schauer reported areas of below-standard performance on August 30, 2019.[7] Plaintiff scored a seventy-seven percent on the downtown streets quiz. The carbon dioxide ("$CO_2$") test was postponed because Plaintiff had not prepared for it. She was insufficiently familiar with tools and equipment. It was noted that Plaintiff was away during the first half of the day taking the EMT certification test. ECF 45-8 at 26.

40.    Assistant Chief Drapeau and Lieutenant Huth met with Plaintiff on September 3, 2019. Plaintiff recalled this meeting at her deposition, testifying that she accused Captain Schauer of being aggressive but denied describing him as "intense" or "detail-oriented." ECF 45-3 at 21. She expressed "concerns about them retaliating" against her, to which they responded by saying the department would not tolerate retaliation. She denied making a complaint about race or gender discrimination at that meeting, although she still "believe[d] that their intent against me was racial." *Id.*

41.    In the September 5, 2018 daily summation report, Captain Schauer stated that Plaintiff scored one hundred percent on a written quiz of downtown streets and passed an oral $CO_2$ quiz. However, she did not answer the carbon monoxide ("CO") questions correctly at the scene of a CO-related call. ECF 45-8 at 30. Plaintiff cites to a Performance Concerns memorandum for additional information about what happened at that call. Captain Schauer recalled asking Plaintiff what CO level most likely triggered the building's alarm. Plaintiff stated "30,000 parts per

---

contents. She does object to the page citation that Defendant gives for it, but this Court was able to find it in the record.

[7] Defendant cites to the next summation report (dated September 2, 2019) in footnote 1 to Paragraph 38 of its SUMF. ECF 45 at 9. The September 2, 2019 report documents several areas of below-standard performance. ECF 45-8 at 28-29. Plaintiff does not object to the existence of the report or its contents. She does object to the page citation that Defendant gives for it, but this Court was able to find it in the record.

million," but that is the short-term limit for $CO_2$ exposure, not CO. Captain Schauer furthered that

Plaintiff "continues to confuse Carbon Monoxide, Carbon Dioxide, and Lower Explosion Limits"

despite studying the Carbon Dioxide Protocol earlier that same day. ECF 45-8 at 6.

      42.     In the daily summation for September 8, 2019, Lieutenant Huth reported that

Plaintiff did not know what levels triggered CO and $CO_2$ alarms. This was in addition to four other

areas of below-standard performance. ECF 45-8 at 32.

      43.     On September 11, 2019,[8] Assistant Chief Drapeau and Captain Schauer wrote a

Performance Concerns memorandum and sent it to Operations Division Chief Charles Drennan

and Training Division Chief Desmond Fulton. Their overall assessment was that Plaintiff:

> has not been successful in her assignment at Fire Station 4. Because the deficiencies
> are so pronounced and broad in scope, we recommend that the decision to continue
> her probation should be re-evaluated. There are four main areas of concern:
> Cognitive, functional, performance, and interpersonal skills.

ECF 45-8 at 1. Six pages of examples follow that introduction. Defendant cites to the

memorandum's concluding paragraph about how Plaintiff "continue[d] to struggle with multiple

core functions," demonstrated a "tentative commitment to learning the skills required," and "has a

pattern of learning a skill, then regressing and failing the same skill, which in turn makes it difficult

to help master a progressive[] building base of skills because a significant amount of time is spent

re-teaching and re-learning basic skills." *Id*. at 6. Plaintiff denies that the memorandum indicates

"significant performance problems." ECF 55 at ¶ 43.

---

[8] This day's summation report is found in the record at ECF 45-8 at 34. In it, Lieutenant Huth
noted that Plaintiff answered seven out of ten $CO/CO_2$ questions correctly. That was her only area
of below-standard performance.

44.     Plaintiff moved to Fire Station 10 on September 16, 2019 as part of the regular rotation.[9] She reported to Captain Kathy Johnson (white female). ECF 45-3 at 22.  While Captain Johnson rated Plaintiff as meeting standards in that day's report, she still identified several different errors and tasks in need of improvement. Captain Johnson noted how Plaintiff exited the truck at the scene of a call with her headset still on and in a disorganized fashion; was unable to remedy a kinked water line; and made mistakes during four out of the five sessions to practice attaching a "humat" (the valve through water flows from a fire hydrant into a hose) to a hydrant. ECF 45-8 at 36-37.

45.     About a month and a half after starting as a probationary firefighter, Plaintiff's current counsel wrote a letter[10] to DFD Fire Chief Eric Tade and the Executive Director of Denver's Department of Public Safety, Troy Riggs. That letter of September 19, 2019 detailed Plaintiff's complaints of discrimination and harassment on the basis of her race and gender. ECF 45-9. "DFD's unlawful conduct," Plaintiff asserted, had caused her "significant distress" and had left her "afraid that due to DFD's discriminatory conduct and attitudes, [she] will lose the career[] for which [she] worked exceptionally hard." Plaintiff expressed her determination "to secure fair

---

[9] Plaintiff says that her daily summation reports from her time at this fire station under Captain Johnson's command "do not seem to be included in Defendant's Exhibit 8." This Court cites to the pages in ECF 45-8 where those reports are located.

[10] The parties dispute whether the September 19, 2019 letter was the *first* time Plaintiff made a complaint about differential treatment. Defendant cites to Plaintiff's deposition at which she testified that up until April 2019 and at other moments she had voiced no such concerns. ECF 45-3 at 9-10, 17, 21. At some point she did begin to complain to command staff about being attacked and discriminatory treatment, but she could not remember whether she did so *before* September 19, 2019. *Id*. at 22. Plaintiff refers to her Statement of Additional Disputed Material Facts ("SADMF") for citations to her deposition transcript of those times when she says she did complain of discriminatory treatment and racial comments. However, Plaintiff indicates no time before September 19, 2019 when she pursued a *formal* complaint of an unlawful employment practice equivalent to the letter or other internal grievance process.

treatment from DFD." *Id*. at 7. Defendant received the complaint on that same day and assigned it to Internal Affairs. Deputy Chief Kathleen Vredenburgh immediately contacted Plaintiff to schedule a meeting to learn about her allegations and to arrange interviews. ECF 45-10.

46.     Internal Affairs investigated the grievance. It interviewed Plaintiff and fourteen DFD employees, resulting in a written report. The Employee Relations Specialist with the Human Resources Department for Denver's Department of Safety completed an independent EEO inquiry and prepared an additional report. "The investigations did not sustain findings of discrimination or harassment," and Defendant determined Plaintiff's allegations to be unsubstantiated. ECF 45-10 at ¶¶ 4-6.

47.     Captain Johnson denies awareness of Plaintiff's September 19, 2019 letter or the grievances raised in it (ECF 45-11 at ¶ 4), and Plaintiff submits no evidence that would otherwise suggest personal knowledge (such as an assertion that Plaintiff directly spoke to Captain Johnson about it). Plaintiff does not say whether Internal Affairs interviewed Captain Johnson, and if so, when.

48.     In the daily summation report for September 19, 2019,[11] Captain Johnson noted many errors at that day's two calls. There were areas of improvement in how she could have handled an automobile accident. Captain Johnson had "lowered confidence that she can operate without coaching." ECF 45-8.

---

[11] The September 22, 2019 report was overall favorable. Plaintiff met all standards, and she had improved on several of the deficiencies flagged in the prior daily summary report. However, she still needed to take more control over the process of providing medical care to car accident patients. ECF 45-8 at 40.

49.     Command staff informed Plaintiff in writing on September 24, 2019 of the need to complete the high-rise evaluation. The memorandum included instructions about the process for doing so. ECF 45-8.

50.     Lieutenant Timothy Lile wrote the daily summation report for September 25, 2019. Plaintiff was unable to explain how the humat valve functioned. Nor was she able to answer questions about fire response resources, fire district information, and geographic locations. ECF 45-8. Plaintiff affirmed the report's correctness at her deposition. ECF 45-3 at 23.

51.     Plaintiff's fire truck was first on scene at a reported structure fire on October 1, 2019. It was her responsibility to attach the humat valve to the fire hydrant and then connect the humat to the hose (a task referred to as "catching the plug"). ECF 11 at ¶ 5. Plaintiff concedes that she was unable to complete that task because she was unable to open the hydrant cap. Nor did she attempt to connect the humat or hose to the hydrant in an alternative way. This incident was subject of a memorandum dated October 7, 2019. ECF 45-12. Plaintiff recalled the incident at her deposition, explaining that she stopped attempting to make the connection after someone had "called—there's no fire" and "called it quit." ECF 45-3 at 23. However, neither did Plaintiff receive an express *order* that there was no fire and no need for water. ECF 45-11 at ¶ 6. According to the memorandum, it was another probationary firefighter from a later-arriving truck who connected the hose to the hydrant "in case the incident escalated." ECF 45-12 at 1. That person told Plaintiff "that he had to give it a little effort but that the cap came off without much trouble." *Id*.

52.     In addition, Plaintiff walked away from the hydrant, leaving the hydrant wrench on top. She did not inform anyone else that she was walking away. ECF 45-3 at 23; ECF 45-12.

53.     Two members of the second truck confirmed that Plaintiff had left the wrench on the hydrant and the humat on the ground when she walked away. ECF 45-12. However, she did return to the hydrant at some point, and she later received advice on how to remove a stiff cap. ECF 45-3 at 23. At the scene, Firefighter Jacqueline Fehr counseled Plaintiff that leaving the wrench at the hydrant was a safety issue and that it was Plaintiff's responsibility to connect water to her rig in anyway possible. ECF 45-12.

54.     Lieutenant Bradley Hoover wrote the daily summation report for October 1, 2019. He noted how Plaintiff had walked away from the hydrant when the second truck arrived. Plaintiff explained that she thought its arrival had relieved her of plug catcher duty even though no verbal command was given for her to move up the line and rejoin her crew. Lieutenant Hoover informed Plaintiff that not making the connection was unacceptable and rated her as "failing" this skill standard. (Plaintiff points out that Lieutenant Hoover did not expressly comment on whether she was knowledgeable (or not) about the responsibilities of the second engine at a fire scene. ECF 55 at ¶ 54).) Plaintiff also failed a street quiz that day. ECF 45-8.

55.     Assistant Chief Peter VanderMiller, in his role as incident commander, emailed command staff about the water connection incident on October 1, 2019. As he reported it, Plaintiff did not make the water connection, and upon seeing the second truck, "simply walked off down the line leaving the wrench on the hydrant and the Humat on the ground." Firefighter Fehr and a probationer made the connection, describing the cap as "not difficult to remove." Plaintiff "eventually" returned and explained that "she couldn't get the steamer cap off as she felt it was painted on." When Firefighter Fehr went to offer her advice, Plaintiff "basically 'blew her off.'" Assistant Chief VanderMiller "spoke with all members of [the second truck] to ensure that [he] had all the information correct" before contacting "Lt. Brad Hoover who was working on

[Plaintiff's truck]." He intentionally did not speak with Plaintiff given that he was acting on information relayed from a truck other than hers. However, he felt obliged to inform those responsible for training about the incident, given that a probationer "in their second house should be able to catch plugs and should certainly understand the seriousness of walking away from an assignment without completing it or relaying the fact that they could not." He now must "think twice about the probability of a basic and extremely crucial assignment[] being completed prior to assigning it to a rig based on that rig's personnel."  ECF 45-12 at 3.

56.     Assistant Chief VanderMiller and Captain Johnson met with Plaintiff on October 4, 2019, which they both documented in written memorializations. ECF 45-11 at ¶ 7. This Court summarizes those reports' contents here. He and Captain Johnson together discussed with Plaintiff several areas of deficient progress. One topic concerned the incident on October 1, 2019. Her explanation of what happened lacked a "clear train of thought," and it was difficult to follow and understand her. She became confused when Captain Johnson "attempted to discuss water supply processes using a pad and pen and basic drawings." Moreover, he regarded it as obvious that Plaintiff did not want to talk about the incident, and she would not answer questions without repeating prompting. She assumed no responsibility for her actions; was ambivalent about both the meeting and the general concerns at issue; and refused to acknowledge efforts to help her. She did not appreciate the need for consistent performance. ECF 45-13 at 1.

57.     Assistant Chief VanderMiller similarly described Plaintiff as ambivalent about her low quiz scores. Captain Johnson opined that Plaintiff "was not up to the expectations of knowing basic DFD policies for her time on probation and the amount of time she had been given to study." She was uninterested in their offers of support or expressions of encouragement. Instead, Plaintiff "began to get agitated, cry and stated she had done tasks requested of her in a very dismissive

tone." Assistant Chief VanderMiller stressed the importance of proper PPE donning and the need to cover all skin. He did so in relation to an incident when her hair had pushed her hood up in the back, exposing her neck. Captain Johnson reminded her of the need to comply with departmental hair policy. Plaintiff reacted defensively, refused to do anything about her hair, and gave what Assistant Chief VanderMiller regarded as a curt answer to change the subject. When he asked her if there was anything he could do to help her or if she had any questions, Plaintiff "simply replied 'no' and left the room." ECF 45-13 at 2.

58.     Captain Johnson wrote her own detailed memorialization of the meeting. The meeting's purpose was "to go over her last two days where she received below standard and failing assessments," with the goal of improvement rather than criticism. Captain Johnson sought to clarify expectations and to explain the importance of adequate performance and communication during a response to an actual fire emergency. Plaintiff was allowed to share her perspective. Captain Johnson described Plaintiff as argumentative, defensive, dismissive, and uninterested in help. ECF 45-13 at 3-4.

59.     Captain Johnson discussed the issue of using a fire hydrant humat and respective roles and responsibilities of the first and second engine at a fire scene. At the meeting Plaintiff did not understand those topics. Plaintiff was unable to complete humat valve simulations independently and without prompting. Plaintiff explained that she correctly had "caught a plug" before, but Captain Johnson stressed the need for consistency and reliability. ECF 45-13 at 3. Recruits, including Plaintiff, learn humat valve use and operation at the Academy. ECF 45-5 at ¶ 23.

60.     Plaintiff was unresponsive to Captain Johnson's offers of help to improve her low test scores. To ensure that she always was in proper PPE, Captain Johnson suggested that when

responding to a scene, Plaintiff dress herself in the same PPE as a senior firefighter with the flexibility to don additional equipment if needed. Plaintiff laughed at that suggestion and dismissively responded, "fine ma'am, that's fine." She refuted an earlier report of improper PPE and asserted that she in fact did mirror a senior firefighter on that occasion. ECF 45-13 at 4.

61.     Captain Johnson acknowledged the positive aspects of Plaintiff's performance to date, and she expressed concern about the lack of improvement in other areas that are "routinely practiced in the academy and repeatedly addressed during shift." Plaintiff was not demonstrating that she was retaining important information in a way that permitted her to apply it independently. Plaintiff had made no improvement in this area. Captain Johnson stressed the need "to operate at a competent level" for which she offered study help and would contact the training department for assistance. ECF 45-13 at 4.

62.     Captain Johnson "addressed the plan to train for Broadway," ECF 45-13 at 4, which the Court assumes refers to the high-rise evaluation. Plaintiff's "official position" on the matter was that "she is not going to complete it" and "will not be participating in Broadway." Captain Johnson asked Plaintiff to inform the training department of her refusal in writing. ECF 45-13 at 4. Plaintiff disputes "that completing Broadway is a requirement to pass probation."

63.     Captain Johnson wrote the daily summation report for October 4, 2019. Plaintiff did not pass a quiz on natural gas, $CO_2$, and CO that was specially planned. Nor did she perform adequately on humat valve use. "As a probationary on the sixth shift on an engine in their second house," Captain Johnson did not believe that Plaintiff was "meeting the standards of knowing and applying that knowledge to one of her primary duties: operating the plug." ECF 45-8 at 46.

64.     Plaintiff's daily summation report for October 7, 2019 contains a statement by Lieutenant Buhlar that Plaintiff struggled in areas that she already should know at her level. In addition, Plaintiff's decision-making was poor and at times, incorrect. ECF 45-8 at 48.

65.     In the October 13, 2019 summation report, Captain Johnson rated Plaintiff's performance in the "emergency incident response" category as "Below Standard." Plaintiff "need[ed] to be prompted what to do on medical incidents." Captain Johnson cited her for using the wrong radio channel which, Plaintiff emphasizes, occurred during a practice session and not on active duty. Plaintiff made an error during hoseline maze training for which Captain Johnson gave her a below-standard rating. Captain Johnson described the error as "a critical fail in the job sheet." ECF 45-8 at 9-10.

66.     Lieutenant Calvo rated Plaintiff's performance during a medical call as below standard in the October 16, 2019 daily summation report. She performed "at a very basic level" and needed prompting. ECF 45-8 at 7.

67.     Denver's Department of Safety oversees the Fire, Police, and Sheriff Departments. In October 2019, Mary Dulacki (white female) was the Deputy Executive Director of Safety, and she had authority to discipline Department of Safety employees. ECF 45-14.

68.     Deputy Executive Director Dulacki reviewed Plaintiff's DRs (gathered at ECF 45-6), daily summation reports (ECF 45-8), and performance memoranda (ECF 45-12; ECF 45-13). She made the decision to terminate Plaintiff pursuant to Defendant's City Charter and Civil Rule 9, Section 2. ECF 45-14; ECF 45-15.

69.     The termination order dated October 24, 2019 contains Deputy Executive Director Dulacki's reasoning for the termination decision. From the termination order's four pages, Defendant highlights the sentence:

24

> You continue to have difficulty retaining and applying vital information to your position as a firefighter, performing multiple job responsibilities, understanding how equipment functions and is deployed, demonstrating safe practices and properly donning your protective gear despite the Department's repeated attempts to provide you individual coaching, tutoring and mentoring.

ECF 45-15 at 4. This Court notes that in her Declaration, Deputy Executive Director Dulacki cites that same passage as her reason for terminating Plaintiff. ECF 45-14 at ¶ 4. In further support of her decision, she notes Plaintiff's "conduct during the fire call on October 1, 2019, and her lack of understanding of the importance of her role that day" as well as her "historically poor performance during her two fire house rotations and her poor performance at the training academy." *Id.* at ¶ 5.

70.     Deputy Executive Director Dulacki denies being "aware of the complaint of discrimination and harassment filed by [Plaintiff] on September 19, 2019" when she made the termination decision. *Id.* at ¶ 6.

**IV.    Plaintiff's Statement of Additional Disputed Material Facts ("SADMF")**

For the sake of thoroughness and to the extent it adds context to the discrimination claims, the Court reviews the fact statements that Plaintiff includes in her Response (ECF 55). This Court follows the same numbering as Plaintiff does. Other than for just a few, Defendant objects to all of Plaintiff's statements, arguing that she may not rely on them to defeat summary judgment. Defendant raises several objections, two of which the Court summarizes below for brevity.

Defendant's primary objection concerns Plaintiff's heavy reliance on hearsay. It adds that Plaintiff does not present an exception that would permit consideration of the out-of-court statements. The exception most relevant here is Fed. R. Evid. 801(d)(2)(D), which concerns a party-opponent. To qualify, Plaintiff must show how the declarant DFD employee was "involved" in the termination decision. *Cruz v. Farmers Ins. Exchange*, — F.4th —, 2022 WL 3051064 (10th Cir. 2022) (explaining that the speaker must have some general involvement, construed broadly,

in the decision-making process that affected the disputed employment action to qualify as a party-opponent). Plaintiff does not defend her reliance on hearsay statements.

Defendant's second principal objection is that a party may not rely on unsubstantiated allegations, *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004), second-hand knowledge, *Hart v. UPS Freight*, No. 15-cv-01441-RPM, 2017 WL 3058026, at *6 (D. Colo. July 19, 2017), or conclusory allegations that lack a supporting foundation, *Dalvit v. United Air Lines, Inc.*, No. 07-cv-00726-WDM-CBS, 2008 WL 3468703, at *8 (D. Colo. Aug. 11, 2008), to oppose summary judgment. Such "testimony, without specific details or corroborating evidence, is [the kind of] unsubstantiated allegation that carries no probative weight in summary judgment proceedings." *Tang v. HSS, Inc.*, No. 13-cv-02636-PAB-NYW, 2015 WL 1345319, at *7 (D. Colo. Mar. 20, 2015). Defendant likewise objects to Plaintiff's reliance on the experiences of others unrelated to her situation.

1.      "Starting before she began the Academy and continuing throughout her attendance" Plaintiff asserts that "DFD employees repeatedly harassed and discriminated against [her] because she is a Black woman." ECF 55 at 11, SADMF ¶ 1. However, contrary to Section III(F) of the undersigned's Practice Standards, Plaintiff does not cite to specific evidence in the record to establish it as a genuine dispute of material fact. *Landon v. Winston Hospitality, Inc.*, No. 20-cv-01547-MEH, 2022 WL 715123, at *3 n.17 (D. Colo. Mar. 10, 2022). Instead, the Court construes it more as an introduction to the next section of statements.

2.      At her deposition, Plaintiff recounted an interaction she had with a white male Denver police department detective[12] (ECF 55-3 at 5-6) before she started at the Academy. The

---

[12] An Internal Affairs investigation identified the employee as one of Denver's Civil Service employees who is a dedicated background investigator. That investigator "vehemently denied

interview was part of her background check, and the interviewer told her that DFD had "concerns [regarding] people like [her]." Upon her requests for clarification, the interviewer questioned whether she would be "moldable" and "open to change" given her age (she was forty-one years old at the time) and "what they say" about "[t]he angry Black woman." ECF 55-3 at 5. Defendant denies any involvement by this employee in DFD's decision-making process.

3.      Plaintiff did not formally report the incident. However, she did mention it in a passing conversation with DFD Captain Pixley who was in charge of recruiting, and she expressed how it had made her feel uncomfortable. ECF 55-3 at 6-7. Plaintiff says that Captain Pixley regarded the incident as "very inappropriate" and something "that shouldn't have been said." Nevertheless, DFD took no action on the matter. Defendant denies this captain's involvement in the termination decision.

4.      "Then, beginning almost immediately at the Academy," Plaintiff alleges, her "instructors consistently treated her differently than the other recruits." ECF 55 at ¶ 4. As it does for SADMF No. 1, above, this Court construes this simply as an introductory argument to set up the next statements.

5.      Plaintiff says that Lieutenant Hamilton was not kind to her although "[h]e very much was" so with the other recruits. Nor did Lieutenant Hamilton give her the same kind of guidance, assistance, or advice that he did to recruits who were not Black women. The only feedback Plaintiff received from him came in her DRs. ECF 55-3 at 8-9. Defendant objects to this deposition testimony as inadmissible hearsay. Moreover, it is irrelevant. There is no indication that Lieutenant Hamilton was involved in the termination decision in any way. Deputy Executive

---

speaking to [Plaintiff] about anything that related to race or racial stereotypes" or ever conducting any "conversations about race with any applicant[]" generally. ECF 56-1 at 2.

Director Dulacki reached her decision to terminate Plaintiff in part on her review of Plaintiff's DRs, but Plaintiff concedes the accuracy of the DRs' contents. Moreover, Plaintiff graduated the Academy despite any alleged wrongdoing by Lieutenant Hamilton.

6.    Plaintiff testified at her deposition that *none* of her instructors gave her guidance. Instead, "[t]hey just talked to [her] and said, Hey, look, do this this way." ECF 55-3 at 30. She only received instructors' feedback through DRs, whereas the other recruits had the benefit of in-person conversations. ECF 55-3 at 30-31. She attributes the lack of guidance and instruction to being a Black woman. ECF 55 at ¶ 6. For the same reason the Court gives for the same allegation against Lieutenant Hamilton, this testimony is generally irrelevant to and unsupportive of her claims. Moreover, Plaintiff herself concedes that some instructors—Lieutenant Kalvels, Lieutenant Radke, and Captain Stewart—were helpful. ECF 55-3 at 30.

7.    Plaintiff says that on February 5, 2019, Captain Stewart asked her if she had many children, suggested that she should return home to raise them rather than be a firefighter, and accused her of joining DFD simply for the paycheck. ECF 55-3 at 23. Defendant counters that Captain Stewart had no involvement in the termination decision.

8.    Plaintiff told the EEOC that she never heard an instructor tell a male recruit to focus on raising children, stay at home, or consider another career. Nor did she hear an instructor accuse a male recruit of being a firefighter solely to collect a paycheck for his children. ECF 55-5 at ¶ 10.

9.    At his deposition, Plaintiff's father, Mr. Kelly, recalled Plaintiff telling him about Captain Stewart's comments that questioned why she was a DFD employee and advising her instead to care for her children at home. ECF 55-6 at 11.

10.    At the time Desmond Fulton was the division chief in charge of the Academy. Plaintiff testified that on multiple occasions, Division Chief Fulton told her not to expect special

treatment just because she is a "legacy" (meaning a recruit with DFD family connections). However, he never made that same comment to other legacy recruits. ECF 55-3 at 32. Division Chief Fulton denies "hav[ing] anything to do with approving" Deputy Executive Director Dulacki's termination order, explaining that "[i]t would not [have been in his] position at that time" to do so. ECF 55-15 at 33.

11.     Plaintiff says she felt pressured to concede DRs to avoid being seen as combative. Chief Helwick, Division Chief Fulton, and Captain Stewart all asked her why she was being so combative. ECF 55-3 at 27. Plaintiff's husband, Mr. Allen, recalled that during the Academy, Plaintiff complained that instructors labeled her as "disrespectful," "combative," or "confrontive" merely for asking questions at training. ECF 55-7 at 8. Defendant responds that neither Assistant Chief Helwick, Division Chief Fulton, nor Captain Stewart were instructors. Moreover, they were not involved in the termination decision. ECF 55-1 at 16; ECF 55-11 at 17; ECF 55-15 at 33.

12.     At her deposition, Plaintiff recalled how Lieutenant Lacey Burke (a female of unspecified race) frequently talked about how big her "behind" or "butt" was. ECF 55-3 at 32-33. Mr. Allen recalled Plaintiff telling him about Lieutenant Burke's comment to do an activity "so you can work that butt off," which Mr. Allen regarded as discriminatory. ECF 55-7 at 14. On one particular occasion, Lieutenant Burke asked Plaintiff and Co-Plaintiff Cassie—the only two Black women in the originating class—to teach her how to "twerk" (for which Plaintiff provides a definition at ECF 55 at n. 5) while they danced to music during a workout. ECF 55-3 at 33; ECF 55-8 at 22. Plaintiff Cassie testified that Lieutenant Burke made additional comments about her butt, including the time when Plaintiff Cassie used it to momentarily support a rack that she was carrying behind her. Lieutenant Burke laughed in response, exclaiming, "[d]ang, that thing's got to be good for something." ECF 55-8 at 22. Lieutenant Burke admitted telling Plaintiff Cassie,

"[t]hat's a good use for a butt," but in a joking manner, she explained, in the context of trying to keep workouts less stressful and not in regards to race. ECF 56-1 at 11. Defendant responds that Lieutenant Burke was uninvolved in the decision-making process and that use of the word "twerk" is non-discriminatory because the dance is not exclusive to African-Americans.

13.    When Plaintiff first started at the Academy, the DFD captain (of unknown name) at the warehouse told her when she came to pick up her uniform something to the effect of how "you people always getting those things [meaning braids] in your hair" and advised her of the "need to really rethink that and think about what you're going to do with that." ECF 55-3 at 32-33. Because Plaintiff was not wearing braids at that time, she regards the comment as a stereotype about Black women generally. ECF 55 at SADMF ¶ 13. Plaintiff included this comment as an instance of feeling racially targeted when she spoke with Lieutenant Radke at some later point. ECF 55-3 at 35.  There is no indication that this captain was involved in the termination decision.

14.    Plaintiff's father, Mr. Kelly, said Plaintiff had complained about the reference to her hair being long. Another firefighter, James Harris, who works at the warehouse and is African-American heard the comment and told Mr. Kelly about it. Mr. Harris felt that it was inappropriate for the captain to say, "you people wear your hair or do something in a certain way and how are you going to deal with that or something," especially the use of "you people." ECF 55-6 at 14.

15.    Plaintiff recalled an incident in May at a meeting with Captain Stewart. Plaintiff did not fully enter the room. Instead, she stood by the door with her back against the wall, to allow someone who was leaving to exit the space. Captain Stewart told her not to stand behind her using curse words and profanity. ECF 55-3 at 34-35. In her EEOC charge, Plaintiff described how Captain Stewart had turned around and yelled at her to "get the f*** out from behind me," to never

"f***ing stand behind me," and to "have a f***ing seat," while pushing a chair at her and snapping her fingers. ECF 55-5 at ¶ 11.

16.     Plaintiff believes it was racially motivated because she never saw Captain Stewart use such language before. ECF 55-3 at 34-35.

17.     Captain Stewart remembered one occasion of telling Plaintiff not to stand behind her and to have a seat, but she denied cursing. ECF 55-11 at 18. Lieutenant Radke also remembered Captain Stewart yelling at Plaintiff not to stand behind her but without foul language. Lieutenant Radke added that Captain Stewart did not like it when others stood behind her as a general matter. ECF 55-10 at 17.

18.     Plaintiff describes a discriminatory act at her graduation ceremony. When Plaintiff went over to greet family inside the auditorium, Captain Stewart used her hand to snap at her "like she's talking to a dog" and yelled at her "to go back there now" (presumably meaning to join the other graduates). She was the only graduate to whom Captain Stewart spoke in that fashion and the only one whom she "humiliated and embarrassed . . . like that in front of . . . guests." ECF 55-3 at 50. Mr. Allen recalled Captain Stewart singling out his wife by aggressively telling her to go sit with the other graduates. ECF 55-7 at 14. Her father, Mr. Kelly, described Captain Stewart as "snap[ping] her fingers in [Plaintiff's] face like a dog" and telling her to go over to the wall and line up with other graduates. ECF 55-6 at 17. Division Chief Fulton included this incident in a personal handwritten note[13] he made during a meeting with both Plaintiffs on July 10, 2019. ECF 55-12.

---

[13] Citing *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1171 (10th Cir. 2018), Defendant argues that the handwritten note is inadmissible hearsay evidence.

19.     Plaintiff alleges that her "instructors set her up to fail evolutions (skills training drills) that her classmates passed by forcing her to complete the evolutions in a more difficult manner or by not allowing her the same accommodation they provided everyone else." As it does for SADMF No. 1, above, this Court construes this as an introductory argument to set up the next statements rather than a fact statement on its own.

20.     As an example of the above assertion, Plaintiff refers to a "gerbil launcher" drill in which two recruits go inside a launcher and rescue a mannequin. She had missed that day's initial round of practice for a medical reason. When she arrived, she observed the others doing the exercise in one particular fashion. However, she and her partner, Tamara Cowgill, were told to do it differently by laying on top of each other, or at least "to start like that." She became "a little panicked" from the resulting claustrophobic feeling inside the launcher. ECF 55-3 at 31. Defendant objects to this deposition testimony as too conjectural and speculative to create a fact dispute. Plaintiff herself concedes that she does not know what happened during practice before her arrival. Nor does she point to confirmatory testimony from Tamara Cowgill that they were being ordered to do the exercise in an adverse way.

21.     Mr. Kelly recalled Plaintiff telling him about required PPE practice in Captain Stewart's office. Those morning practice sessions caused her to "show up sometimes late to the [physical education] class," and as a result, "they" (Mr. Kelly does not specify who but Plaintiff alleges her instructors, ECF 55 at 17) "got mad at her." ECF 55-6 at 10-11.

22.     Plaintiff says that "[d]iscriminatory attitudes toward [her] did not stop after she graduated the Academy." Her "new supervisors continued to treat her according to negative stereotypes about women, and often specifically Black women." This Court construes this as an introductory argument to set up the next statements.

23.     Plaintiff alleges that her *supervisors* during her probationary period—although she identifies only Captain Schauer, the firehouse captain at her first assignment—called her "lazy" based on what they heard from Academy staff. This comment was made in the context of the high-rise evaluation. She emphasizes how Captain Schauer had called her lazy before he personally observed her perform any tasks. ECF 55-3 at 38. Defendant notes that Captain Schauer had no involvement in the termination decision, and that regarding someone as lazy is not inherently discriminatory.

24.     Firefighter Koziol answered Plaintiff's question about Narcan use by responding, "You don't know sh*t . . . If you don't know sh*t, why are you here?" He was "yelling, cussing me out." Plaintiff became upset and cried. Captain Schauer explained that they had "talked to him before about talking to people the right way," but Mr. Koziol is "an old-timer" set in his ways. ECF 55-3 at 38-39. Plaintiff believes that Mr. Koziol acted with discriminatory animus because she never saw him yell or curse at others. She also construes Captain Schauer's explanation as describing Mr. Koziol as a member of the "good old boys club" who prefers "the old days [when] Black people wasn't allowed on the fire department." ECF 55-3 at 39. Plaintiff's husband, Mr. Allen, described Mr. Koziol as one of the older firefighters who prefers when "there was no women and there was no black guys." ECF 55-7 at 16. Defendant points out that Mr. Koziol was not involved in the termination decision.

25.     Plaintiff says that Captain Johnson told her that if she "really wanted to be a firefighter," she should cut her hair off or thin it out "because it's too much." Plaintiff questions why Captain Johnson made that comment to her. There were other "girls . . . with hair hanging to their butt when they have their braids," and her PPE hood would fit properly if she tucked her hair down. ECF 55-3 at 50.

26.     Plaintiff complains that supervisors assigned her tasks that no one else was required to do. As evidence of such, she cites the depositions of her husband and father who described how (1) Captain Schauer made her throw ladders in the middle of the night and (2) both Captain Schauer and Captain Johnson made her run the Broadway high-rise evolution every shift. ECF 55-6 at 20, 23; ECF 55-7 at 18-19.

27.     Plaintiff gives an example of when she was set up to fail an evaluation. A door was locked in a way to make it nearly impossible for her to breach it. She observed others try after her on the same door, and only a team of experienced firefighters after multiple attempts were able to open it. She was cited for failing the exercise because she could not open the door. However, when others came to practice, the door was made easier to open and thus easier to complete the exercise. ECF 55-3 at 37-38.

28.     Both Plaintiff's father and husband regard the safety concerns expressed over her inability to connect a hose to a hydrant on October 1, 2019 as over-inflated and strategically made for Defendant to use against her. Neither regard the hydrant incident as significant. ECF 55-6 at 24; ECF 55-7 at 23. Citing *Tang*, 2015 WL 1345319 at *7, Defendant counters that a court should not second-guess an employer's judgment over what form of discipline is appropriate for a given type of misconduct.

29.     Plaintiff complains about the response of DFD command staff to the claimed discrimination. Plaintiff's father spoke to Division Chief Fulton about her mistreatment for two and a half hours. Division Chief Fulton took three pages of notes. Plaintiff was not present at the meeting between Mr. Kelly and Division Chief Fulton. The exact date of the meeting is unstated, but Mr. Kelly remembers that it was three-quarters of the way through Plaintiff's time at the Academy. ECF 55-6 at 15.

30.     Mr. Kelly says that Division Chief Fulton denied being racist at the meeting "because there's a kid on their soccer team or something that's black." Division Chief Fulton furthered that he has been instrumental in recruiting more women to the Academy, which Mr. Kelly challenged by accusing him of then "just fail[ing] them all out." ECF 55-6 at 16.

31.     Mr. Kelly already had conferred with other African-American firefighters beforehand, but together, they doubted that Division Chief Fulton would be held accountable. Rather, they anticipated that DFD would respond to the grievance by "get[ting] their ducks in a row and still do what they're doing." Mr. Kelly next spoke with Department Chief Eric Tade to whom he complained about the discrimination against his daughter. Chief Tade referred him to Division Chief Fulton who in turn held the meeting.  ECF 55-6 at 16.

32.     As Mr. Kelly anticipated, his intervention did not change his daughter's situation. It seemed to improve for the first week, but "then it just started . . . going downhill from there." ECF 55-6 at 15. Because there was no improvement, Mr. Kelly gave up on further action. ECF 55-6 at 23-24.

33.     Plaintiff describes meeting with Lieutenant Radke, Captain Stewart, Assistant Chief Helwick, and Division Chief Fulton on an unspecified date.  She told them how she felt like she was being targeted. ECF 55-3 at 33. They asked her why her spirits seemed down. She explained with the metaphor of how you only can whip a horse so much until you finally break it. She told them that they were trying to break her and that she feels broken. "[A]ll the things that you're doing is kind of overwhelming." ECF 55-3 at 33. Later, Division Chief Fulton told her that he was not racist because "[t]here's a black boy on my soccer team, and we get along fine." Plaintiff replied by asking whether having "a black boy on your soccer team, that means that you're not racist? Oh, okay." *Id*.

34.     Plaintiff cites to an email written by Assistant Chief Andrew Drapeau on September 18, 2019 that memorializes[14] his meeting with her two days earlier. Plaintiff told him that "a person can only take so much whipping." She made that comment to explain an incident in which she reacted negatively to Captain Schauer quizzing her about the natural gas protocol. ECF 55-13. Reading that comment gave Division Chief of Administration, Wendi Moeder, concern about how Plaintiff was experiencing her job, and she conferred with the email's other recipients. However, nothing resulted from those discussions. ECF 55-14 at 19.

35.     Assistant Chief Drapeau told Chief Moeder that Plaintiff feared retaliation if he spoke to Captain Schauer and Mr. Koziol about her concerns. Chief Moeder agreed that a probationary firefighter's fear of retaliation is a matter of concern, but she did not initiate a discussion with Plaintiff about the allegation. ECF 55-14 at 20.

36.     Plaintiff accuses Academy staff of making her post-graduation success impossible. In support of that assertion, Plaintiff begins by noting how DFD's Division of Safety and Training both oversees the Academy and has authority over probationary firefighters (which includes the ability to recommend termination of a probationer). Assistant Chief Helwick testified that she receives deficiency reports, and she intervenes to find ways to support a probationer who has repeat performance problems. She also may recommend termination for unsatisfactory performance (although she neither made such a recommendation with respect to Plaintiff nor otherwise was consulted about the matter). ECF 55-1 at 16. Defendant adds that Division Chief Fulton outranked Assistant Chief Helwick. ECF 64 at 18, ¶ 36.

---

[14] The email lists additional topics of discussion. Plaintiff denied avoiding kitchen chores, overusing her personal phone, or saying that everyone is out to get her. She complained about Captain Schauer's reaction when she bumped against him during a medical call; Captain Schauer's discomfort with her skill level; and Mr. Koziol's noncooperation on medical calls. Others disrespect her even though she always is respectful to them. ECF 55-13.

37. Defendant admits for purposes of this summary judgment review only that Plaintiff met the minimum requirements to graduate from the Academy. Plaintiff would not have graduated if she could not perform the job of a probationary firefighter safely.

38. Plaintiff emphasizes at ECF 55 at 22, ¶ 38 how Academy command staff (including Division Chief Fulton, Assistant Chief Helwick, and Captain Stewart) receive emails from a probationers' instructors after graduation. Division Chief Fulton testified that training division headquarters receives a daily report about each probationer's performance at her assigned firehouse. ECF 55-15 at 21. Plaintiff assumes that Academy command staff potentially could forward reports further up the chain of command.

39. The daily reports permit Academy command staff to monitor a probationer and offer remedial training where needed to ensure progression. ECF 55-15 at 22. In other words, the procedure is intended to benefit probationers. However, Plaintiff "did not receive the communications or the info therein," Plaintiff asserts at SADMF ¶ 39. Possibly she means that Academy command staff did not reach out to Plaintiff to offer supplemental training, which is what Division Chief Fulton's testimony at ECF 55-15 at 22 seems to imply is one purpose of the reports.

40. The parties dispute whether firehouse supervisors (DFD's operations side) corresponded daily with Academy command staff about Plaintiff *in addition to* the above-discussed daily summation reports. If there was, the parties dispute whether only Plaintiff was subject of these additional communications and whether they were *required* for her.

41. Captain Schauer testified that he had received Plaintiff's DRs and confirming memoranda before Plaintiff started her probationary assignment at his firehouse. He learned that Plaintiff had failed EMT certification and the high-rise evaluation at the Broadway building. ECF

55-17 at 4. Captain Schauer expressed concern about the safety of his crew, the public, and Plaintiff herself. The number of DRs Plaintiff had would have been grounds for termination when he was a probationer. ECF 55-17 at 9. Command staff responded to Captain Schauer's concerns by making Plaintiff an extra fifth member of a truck crew. That allayed the concern about Plaintiff serving in a "crucial safety position," and it created an opportunity for her to learn from the others. ECF 55-17 at 10.

42.     Although Captain Schauer objected to being assigned a firefighter with "that many deficiency reports and failures," he was not "pissed off" about it. ECF 55-17 at 12. Plaintiff says that when she first met Captain Schauer, he told her that he had a problem with her and her work ethic and that "he believes in the old way." ECF 55-3 at 36. Mr. Kelly recalls that when Plaintiff first arrived at Captain Schauer's firehouse, he told her, "I heard you're disrespectful" in an aggressive way, even though he had never met her before. Mr. Kelly also described Captain Schauer as generally more aggressive than other shift leaders. ECF 55-6 at 18-19.

43.     Plaintiff accuses her Academy  instructors of treating her less favorably and with discriminatory animus because she is a Black woman. The negative perception that they created of her, she says, did not stay with those who had an "arguable need to know" about her Academy performance. As a result, "those without any legitimate reason for learning about her [Academy performance] still had negative opinions about her." ECF 55 at SADMF ¶ 44. This Court construes her contention to be that (1) the Academy instructors placed her in a negative light without legitimate reason (2) which then affected her experience as a probationary firefighter. The following statements are the examples Plaintiff gives in support of this allegation.

44.     Mr. Allen recounts overhearing Captain Dave Powell complain about "getting that pain in the ass at Truck 4." The comment referred to his wife because she was the only probationer

who was coming from Truck 4. Captain Powell did not know Mr. Kelly was her husband when he uttered the criticism. ECF 55-7 at 6, 21.

45.    Mr. Kelly recalls Plaintiff telling him of the requirement to perform the high-rise evaluation every shift. That meant the others on her shift had to do it with her. From a conversation he had with an engineer at Plaintiff's first assigned firehouse, he learned that the others had heard Plaintiff was unable to run up the stairs. Consequently, they were surprised when they saw her make it. ECF 55-6 at 19.

46.    Mr. Kelly regards it as unusual for a firehouse to receive negative information about an incoming probationer "because you want them to get fair treatment at the house." "[T[hat was not being done [for Plaintiff] just from comments that we heard from people that weren't even at the station. So obviously there was talk being said about her." ECF 55-6 at 21. Defendant objects that Mr. Kelly makes those statements without the benefit of first-hand knowledge.

47.    Plaintiff claims that DFD fired her in retaliation for complaining about discrimination. Plaintiff references the letter her attorneys sent to Denver on September 18, 2019 in which she asserted numerous examples of discrimination by DFD against her. ECF 45-9.

48.    Plaintiff also references DFD's Internal Affairs investigation which included her interview on October 4, 2019. Plaintiff reiterated at that interview the examples of discrimination that her attorneys earlier had stated in the letter, and she shared additional ones from her time at the Academy and as a probationary firefighter. ECF 56-1. Internal Affairs concluded its investigation by deeming her complaints "unsubstantiated." According to DFD's *Discipline Handbook*, "unsubstantiated" means that the investigator found insufficient evidence to either prove or disprove the allegation. ECF 55 at SADMF § 48, n.6.

49.     DFD informed Plaintiff on October 22, 2019 that she was on administrative leave effectively immediately. Defendant terminated her employment on October 24, 2019.  Fire Chief Eric Tade and Deputy Chief Bower had recommended the termination to Deputy Executive Director Dulacki. ECF 55-14 at 17.

50.     Plaintiff alleges that Defendant acted with a discriminatory and retaliatory motive when it fired her. The reasons Defendant gives for terminating her therefore are false and pretextual, she argues. In support of that assertion, Plaintiff cites instances of what she characterizes as procedural irregularities. She points to Assistant Chief Helwick's request that she ride as the fifth member of a fire truck crew at her first firehouse assignment as one example. Two memoranda discuss the fifth member truck assignment. On May 20, 2019, Captain Stewart wrote Assistant Chief Helwick about Plaintiff and her twenty-two DRs and ten confirming memoranda. Plaintiff had struggled to achieve proficiency and maintain it. Because of Plaintiff's need for "significant assistance and effort from her classmates and the DFA staff to keep her skill levels proficient and to the minimum standards," Captain Stewart had "concerns about her ability to maintain proficiency in basic skills without consistent reps and continual reinforcement." "Every effort [had] been made to support [Plaintiff's] successful completion of the academy," and in anticipation of her time as probationary firefighter, Captain Stewart saw need to continue monitoring and proactive support. ECF 55-16 at 1. On May 21, 2019, Assistant Chief Helwick wrote Division Chief Fulton about Plaintiff's difficulties in achieving—and maintaining— minimum standards important for firefighter survival. Although she met the minimum standards for graduation, she lacked the kind of consistent performance that otherwise would be expected. There was need to monitor Plaintiff's time as a probationary firefighter and to ensure the provision of assistance and support. As part of that strategy, Division Chief Fulton requested that Plaintiff

"ride 5th on her rig for 3-weeks" to "give her an opportunity to work on her proficiency [and to create a time] period for her officer to review her skills." The goal was to create an environment in which Plaintiff could "become confident in her skills and continue to grow during her firehouse rotations." ECF 55-16 at 2. At her deposition, Assistant Chief Helwick discussed the reasoning behind her fifth member assignment recommendation. ECF 55-1 at 16.

51.     Division Chief Fulton also discussed the fifth riding position option. A DFD truck normally has a crew of four. Because Plaintiff would be an extra person and not part of the actual working crew, she could learn and train alongside the others. ECF 55-15 at 19.

52.     An injury delayed Plaintiff's start as a probationary firefighter. After she recovered, DFD returned her to the Academy for refresher training. With the benefit of that additional training, Assistant Chief Helwick now regarded the fifth member assignment as optional. She left the decision to Plaintiff, and according to her, Plaintiff chose it over the standard four crew assignment. ECF 55-1 at 16. Command staff informed Captain Schauer that Plaintiff was allowed to ride as a fifth member. ECF 55-17 at 10.

53.     The parties dispute whether any other probationary firefighter was assigned to a firehouse as a fifth crew member. Plaintiff characterizes the fifth crew member assignment as "superfluous" and exclusionary. In other words, she regards it as an improper *adverse* action taken against only her.

54.     Plaintiff cites to the memorandum written by Assistant Chief Drapeau on September 11, 2019 regarding her performance. The fifth page of that report recalls how on several occasions Plaintiff responded to unsatisfactory ratings by stating, "[t[his is not fair" and "[e]verybody is out to get me." Division Chief Fulton agreed that as a general rule, DFD should

investigate an employee's complaint of unfair treatment, but no such inquiry was undertaken when Plaintiff voiced it. ECF 55-15 at 28.

55.    Plaintiff supports her claim of pretext with the argument that Defendant relied on subjective criteria in rating her performance. In support thereof, Plaintiff cites Division Chief Fulton's deposition testimony in which he conceded—as a general proposition—"that there is a subjective component to the evaluative process that occurs at the academy and in the stations" because "when you have people involved, I think it's impossible to take some subjectivity out of anything." He explained that measuring a probationer's performance of a task is primarily objective, but there is a subjective dynamic in how an instructor may focus on different finer points of performance. ECF 55-15 at 10-11, 20. Captain Schauer described the evaluative process in a similar way: of an essentially objective undertaking based on objective measurements and a pass/fail grading system but also involving a subjective component to some degree. ECF 55-17 at 12.

56.    Plaintiff reasons that if there is a subjective component to how Academy instructors rate a recruit's performance, that "[s]ubjectivity carries over" to how the performance of probationary firefighters is rated. Plaintiff stresses how (1) probationary firefighters' performance of training tasks remains under evaluation and (2) the skills that the Academy teaches are the same that a probationary firefighter utilizes. Plaintiff cites to nothing in the record that directly supports her assertion of an ongoing subjective performance rating system as a statement of fact, but the Court nonetheless construes it to be an inference reasonably drawn from the evidence. However, while there may be some degree of a subjective component to the evaluation process (for both recruits at the Academy and probationary firefighters on assignment), the Court makes no finding of fact as to how subjective it actually is.

57.     As an example of how a task is evaluated, Plaintiff cites the deposition testimony of Captain Stewart about ladder safety. The record citation that Plaintiff gives for the relevant testimony is incorrect. The Court assumes she cites to pages 49-52 of the transcript in which Captain Stewart describes the criteria for determining whether a ladder is braced properly against a wall. ECF 55-11 at 14.

58.     The Court is unable to find in the record the citations to Lieutenant Radke's deposition that Plaintiff gives to support her assertion that "it is possible for two evaluators observing the same firefighter perform the same task to disagree over whether the firefighter performed certain steps adequately." Plaintiff also cites to the daily summary report concerning T.B. dated November 24, 2019 in which the evaluator describes the probationer as doing "what he was taught in the academy and open to different methods." ECF 55-18 at 1.

59.     Plaintiff submits comparator evidence to show pretext, although she also discounts the usefulness of other probationary firefighters' records because DFD did not subject them to the same "hyper-scrutiny" targeting and harsh grading as it did her. This Court observes how Defendant's above Statements of Undisputed Material Facts and specifically those regarding other recruits' DRs at the Academy mention the same individuals who Plaintiff identifies as her comparators below (except as noted to the contrary).

60.     On October 1, 2019, Lieutenant Hoover gave Plaintiff a failing grade for the "Incident Operations" category for not connecting the hose to the hydrant. He gave a failing grade for the "Training" category for answering only one of ten street questions correctly. He rated her performance in the "Use of Proper Protective Equipment" category as "Below Standard" for wearing the wrong gloves during training. ECF 45-8 at 44-45. As an example comparator, Plaintiff points to the summary report for T.B. (a white male in Plaintiff's recruit class) dated November

24, 2019. Lieutenant Hoover gave him a "Meets Standard" rating for the "Public Relations" category despite a comment about how T.B. "angers every single citizen he comes into contact with." ECF 55-18. As of September 30, 2021, T.B. was a DFD firefighter second grade (ECF 55-19 at 5), on a four-grade scale with the fourth grade denoting a probationary firefighter and the first being the highest. Defendant says T.B. is not a relevant comparator because he did not fail to make a hydrant connection at a reported structure fire.

61.     A.B. was a white male in Plaintiff's recruit class, who on September 30, 2021 was a DFD firefighter of second grade rank. ECF 55-19 at 5. On June 14, 2019, he received a "Below Standard" rating in the category of "Tool Knowledge and Maintenance" for not knowing the tools and equipment on the engine despite being on his fourth shift. He received a "Below Standard" rating for his handling of a medical emergency. He needed to learn "med policies administering albuterol and call ins." A.B. "immediately beg[a]n reviewing policies and working to better himself in this area." ECF 55-20. Defendant emphasizes that A.B. had a different supervisor (Captain Pavlich) and was assigned to a different firehouse than Plaintiff. A.B. was not cited for failing to make a hydrant connection. Plaintiff could not be evaluated on medical tasks during her fourth shift because she still was not EMT-certified. Plaintiff did *not* receive an adverse employment action for the several times she performed below standard on tool knowledge.

62.     In their September 11, 2019 memorandum regarding their concerns about Plaintiff's performance, Assistant Chief Drapeau and Captain Schauer noted how Plaintiff had "scored an 81% on the downtown streets quiz." ECF 45-8 at 1. In a Summary Report dated April 8, 2019, M.C. (a white male) scored an eighty percent on a "SOGS" engine operations quiz. ECF 55-21 at 1. (Plaintiff describes the report as showing that M.C. twice scored an eighty percent on a SOGS quiz, although the report also could be read as containing two separate references to the

same SOGS quiz score.) On April 14, 2019, M.C. received a "Below Standard" rating for EMS

tasks, along with the advice to improve "on patient questioning to keep a more fluid interview"

and a more precise relay of information to paramedics. ECF 55-21 at 2. On April 29, 2019, and

again on May 17, 2019, M.C. was told to improve how he handed patients off to paramedics. ECF

55-21 at 3-4. Because he "still [was] struggling with clear, concise patient hand offs to paramedics"

on May 20, 2019, he received a "Below Standard" rating. ECF 55-21 at 5. On July 11, 2019 and

again on July 20, 2019, M.C. was told to improve his patient interview skills on medical calls, but

he still received a "Meets Standard" rating. ECF 55-21 at 6-7. The earlier May 20, 2019 Summary

Report also gave M.C. a "Below Standard" rating for sleeping through an emergency response, for

which another firefighter was sent to get him. ECF 55-21 at 5. On January 11, 2020, he received a

"Below Standard" rating for the poor quality of his "pre Plan book for which he should have put

in more effort and taken more seriously. M.C. was described as comfortable and performing well

but "seem[ed] above probationary duties." ECF 55-21 at 8. As of September 30, 2021, M.C. was

a grade-two firefighter. ECF 55-19 at 5. Defendant counters that M.C.'s situation is materially

different. For one, M.C. reported to different supervisors and was assigned to different stations.

Second, he was participating in a condensed training program, called the "Echo Group," for those

with prior firefighting experience. Although they entered the same Academy class, they already

had the rank of a grade-three firefighter. ECF 64-1.

63.     The summary report issued for S.D. (a white male) on March 27, 2019 rated his

performance on a training evolution as below standard. While he ultimately was successful in the

task (locating the victim), his "wall search" needed improvement for which more practice was

recommended. ECF 55-22 at 1. On April 5, 2019, he made multiple mistakes on the last of that

day's several evolutions. ECF 55-22 at 2. On September 28, 2019, he was instructed to study

natural gas protocols and city streets in preparation for his yearly test. A verbal quiz administered on that day showed deficiencies, and the need for improvement was a priority. Despite the poor quiz performance, his performance was rated as "Meets Standard." ECF 55-22 at 15. Regarding EMS-related skills, S.D. was noted as needing "reps and equipment familiarization" and was advised to prepare "a line of questioning and paramedic hand off report" in a summary report from May 17, 2019. His performance was rated as "Meets Standard." ECF 55-22 at 3. On June 9, 2019, S.D. was described as needing "more repetitions with [patient] assessment and hand off" and would receive ongoing training. His EMS performance was rated as below standard. ECF 55-22 at 5. Subsequent summation reports through August 26, 2019 show that patient assessment remained an area for which D.S. continued to work on, but he received no more below standard ratings during that time. ECF 55-22 at 6-14. No comment regarding EMS skills was made in the final report dated September 28, 2019. ECF 55-22 at 15. The June 1, 2019 summation report notes that S.D. had "come a long way," "still has a long way to go," but the evaluator was "confident that he will continue to improve" in the comment field for the "Incident Operations" category. ECF 55-22 at 4. Plaintiff emphasizes how the prior three reports mention no need for improvement in that field (although as Plaintiff notes above, other categories were noted as needing improvement). As of September 30, 2021, S.D. was a grade-two firefighter. ECF 55-19 at 5. As for M.C., Defendant adds S.D. had different supervisors, was assigned to a different firehouse, and participated in the different Echo program.

64.     The summary report for Z.D. (a Hispanic male) on September 5, 2019 described Plaintiff's performance on EMS skills as better. Z.D. "continues to work hard on improving [but] still needs to work on not being timid and hand offs." ECF 55-23 at 9. Because his performance of this task still was falling short, he received a below-standard rating on September 2, 2019 (ECF

55-23 at 10) and again on January 6, 2020 (ECF 55-23 at 12). Otherwise, for his summary reports leading up to January 6, 2020, he received a "Meets Standard" rating despite this particular task being an area in need of improvement. ECF 55-23. Plaintiff emphasizes his overall "meets standard" ratings even though she had "very similar struggles over [her] many shifts." ECF 55 at 30, SADMF ¶ 64. As of September 30, 2021, Z.D. was a grade-two firefighter. ECF 55-19 at 5. Defendant counters that Z.D. had different supervisors and firehouse assignments, and there was no incident of an inability to make a hydrant connection at the scene of a reported structure fire.

65.     The summary report for J.W. (white male) on August 22, 2018 advised him of the need to review the carbon monoxide "sog" after taking a CO quiz that day. ECF 55-24 at 3. On December 13, 2019, J.W. did "well on quizzes" but "struggle[d] on streets." ECF 55-24 at 4. Both day's summary reports gave J.W. a "Meets Standard" rating for the "Daily Academic Evaluations" category. As of September 30, 2021, J.W. was a grade-two firefighter. ECF 55-19 at 6. Defendant adds that J.W. had different supervisors and firehouse assignments, and there was no incident of the inability to make a hydrant connection at a reported structure fire.

66.     Plaintiff submits the daily summary reports for E.H. (Black male) who, unlike the others, is not discussed in Defendant's above Statements of Undisputed Material Facts. The first report, dated October 3, 2019, instructed him to study the different ways to fold tarps, but he still was given a "Meets Standard" rating for the "Knowledge and Performance for Training Evolutions" category. He also received a "Meets Standard" rating despite need to improve on patient interview skills and hand-off regarding EMS skills. ECF 55-25 at 1. On December 16, 2019, E.H. received a "Meets Standard" rating for the "Daily Academic Evaluations" category despite need to study streets and addresses and for the "Knowledge and Performance for Training Evolutions" category despite need for further improvement regarding SCBA equipment use. ECF

55-25 at 2. Although E.H. continued to work on his EMS skills, he received a "Meets Standard" rating for the EMS category on January 6, 2020. He received a "Meets Standard" rating for the "Daily Academic Evaluations" category despite the instruction "to put some serious time into the books and to get more familiar with department terminology and JPR's." However, he received a "below standard" rating after he "failed several job sheets during testing" on this day. ECF 55-25 at 3. E.H. received an eighty percent on a written SOG test but did well on other training activities on January 9, 2020, and he received an overall "Meets Standard" rating for the "Daily Academic Evaluations" category. He also received a "Meets Standard" rating for the "Knowledge and Performance for Training Evaluations" despite the instruction "to continue cleaning up his JPRs." ECF 55-25 at 4. On January 12, 2020, E.H. was encouraged to gain greater self-confidence in EMS tasks, reminded to prepare for an upcoming test, and advised to some tasks better by doing them slower. That day's summary reports contained all "Meets Standard" ratings. ECF 55-25 at 5. As of September 30, 2021, E.H. was a grade-two firefighter. ECF 55-19 at 10. Defendant counters that E.H. had different supervisors and firehouse assignments, and there was no incident of the inability to make a hydrant connection at a reported structure fire.

67.     E.D. (white male) scored a seventy-five percent on a daily test (of a unspecified subject) on September 29, 2019 for which he received a "Below Standard" rating. ECF 55-26 at 1. On October 2, 2019, he received an "Exceeds Expectations" rating after doing "very well on this quiz" indicating how "he is spending more time studying." He received a "Below Standard" rating for EMS skills after having an "issue setting up the neb. treatment for an asthma patient." E.D. was informed of the "[n]eed to be familiar with all equipment on the rig and know how to deploy it rapidly." ECF 55-26 at 2. The summary report from October 26, 2019 described how E.D. performed in-vehicle patient care and an automobile extraction well and after the call areas

of improvement were discussed. He was given a "Meets Standard" rating. He received a "Below Standard" in the PPE category because he did not wear safety glasses for a medical call involving an unruly patient. He received several "Exceeds Expectations" such as for redoing inventory on his own initiative without being asked. ECF 55-26 at 3. As of September 30, 2021, E.D. was a grade-two firefighter. ECF 55-19 at 5. Defendant notes that E.D. had different supervisors and firehouse assignments, and there was no incident of the inability to make a hydrant connection at a reported structure fire.

68.     The summation report for A.B. (white male) from June 14, 2019 gave Plaintiff one "Below Standard" rating regarding his knowledge of city streets for which he was advised to continue studying. ECF 55-27 at 1. As of September 15, 2019, A.B. came under Captain Schauer's supervision upon his second firehouse assignment. In that day's report, Captain Schauer articulated his expectation that A.B. "memorize the inventory in 3 shifts." On that same day, Captain Schauer gave A.B. "Below Standard" ratings for two different ladder use errors, one of which had put A.B. "in a dangerous situation." *Id*. at 2. On October 30, 2019, Captain Schauer instructed A.B. "to continue . . . learning SOGs and refreshing city information" after being "quizzed on basic city information and street info." Despite that need for improvement, Captain Schauer gave A.B. a "Meets Standard" rating for the "Daily Academic Evaluations" category. As of September 30, 2021, A.B. was a grade-two firefighter. ECF 55-19 at 5. Unlike A.B., Plaintiff came under Captain Schauer's supervision on her *first* firehouse assignment, during which Defendant expects a probationer to receive a greater number of negative comments. Defendant adds that A.B. encountered no difficulty connecting a hydrant on the scene of a reported fire.

69.     Plaintiff refers to the daily summary reports that C.M. (white male) received. Beginning June 14, 2019, they show consistent good performance and positive feedback on how

C.M. handled various calls and incidents. Indeed, the reports through July 17, 2019 are the most consistently positive of any probationary of record. ECF 55-28 at 1-10. That is why Plaintiff highlights the report from July 23, 2019, because it contains the first negative comments without indicating any preceding areas of difficulty. On that day, C.M. received a "below standard" rating for EMS skills noting that he "struggles with medical terminology, lines of questioning, and knowledge of medical equipment" and advising him to improve "his handoffs to EMS personnel." C.M. conceded "his deficiencies and has been working diligently to correct them." Likewise C.M.'s knowledge of EMS protocols were "still below the standard" albeit improving. *Id*. at 11. As of September 30, 2021, C.M. was a grade-two firefighter. ECF 55-19 at 5. Defendant points out that C.M. had different supervisors and firehouse assignments, and he did not fail to connect a hydrant on a call.

70.     Two white male members of Plaintiff's class—J.G. and J.W.—started their probation without EMT certification. J.G.'s first daily summation report notes that he will be taking his final EMT test on July 15. ECF 55-29 at 1. The July 10, 2019 report says that he helped with medical tasks although he lacked EMT-certification at that time. *Id*. at 3. There are no subsequent daily summation reports for J.G., and presumably, he did obtain EMT certification after his July 15, 2019 test. For his first daily summary report, J.W. was described as "practicing EMRIC skills while waiting for EMT certification to become valid" and was advised to "[u]se caution when handling [patients] closely." ECF 55-24 at 1. His second report from July 23, 2019 notes that J.W. "[j]ust got EMT [certified]." *Id*. at 2. Plaintiff contrasts the fact that they received firehouse assignments despite lacking EMT certification whereas "Captain Schauer was so upset that, among other things, [she] had not completed her EMT certification when she was assigned to his firehouse that he complained about her up the chain of command." ECF 55 at 32-33, SADMF

¶ 70. Defendant says the comparison is not relevant. Neither J.G. nor J.W. come under Captain Schauer's supervision, and thus Captain Schauer had no reason to complain about their assignments. At his deposition, Captain Schauer explained that Plaintiff "was the very first firefighter [he had] supervised that did not have an EMT certification," and only recently, just thirteen days before his deposition, was a second probationer without EMT certification (a Black male) assigned to his station. ECF 55-17 at 13-14. Captain Schauer "made similar objections" about the second assignment (*id*. at 14), and in that sense, his reaction was the same. However, he has "also learned that those objections don't go anywhere," and so now, he simply does the job that command staff gives him to do. *Id*.

71.     Plaintiff contends that passing the high-rise evaluation at the Broadway building is not required for Academy graduation. In support thereof, she cites a DR dated October 27, 2018 which flagged the need to complete that task as an area of improvement for D.D. (race and gender unstated). ECF 55-30. Tawannia Clark, a former DFD firefighter of fourteen years says that she was the victim of both race and gender discrimination during her time on the force. She states that she "did hear of others who did not complete the Broadway evolution but were allowed to graduate and then remain firefighters without ever completing a high-rise evolution." ECF 55-37 at 3. Defendant objects to Ms. Clark's Declaration as hearsay, conclusory, and unsubstantiated. Plaintiff's husband affirmed that the "high-rise evolution is a requirement," but he added that he has "heard of certain people," and specifically, M.S. who now is a DFD lieutenant, who did not have to do it. ECF 55-7 at 10-11. Defendant likewise objects to Mr. Allen's testimony as hearsay and overly speculative.

72.     Plaintiff asserts that Defendant "clearly does *not* have a problem with blatantly racist, sexist, and racial stereotyping comments" (emphasis added). Instead, she claims that such

comments were directed towards her personally. Plaintiff furthers that Defendant's alleged "ratification of and support for these comments" reveals "the large extent to which" it has tolerated racism and sexism over the years. ECF 55 at 33, SADMF ¶ 72. The Court construes this assertion as argument and an introduction to her following fact statements on the topic of DFD's "long history of sex and racial discrimination."

73.     In support of the above assertion, Plaintiff cites to the Findings of Fact and Conclusions of Law that District Judge R. Brooke Jackson wrote after a bench trial of a race discrimination case against DFD. Plaintiff says the trial testimony of Charles McMillan shows "that women and Black people were made to feel unwelcome by DFD." ECF 55 at 33, SADMF, ¶ 73. After recounting the testimonies of several African-American DFD officers, Judge Jackson recognized the "perception that African Americans have historically been more harshly disciplined on average than others." *Lewis v. Denver Fire Dep't*, 943 F. Supp. 2d 1173, 1182 (D. Colo. 2013). Judge Jackson also cited "the testimony of Lt. Johnson who believes that the Department is making great strides towards better diversity under the administration of the current Fire Chief, Eric Tade (a Caucasian)." *Id*. Ultimately, Judge Jackson ruled on Defendant's favor, after seeing no evidence of discrimination or retaliation (or a custom, practice, or policy thereof) in the DFD. *Id*. at 1191.

74.     Plaintiff submits the EEOC Charge that Camilla VonBurkhardt filed against DFD on April 23, 2015 claiming discrimination on the basis of her sex (female) and disability (by virtue of being the daughter of a person that the Americans with Disabilities Act considers as qualified individual). There, Ms. VonBurkhardt complained of "pervasive and severe sexual harassment" and "misogyny" against all women that is the "accepted norm" and "ingrained in DFD culture and tolerated and condoned at all levels." ECF 55-31. This occurred despite how well she had done during her first six-week probationary assignment during which she had "met the standards on all

of [her] tested skills, and [her] superiors regularly commended [her]." She alleged a hostile environment that forced her to resign. ECF 55-31. Plaintiff says (without a supporting record citation) that Defendant settled her claims for $75,000.00. Nor does she specify whether Defendant settled claims of unlawful discrimination as committed by an individual or as a matter of DFD custom or policy.

75.     At her deposition, Captain Stewart discussed an Internal Affairs investigation regarding Ms. VonBurkhardt's claims of discrimination and FMLA leave request. Captain Stewart recalled Ms. VonBurkhardt saying something to the effect "that she wanted to do better so that the men would treat her better or differently." ECF 55-11 at 4. Plaintiff submits this as evidence of how Ms. VonBurkhardt was treated less favorably. Captain Stewart furthered that Ms. VonBurkhardt "never really elaborated" when she "asked her what she meant by that," and at the time, Captain Stewart perceived it as expressing a desire for improvement generally rather than a gender discrimination claim specifically. *Id*. Defendant objects to the evidence as inadmissible hearsay.

76.     Plaintiff submits an EEOC Charge of Discrimination filed by Colley Fisher (a female) on February 6, 2015. She claimed discrimination on the basis of her sex (female) and age (fifty-five) as well as unlawful retaliation. She had worked for DFD since 1992, and her most recent position was as Fire Prevention Captain. She complained of lower pay (resulting from increased job duties), less favorable employment terms, and inadequate training to correct performance errors. She also complained of being required to take a drug and alcohol test (after an accident driving a DFD vehicle which was positive for Vicodin) and placement on administrative leave without cause.  The focus of her grievance was on two particular chiefs (ECF 55-32) and thus not DFD custom or policy. Plaintiff cites a local newspaper article that quoted Captain

Fisher's description of herself as the viction of DFD's "boys club" culture for which Defendant paid a $1 million settlement. ECF 55 at 34, SADMF ¶ 76. Citing *Marotta v. Rocco-McKeel*, No. 08-cv-02421-WJM-CBS, 2011 WL 2633028, at *8 (D. Colo. June 27, 2011), Defendant objects to Plaintiff's reliance on a newspaper article as proof of the facts stated therein; instead, the article constitutes inadmissible hearsay. The only question tried to a jury was whether Defendant fired Captain Fisher "in retaliation for her complaints of discrimination, harassment, or retaliation," to which the jury answered in the affirmative. ECF 45-20.

77.     Division Chief Fulton did not know of any additional discrimination and retaliation training that DFD offered as a specific result of Captain Fisher's lawsuit. ECF 55-15 at 5-6. Plaintiff reasons that the large settlement amount should have made DFD see the need to take corrective action to avoid repeat liability. *Id*. The Court notes the general rule that the mere fact a defendant settled a lawsuit (or a claim raised in a lawsuit) is not evidence that the defendant committed any wrongdoing. *Olguin v. Adams County*, No. 21-cv-00025-STV, 2022 WL 227240, at *5 (D. Colo. Jan. 26, 2022).

78.     At her deposition, Co-Plaintiff Cassie testified that Captain Fletcher described DFD as a "good old boys club," and because she is a minority, he advised her to keep her head down, not talk back or argue, and "work like a slave" if she wanted to do well. ECF 55-8 at 21-22. Defendant adds that Captain Fletcher played no role in Plaintiff Allen's termination.

79.     In both her EEOC Charge of Discrimination (ECF 55-33) and at her deposition (ECF 55-8 at 22), Co-Plaintiff Cassie said that Assistant Chief Helwick and Chief Fulton explained to her that even if done unintentionally, others will single her out because she looks different (in reference to being Black) and is female.

80.     Co-Plaintiff Cassie testified that at some point in 2019 when Assistant Chief Helwick saw her with her hair straightened (rather than in braids or twists), she told her that she "looked human." ECF 55-8 at 22. Assistant Chief Helwick denied making any statement to her individually about her hair. However, Assistant Chief Helwick did instruct the Academy class on the whole to wear their hair up and off the collar when in their Class B and Class A uniforms. ECF 55-1 at 21.

81.     Assistant Chief Helwick met with Co-Plaintiff Cassie in February 2019 to discuss her performance. As Co-Plaintiff Cassie exited the meeting at its conclusion, Assistant Chief Helwick instructed her to send in another female recruit. Co-Plaintiff Cassie says that Assistant Chief Helwick then asked another officer present, "Why in the hell am I having to speak to all the females?" Assistant Chief Helwick then turned to her and asked, "Why, Cassie?" and told her to "fix it." ECF 55-33 at 3. Assistant Chief Helwick conceded feeling frustrated over why she needed to address all the female recruits *together* about the number of DRs they were receiving. ECF 55-1 at 21.

82.     Assistant Chief Helwick maintains "a very consistent message" to female firefighters to be "good ambassadors" and to show others how it is possible for any woman to do the job. She explained that females "are newer, in essence, to the trade," and "it is very common for kids in particular to notice you are a woman firefighter." ECF 55-1 at 20.

83.     Division Chief Moeder denied experiencing discrimination during her career. She furthered that the opportunities are equal and treatment fair. She conceded that females do face "challenges in . . . a male-dominated workforce" such as "being a member of a team" and the job's physical strength demands. ECF 55-14 at 14.

84.     Co-Plaintiff Cassie testified that DFD employees, including her supervisors, told her that as a woman, she was unwelcome at DFD; some DFD employees will not like her; and older firefighters are stuck in their ways and do not like female firefighters. ECF 55-8 at 23-25, 41.

85.     Assistant Chief Helwick recalled observing a particular incident at the 2019 firefighters' ball, about which a comedian made a joke at the next year's ball. ECF 55-1 at 10. Neither Assistant Chief Helwick nor Division Chief Moeder knew if those incidents were the reason why Eric Tade voluntarily resigned as the DFD Chief in 2020. *Id.*; ECF 55-14 at 8.

86.     Division Chief Moeder recalled no remarks being made at a firefighters' ball that were disparaging of Latino firefighters generally or in reference to a particular Latino firefighter. The individual Latino subject of the purported disparaging remark preferred that no action or investigation be taken, and consequently, none was. ECF 55-14 at 9.

87.     Neither Assistant Chief Helwick nor Division Chief Moeder recalled DFD written communications regarding the above rumored misconduct at either the 2019 or 2020 events. ECF 55-1 at 10; ECF 55-14 at 9.

88.     Internal Affairs interviewed K.S., a female member of a 2018 Academy class, as part of an Internal Affairs investigation of Plaintiff's grievance. The summary of this interview is found in the record at ECF 56-2. K.S. did not graduate in 2018 because of an injury, and she declined to enter the 2019 Academy year. K.S. said that some of the 2019 female probationers had told her they were having to "play the game" to fit in and were being subject to unspecified "inappropriate" conduct. One told K.S. that a male officer had asked her if she knew "how to work with men," and there was a bet on whether she would complete probation. The investigator was unable to confirm K.S.'s allegations. None of the three female probationers whom K.S. identified

reported negative experiences as probationers "[a]lthough there was discussion about difficulty functioning as a cohesive class during the academy." ECF 56-2.

89.     Plaintiff characterizes the daily summary report written for J.M. (a multi-racial male) on October 24, 2019 by a male evaluator as indicative of DFD's "boys' club" culture. J.M. received overall "Exceeds Expectations" and "Outstanding" ratings with positive comments about his handling of different tasks. Of them, Plaintiff highlights the comments about how he "fits in great with the crew and does a great job at balancing being a [probationer] and one of the guys." ECF 55-35.

90.     Plaintiff submits the Investigative Summary written by Internal Affairs on July 21, 2021 regarding the arrest of a lieutenant for covertly filming a female firefighter, K.K., while she changed clothes. ECF 56-3. Division Chief Moeder recalled that the lieutenant was immediately sent home after the recording device was found, and he retired within days of that incident. Division Chief Moeder explained that because he had retired, Internal Affairs ceased with its investigation. ECF 55-14 at 10. The Investigative Summary adds that Internal Affairs had attempted to interview K.K. on March 16, 2021, but K.K. declined, preferring to wait until after her lawsuit against Defendant had concluded. Internal Affairs interviewed her later, on June 3, 2021, when her lawsuit was over. ECF 56-3.

91.     The Investigative Summary also reports on the investigation into K.K.'s allegations that (1) a DFD chief started a GoFundMe page to raise money for the lieutenant's defense and (2) several officers expressed to her (K.K.) their support of the lieutenant. The investigator was unable to substantiate K.K.'s allegations. While some may have made comments suggesting a degree of support for the lieutenant (in the sense of wanting to hear both sides' stories), all were supportive of K.K. ECF 56-3.

92.     Plaintiff asked Division Chief Moeder at her deposition why the investigation into the lieutenant-supportive comments that K.K. reported was closed as unsubstantiated. Division Chief Moeder had not watched the interviews herself, but her "guess" was that the matter had boiled down to a he-said/she-said contest. She reiterated that an investigation indeed was conducted, and the parties of interest were interviewed. Those interviewed did not remember making the alleged statements, and there was no other evidence supportive of K.K.'s claim. ECF 55-14 at 11.

93.     Plaintiff also asked Division Chief Fulton about the comments that K.K. reported hearing that were supportive of the lieutenant. He regarded the purported comments as wholly inappropriate. Division Chief Fulton agreed that the secretive filming was a crime, motived by sexual interest, and a sex-based reprehensible act. Division Chief Fulton did not know whether the act also constitutes "sexual harassment" as the law defines the term. Division Chief Fulton disagreed that the occurrence of that filming act would make other female employees feel targeted by lieutenants or feel less safe. ECF 55-15 at 32.

94.     Plaintiff's husband testified that ninety-nine percent of the time, he is "the only black guy" at any given DFD firehouse. He furthered that when he enters a room, the people inside stop their conversation about such topics as politics or "police and black people getting shot". ECF 55-7 at 12. Mr. Allen furthered that "there's always eyes on [him]" and "a double standard," and as "a black person on the Denver Fire Department you've got to do everything twice as good." ECF 55-7 at 10.

95.     Mr. Allen opined that DFD "like most fire departments" does not "really like women" and has "an issue with women." He forewarned Plaintiff that if she joined DFD, everything she does will be "looked at and scrutinized." ECF 55-7 at 7. There was only one woman

(S.K.) in his Academy class, and Chief McGrail transferred her elsewhere because he "didn't want a female working in his district." People also complained "about how incompetent S.K. was as an engineer [even though she] was number one on the engineer's list." *Id*. at 11-12. That testimony, Defendant objects, is made without firsthand knowledge and thus does not constitute a fact for Fed. R. Civ. P. 56(e) purposes.

96.     Twannia Clark worked for DFD for fourteen years. She was its "first female African-American engineer," and from the beginning at the Academy, she felt discriminated against. She believes the culture is changing—and she hopes it does—but she still would not allow her daughter to join "because of how women and people of color were treated when [she] was there." ECF 55-37.

97.     Ms. Clark says that Captain Kelley Fornay subjected her to "constant and unbearable harassment" because she is Black. Ms. Clark says that "Captain Fornay was placed on secret probation" and made sure Ms. Clark knew that she was the one responsible for why he was under investigation. Ms. Clark "was annoyed that nothing was made public about [Captain Fornay] getting in trouble and why," and "[a]s a result of this, [Ms. Clark] was retaliated against." ECF 55-37 at ¶ 4.

98.     Ms. Clark was assigned to a different firehouse, but its command staff did not want her. She was replaced by a white male with the same amount of experience. *Id*. at ¶ 5.

99.     Ms. Clark accuses Academy instructors and officers of targeting her with write-ups and criticism because she "was the only Black woman." No other recruits were targeted in that fashion. Captain Magana sought her termination for discriminatory reasons, she alleges. *Id*. at ¶¶ 6-7.

100.    During her time at Station 28, Ms. Clark wore her hair in braids in "a common style for Black women." A firefighter there "always made comments about [her] hair," did not "like any girls who had parts in their hair," and "believed it was disgusting and offensive." *Id*. at ¶ 8. Another firefighter accused her of stealing a $100 bill from his bed because she is Black and on the assumption she is poor. He repeated the accusation "until another guy stepped in and made him stop bothering [her]." *Id*. at ¶ 9.

101.    Ms. Clark says that a chief was allowed to keep his job despite common knowledge that he "hates and discriminates against women." *Id*. at ¶ 10.

102.    Ms. Clark describes the experience of another female firefighter, C.D., who despite her knowledge, good job performance, and familial connections was "mistreated "and "set up for failure by the officers and Chiefs who were overseeing her." *Id*. at ¶¶ 13-14. Defendant objects to Ms. Clark's Declaration as containing personal opinions rather than facts for Fed. R. Civ. P. 56(e) purposes; conclusory in nature; and irrelevant to Plaintiff's case.

103.    Plaintiff submits the Declaration of Jennifer Florez. She is a DFD technician and employee for twenty-five years, and she describes herself as "the African-American female who has been with the Department the longest." Although Technician Florez personally did not experience "the same issues of discrimination that [Plaintiffs] have had while working here," she sees no "reason to disbelieve" their allegations. Technician Florez says that learning of Plaintiffs' allegations brought her to tears and now hinders her work relationships with those who mistreated them. ECF 55-38.

104.    Technician Florez attributed the indifference of DFD's white leadership to their lack of understanding of "the culture" and their discomfort dealing with "a strong Black woman." *Id*. at ¶ 7. Defendant objects to Technician Florez's Declaration on hearsay ground as well as for

containing personal opinions rather than facts for Fed. R. Civ. P. 56(e) purposes; conclusory in nature; and irrelevant.

105.    Tamara Cowgill is a white female who was fired while still an Academy recruit. ECF 55-39 at 5. She says she "was dismissed because [she] dropped a ladder in the firefighter 1 test" and "was not allowed to retake it" even though the Academy permitted others to do so. ECF 55-40 at ¶ 2. Ms. Cowgill complains that she was treated differently because (1) she is a female and (2) her preexisting relationship with DFD. Her husband is a twenty-year DFD employee, and many firefighters already knew her from her twelve years as a paramedic. *Id*. at ¶ 3. She describes herself as the smallest (weighing 120 pounds) and oldest (at forty-five years of age) member of the class. She alleges that the Academy administered the ladder test in a discriminatory way, making her do it "the way the guys or someone taller would." *Id*. at ¶ 19. Ms. Cowgill recounts an incident when Assistant Chief Helwick and the lead instructor, John Radke, aggressively accused her of overstating the number of tower laps she had run that day and distrusting her physical ability. *Id*. at ¶¶ 21-22.

106.    Ms. Cowgill said that Academy instructors evaluated Plaintiff's physical performance more harshly than "some guys who were in worst shape and slower." *Id*. at ¶ 11. Following a five-mile class run, Lieutenant Burke expressed disbelief that Plaintiff would enter the Academy in such a bad shape even though a white female and some males ran equally slow. *Id*. at ¶ 12.

107.    Ms. Cowgill describes DFD as a "good old boys' club." *Id*. at ¶¶ 13, 16. Of the three female recruits, one (who the Court presumes Plaintiff means Anna.M., a white female (ECF 55-41)) fit in better "because she was less feminine." *Id*. at ¶ 13. Anna.M. was treated less differently because "she looked more like a guy and was built like a guy." *Id*. at ¶ 14. Ms. Cowgill

recounts an instance with Assistant Chief Helwick[15] who at the end of her speech looked towards her "and said that there was no pretty in fire academy" and that "they were not allowed to wear make-up or earrings," comments which Ms. Cowgill regards as very sexist. *Id*. at ¶ 17. As it does with the above-cited declarants, Defendant objects to Ms. Cowgill's Declaration for containing hearsay, offering personal opinions over Fed. R. Civ. P. 56(e) facts; being conclusory in nature; and being irrelevant to Plaintiff's case.

108.    Plaintiff submits a demographic study showing that from 2016 to 2019, on average five percent of DFD's employees were Black and five percent were women. ECF 55-42. Only two to three employees were Black women, representing 0.2 and 0.3 percent of DFD's 1,000 total employees. ECF 55-41. In her Academy class, Plaintiff Allen was one of three women and the only Black woman. ECF 55-41. Three firefighters were terminated or dismissed from the 2018 and 2019 Academy classes, all of whom were women and two of whom were Black. ECF 55-39. All four Black female recruits (including Plaintiffs) who entered Academy classes in 2018 and 2019 no longer are with DFD. *Id*. Citing *Carney v. Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) and *Mohn v. Progressive Ins*., No. 18-cv-00812-MSK-KMT, 2019 WL 2341559, at *6 (D. Colo. June 3, 2019), Defendant argues that statistics that fail to control for all relevant variables and subsets do not prove the existence of a discriminatory custom. Citing *Clincy v. Transunion LLC*, 684 F. App'x 680, 684 (10th Cir. 2017), Defendant furthers that absent a showing that an employer's overall practices played any role in a termination decision, statistical evidence does not support the inference of discriminatory motive.

---

[15] Plaintiff does not include them in her SADMF, but this Court notes that Ms. Cowgill raises in her Declaration a variety of additional allegations against Captain Stewart.

109.    Plaintiff says that the above statistics show a persistent disparity. Plaintiff contends that the Academy nevertheless "has no initiatives or programs to increase retention of minority and female firefighters." In support thereof, Plaintiff[16] refers to the deposition testimonies of several command staff officers. On their own, DFD firefighters independently have created "affinity groups," but according to Division Chief Fulton, DFD has no female or minority firefighter retention program. ECF 55-15 at 17. Assistant Chief Helwick said that "not only the fire department, but the City as a whole is working to achieve" recruitment of minorities and women. However, she was unaware of a retention program. ECF 55-1 at 8. Lieutenant Radke was personally unaware of any recruitment or retention programs. ECF 55-10 at 9. Captain Stewart explained that DFD has a recruitment program and strives to retain all firefighters. However, DFD does not have a program for the retention of minority firefighters specifically. ECF 55-11 at 7-8. Citing *Waller v. Denver*, 932 F.3d 1277, 1289 (10th Cir. 2019), Defendant stresses the need for Plaintiff to establish a direct causal link between municipal action and the alleged unlawful discrimination against Black women.

110.    At his deposition, Division Chief Fulton answered "no" to Plaintiff's question of whether "retaining female or minority firefighters is a problem for [DFD]," although he emphasized the goal of retaining all employees and ensuring equal treatment and appreciation of all. ECF 55-15 at 17, 18. Division Chief Moeder described DFD's recruitment teams that focus on the African-American and Latino communities, but she did not believe that Black female firefighter retention was an issue. ECF 55-14 at 8.

---

[16] At her deposition, Plaintiff described being part of DFD's first "CAP" program. The CAP program includes a recruitment effort in which Plaintiff participated. She did outreach at city events such as for the Juneteenth holiday and the Black Arts Festival. She spoke with those in attendance, but she denied an express instruction to recruit minorities specifically. ECF 55-3 at 3-5.

## LEGAL STANDARDS

**I.      Fed. R. Civ. P. 56(c)**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings

themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.    Disparate Treatment

Plaintiff (Da Lesha Allen) contends that Defendant terminated her employment because she is Black and/or a woman. She expresses her disparate treatment claim through three different statutory causes of action: 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 2000e-5 (Title VII). The elements that define unlawful discrimination are the same for all three. *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995). The first element is membership in a protected class, which Plaintiff meets on the basis of both race and gender. Plaintiff also raises an "intersectionality" argument that Defendant discriminated against her because she is a Black woman. Indeed, the primary protected class type on which Plaintiff bases her Response is that of a Black woman specifically and the unique discrimination that they face distinct from either African-American men or white women. ECF 55 at 47-50. The Tenth Circuit recognizes discrimination claims based on multiple protected traits. *Rodriguez v. Brown*, No. 21-1124, 2022 WL 3453401, at *8 n.8 (10th Cir. Aug. 18, 2022). The remaining elements are: (2) an adverse employment action, (3) qualification for the position and satisfactory job performance, and (4) less

favorable treatment than others not in the protected class. *Anderson v. Academy Sch. Dist. 20*, 122 F. App'x 912, 915 (10th Cir. 2004); *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

It is intentional, discriminatory animus that is unlawful under those statutes. "Plaintiff has the ultimate burden of proving, either directly or indirectly, that defendant intentionally discriminated against [her]." *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). In other words, Plaintiff must show how it was the protected trait(s) that motivated Defendant to terminate her employment or had a determinative influence on that decision. *McDonald v. Sch. Dist. No. 1*, 83 F. Supp. 3d 1134, 1148 (D. Colo. 2015) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). "Proof of discriminatory motive is critical" to prevailing on a disparate treatment theory. *Rodriguez*, 2022 WL 3453401 at *7.

The record contains no direct evidence of discrimination by the relevant decisionmakers (Deputy Executive Director Dulacki, Fire Chief Eric Tade, and Deputy Chief Bower) in the form of express statements of bias by them in connection to Plaintiff's termination (or even generally). Nor, as Plaintiff emphasizes at footnote 11 of her Response (ECF 55 at 57), she is not proceeding on a direct evidence theory. However, the lack of direct evidence is not necessarily a barrier to prevailing on a disparate treatment claim. Plaintiff may rely on circumstantial evidence instead, but to do so, she must satisfy the three-step burden-shifting framework that *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny apply. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). The *McDonnell-Douglas* framework provides the means by which intentional discrimination can be inferred from the evidence.

The first step in that process requires Plaintiff to make a prima facie showing of unlawful employment conduct. To do so, Plaintiff must demonstrate how the circumstances of her

termination permit the inference of discrimination, and there must be some logical connection between that inference and the elements of the cause of action. *Plotke*, 405 F.3d at 1099. The standard is "not onerous" to meet, but neither is it "empty or perfunctory." *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323-24 (10th Cir. 1997). Plaintiff must go beyond mere allegations and point to evidence in the record that if believed—and left unchallenged by Defendant—would entitle her to judgment as a matter of law. *Morgan*, 108 F.3d at 1324.

Tenth Circuit case law is unclear whether the initial prima facie showing involves consideration of job qualification or performance. On the one hand, its "essential purpose" is to eliminate the most common legitimate reasons for adverse employment action, which in a termination case is lack of qualification. *Plotke*, 405 F.3d at 1099. That suggests it is a relevant factor. There are opinions, such as *Anderson* and *Khalik* cited above as well as *Watts v. City of Norman*, 270 F.3d 1288, 1292 (10th Cir. 2001) and *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1229 (10th Cir. 2000), that include it. On the other hand, there is case law that does not mention job qualification as a prime facie element. *E.g.*, *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). For present purposes, the Court leaves any issue regarding job qualification or performance for the third step of the *McDonnell-Douglas* framework. Case law permits such an approach to simplify the analysis. *E.g.*, *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800 n.5 (10th Cir. 2007). For the same reason, this Court postpones until the third step consideration of whether Defendant treated other similarly situated workers who are outside the protected class(es) more favorably than Plaintiff. *Watts*, 270 F.3d at 1292-93; *Kendrick*, 220 F.3d at 1229, 1232. Considering these additional factors at the first step risks compressing the full analysis into one step and depriving Plaintiff the opportunity to argue pretext. *E.E.O.C. v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1193-95, n.7 (10th Cir. 2000).

Having postponed consideration of any argument concerning job qualification, job performance, or treatment of similarly situated co-workers, and "without passing on the merits or credibility of any Party's evidence," *Jackson v. Stonebridge Hospitality Assocs., LLC*, No. 18-cv-01397-NYW, 2019 WL 5622645, at *6 (D. Colo. Oct. 31, 2019), the Court finds that Plaintiff meets her burden at the first *McDonnell-Douglas* step. She is a member of protected groups (Black and/or female), and she experienced an adverse employment action (termination). A presumption of discrimination therefore arises. *Jaramillo*, 427 F.3d at 1307. That causes the burden to shift to Defendant to articulate a legitimate, non-discriminatory reason for terminating Plaintiff. *Jaramillo*, 427 F.3d at 1307.

As it is for Plaintiff at the first step, the burden on Defendant at the second step is light. *Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1363 (10th Cir. 1997). Defendant is not required to explain any differences between Plaintiff and similarly situated others. *Stinnett v. Safeways, Inc*., 337 F.3d 1213, 1218 (10th Cir. 2003). The termination order (ECF 45-15) discusses at length the performance problems that culminated in the decision to fire her. As it summarizes those reasons in its Reply, Defendant fired Plaintiff for not successfully attaching a hose to a fire hydrant to secure water at a reported residential fire; leaving the hydrant wrench on the hydrant when she departed the scene; and not informing the later arriving firefighters of her inability to connect the hose to secure it as a water source. As a result, it was the later arriving firefighters who had to attach the hose to the fire hydrant before they could proceed with their responsibilities. In other words, Defendant fired her for not being able to perform an essential task, not securing a tool, and not communicating the problem to others. Even if her omissions resulted in no real harm, they are matters of obvious importance to the fire department's public safety mission. They are legitimate reasons to terminate a probationary firefighter's employment.

Thus, the burden shifts back to Plaintiff to show that Defendant's stated reason is actually pretext for unlawful discrimination. Pretext is shown through "evidence of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its termination decision." *McDonald*, 83 F. Supp. 3d at 1148-49 (citing *Crowe v. ADT Security Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011)). *See also DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). An invidious discriminatory purpose may be inferred from totality of the relevant facts, taking the evidence into consideration on the whole. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

One way to show pretext is with evidence suggesting that Defendant's reason is either a post hoc fabrication or otherwise played no actual motivating role, *Plotke*, 405 F.3d at 1099, sufficient to cause a reasonable jury to disbelieve Defendant, *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). That includes substantive inconsistencies in Defendant's explanations, *Paup v. Gear Prods., Inc.*, 327 F. App'x 100, 113-14 (10th Cir. 2009), so long as those changes occur in a way that implies dishonesty or bad faith, *Rutledge v. Bd. of Cnty. Comm'rs of Johnson County*, No. 20-2012-DDC-GEB, 2022 WL 910724, at *17 (D. Kan. Mar. 29, 2022) (citing *Litzsinger v. Adams Cnty. Coroner's Office*, 25 F.4th 1280, 1290 (10th Cir. 2022) and *Mueggenborg v. Nortek Air Sols. LLC*, No. 20-6147, 2021 WL 4807176, at *8 (10th Cir. Oct. 15, 2021)). A meaningful procedural irregularity in Defendant's standard investigatory and disciplinary processes also may support the inference of pretext, *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008); *Rutledge*, 2022 WL 910724 at *19, such as falsifying or manipulating criteria. However, the mere fact of a procedural deviation may not suffice. *Rutledge*, 2022 WL 910724 at *20-21. The use of subjective criteria may suggest pretext. *Simms v. Okla. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999). Actions or

remarks may be relevant, but only if there is a nexus between them and the termination. The subject conduct must have been by those involved in the decision and must have occurred proximate in time to it. *Hare v. Denver Merchandise Mart, Inc.*, 255 F. App'x 298, 303 (10th Cir. 2007); *Rutledge*, 2022 WL 910724 at *20-21.

Another potential indicator[17] of pretext is if Defendant treated similarly situated employees who do not belong to the protected class differently (i.e., more favorably) despite an equivalent work rule violation. *Riggs*, 497 F.3d at 1120. For other employees' experience to be relevant, they must have answered to the same supervisor; were held to the same performance and discipline standards; and their conduct must have been of comparable seriousness. Moreover, the inquiry is limited to those other employees who share similar relevant circumstances of employment such as work history and company policies. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). Nor may Plaintiff "cherry pick" comparators, omitting those who were treated equivalently or more harshly. *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1012 (10th Cir. 2001).

At ECF 31, I discussed the potential relevance of statistical data to Plaintiff's disparate treatment case. An employer's pattern of conduct toward a protected class may permit the inference of that employer's discrimination against an individual class member. *See Owens v. Unified Gov't of Wyandotte County*, No. 21-2185-KHV, 2022 WL 2131117, at *11 (D. Kan. June 14, 2022). In my Order (ECF 31), I also reminded Plaintiff of the need to account for and eliminate non-discriminatory reasons for statistical observations. *See Owens*, 2022 WL 2131117 at *10

---

[17] The Tenth Circuit summarizes the foregoing potential ways of showing pretext as: "(1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Drury v. BNSF Railway Co.*, 657 F. App'x 785, 789-90 (10th Cir. 2016).

(noting how statistics "are refutable and depend on the surrounding circumstances," thereby heightening the need to show not only a significant degree of statistical disparity but also to eliminate non-discriminatory reasons for it). Even statistics that show a "prolonged and marked imbalance may not be controlling in [an] individual discrimination case" if the employer's reason is legitimate. *Id.* (citing *McDonnell-Douglas*, 411 U.S. at 805).

Not relevant to the pretext inquiry is the wisdom, fairness, or correctness of the stated reason. Instead, the focus is on whether Defendant honestly believed it and acted in good faith on that belief. *McDonald*, 83 F. Supp. 3d at 1150 (citing *Rivera v. Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004)). In other words, the facts are considered from how they appeared to the person who made the termination decision at the time. *Kendrick*, 220 F.3d at 1231; *Rutledge*, 2022 WL 910724 at *18-19. The Court's "role is to prevent intentional discriminatory [employment] practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)).

To defeat summary judgment, Plaintiff must show a genuine dispute of material fact over whether Defendant's explanation is pretextual. *McDonald*, 83 F. Supp. 3d at 1149 (citing *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006)). Doing so entails more than just disbelieving Defendant; there must be sufficient evidence from which the factfinder could conclude that *discrimination* was a *determinative* factor in Defendant's decision to fire Plaintiff. *McDonald*, 83 F. Supp. 3d at 1149 (citing *Young*, 468 F.3d at 1250). Viewed from a different perspective, a stated reason may be legitimate if the adverse employment action is "unsurprising" under the circumstances. *Litzsinger*, 25 F.4th at 1290. It is by rebutting Defendant's stated reason as pretext that Plaintiff shows the possibility of how the jury might infer discriminatory motive.

*Randle*, 69 F.3d at 452-53. If Plaintiff survives summary judgment, then it will be for her to prove illegal discrimination to the factfinder "either (1) *inferentially* by showing that the proffered reason is a pretext for *discrimination*;[] and/or (2) *directly* by offering direct evidence of discrimination." *Id*. at 453 (emphasis in the original). The true state of Defendant's mind and questions of intent and credibility "are best left for trial and are within the province of the jury." *Id*.

## II.      Pretext

In the preceding section, the Court defines the contours of disparate treatment generally, and it finds that Plaintiff's claim proceeds past the first two steps of the *McDonnell-Douglas* framework. The dispositive question therefore is whether Plaintiff shows a genuine dispute of material fact over whether the legitimate reason Defendant offers is pretextual.

### A.      Alleged Racist or Sexist Comments by Those Uninvolved in the Termination Decision

Plaintiff argues that her supervisors' intent to discriminate against her can be inferred because they used "terms . . . associated with stereotypes of Black women." Plaintiff does not expressly say what terms are at issue and which supervisors said them. From its own review of the record, the Court sees no use of discriminatory terminology in her performance reviews, confirming memoranda, or formal disciplinary reports. As such, Plaintiff's situation is distinguishable from *Goldschmidt v. New York State Affordable Housing Corp*., 380 F. Supp. 2d 303, 315 (S.D.N.Y. 2005), the case upon which she relies. At issue here are comments made by instructors and supervisors over her full length of time with DFD but not in relation to the decision-making process to terminate her employment.

Plaintiff accuses most every Academy instructor and probationary supervisor she encountered as well as the officers above them of racism and sexism that negatively affected all aspects of her experience with DFD. In support thereof, she relies on comments that she or others

heard DFD instructors, supervisors, and command staff say either to her or about her. Because many of those comments are hearsay, she must show how they can enter the record as admissible evidence. She does not undertake this additional step. For the sake of thoroughness—and because Defendant raises it as an objection—the Court considers whether Plaintiff could benefit from the Rule 801(d)(2)(D) hearsay exception that covers declarations by the opposing party.

In *Cruz v. Farmers Ins. Exchange*, — F.4th —, 2022 WL 3051064 (10th Cir. 2022), the Tenth Circuit recently clarified the degree of involvement that a declarant-employee must have in a termination decision in order to benefit from the Rule 801(d)(2)(D) hearsay exception. *Cruz* explains that the speaker must have some general involvement, construed broadly, in the decision-making process that affected the disputed employment action. It is not limited only to those who exercised ultimate decision-making authority. At issue in *Cruz* was the employer's decision to fire an insurance agent. From lowest to highest rank, the command hierarchy above Mr. Cruz began with the district manager, then the sales manager, and ended with the territory manager. The (middle-level) sales manager recommended termination, which territory managers and others at that highest level approved. The Tenth Circuit held that the (lowest-level) district manager also was sufficiently "involved" in decision-making process because he served as the principal investigator of the underlying incident and as the channel of communication between them and the plaintiff-employee, two functions he carried out at the middle-level manager's direction. Because of his "key role in the process," the district manager "participate[d] in the process leading to the termination decision." *Id*. at *7. Consequently, a comment by the district manager was not hearsay.

*Cruz* provides a helpful guidepost. At one end of the involvement spectrum are those who played no role whatsoever. As applied here, this includes the background check interviewer and the warehouse captain who gave Plaintiff her uniform. This also includes fellow recruits and

probationary firefighters as well as non-supervisory firefighters. It covers instructors and training officers who interacted with Plaintiff during her time at the Academy but played no direct role in the decision to terminate her during her later time as a probationary firefighter.

This category also includes Lieutenants Buhlar, Burke, Calvo, Hoover, Huth, and Lile. They were either Plaintiff's supervisors for her firehouse assignments or training officers during her time as a probationer. They wrote performance-related daily summation reports and confirmatory memoranda in the regular course of the probationary experience. They wrote those reports solely as part of the evaluative process as was done for all probationers. These reports had no punitive or disciplinary purpose but rather served to monitor probationers' skills and development. These lieutenants played no direct involvement in the termination decision.

At the other end of *Cruz*'s involvement spectrum are those who actually made the termination decision or otherwise had ultimate authority over it. Deputy Executive Director Dulacki made the decision, and Fire Chief Tade and Deputy Chief Bower recommended it. Clearly, they are relevant actors.

Less certain is whether *Cruz* covers the higher-ranking officers, Assistant Chief Drapeau, Assistant Chief Helwick, Assistant Chief VanderMiller, Captain Johnson, Captain Schauer, and Captain Stewart. They raised performance concerns beyond the regular evaluative process. The same could be said of those who acted in response to Plaintiff's discrimination complaints. This might include Executive Director Riggs, Division Chief Drennan, Division Chief Fulton, Assistant Chief Drapeau, Assistant Chief Helwick, Captain Stewart, and Lieutenant Radke. A reasonable argument could be made that they played a role sufficient to make them the "opposing party" under *Cruz*'s definition. If *Cruz* did apply to them, then comments uttered by them could be admissible evidence.

74

However, even after construing *Cruz* broadly in Plaintiff's favor, she still must show how any such comment is relevant. For her disparate treatment claim, it is only the motivations of those involved in the decision to terminate her that counts. Discriminatory comments allegedly made by DFD employees at large do not prove that those who decided to terminate Plaintiff acted with discriminatory motive. There is no evidence of any potentially discriminatory comment was uttered by Deputy Executive Director Dulacki, Fire Chief Tade, and Deputy Chief Bower, those who were directly involved in the termination decision. That renders irrelevant any potential comments by the others.

Nevertheless, even if this Court were to consider the alleged comments by those who reasonably could fall within *Cruz*'s involvement definition, they still would provide an insufficient basis by which to infer unlawful discriminatory motive. Of those falling into this category, Plaintiff questions statements allegedly expressed (without regard to any hearsay concern) by only Division Chief Fulton, Assistant Chief Helwick, Captain Johnson, Captain Schauer, and Captain Stewart in relation to her. The greater focus of Plaintiff's grievance concerns female supervisors. She alleges that Assistant Chief Helwick asked her why she is so combative and explained to her that even if done unintentionally, others will single her out because of her race and gender. She says that Captain Stewart advised her to stay at home to raise her children, accused her of joining DFD solely for the paycheck, asked her why she is so combative, aggressively told her not to stand behind her during a meeting but to take a seat, and aggressively told her to join the other graduates during the graduation ceremony. She complains that Captain Johnson advised her that she had too much hair. Regarding male supervisors, she says that Division Chief Fulton cautioned her not to expect special treatment because of her legacy status (advice she did not hear him give to males),

asked her why she is so combative, and denied being racist because there is a Black kid on his soccer team. Captain Schauer allegedly called her lazy.

As the Court explains elsewhere, many of the above comments (assuming that they indeed were uttered and constitute admissible evidence) were made in the context of either legitimate safety concerns, pre-judgment (in the sense of being made before meeting Plaintiff personally), or offers of help or reassurance. Most of them occurred before Plaintiff even started the probationary stage. The extent to which they reflect discriminatory animus is ambiguous. Importantly, *none* of these declarants played a *direct* role in the termination decision.

**B.      Cat's Paw Theory of Liability**

The above supervisors and training officers did write performance-related reports which became part of the record that the decision-makers reviewed. As such, Plaintiff argues that they are relevant because they played an *indirect* role in her termination. In other words, Plaintiff relies on a "cat's paw" or "rubber stamp" theory of subordinate bias.

Under such a theory, an employer who acted without discriminatory intent still can be held liable if she uncritically relied on the reports and recommendations of a biased subordinate when deciding to take the adverse employment action. *Rodriguez*, 2022 WL 3453401 at *7. To survive summary judgment on a cat's paw theory, Plaintiff must establish (1) a biased subordinate, (2) who influenced the decision-making process, and (3) the employer's adoption of the biased recommendation without an independent investigation. *Id*. Plaintiff does not demonstrate how the evidence would support liability on this basis.

Construing the record broadly in Plaintiff's favor, the supervisors potentially relevant to Plaintiff's argument would be Division Chief Fulton, Assistant Chief Helwick, Captain Johnson, Captain Schauer, and Captain Stewart. However, as the Court addresses above, Plaintiff shows no

comments by them (assuming no hearsay admissibility bar) that suggest bias against Plaintiff. Even at face value, the alleged statements are ambiguous, and the contexts in which they were made detract further from what bias they may imply.

Even if this Court were to assume for present purposes that Plaintiff could establish the first element, her theory fails on the remaining two. The various performance-related reports written by these officers were part of Plaintiff's employment record, but they exerted no direct influence over the outcome. Plaintiff's record contains numerous reports of wide-ranging performance deficiencies that were authored by many instructors, fire station captains, and command staff. The record does not establish that a decisionmaker cherry-picked those negative reports and ignored positive reports. Plaintiff herself does not dispute the occurrence of the underlying performance issues that gave rise to them. Moreover, no decisionmaker was involved in the hydrant incident that precipitated the termination inquiry. Lieutenant Hoover was Plaintiff's supervisor on the day of the hydrant incident, and it was Assistant Chief VanderMiller who investigated it. Captain Johnson did speak with Plaintiff about it (and performance issues generally), but she conducted that meeting with Assistant Chief VanderMiller.

Nor can it be said that a decisionmaker "uncritically" relied on a particular subordinate. Plaintiff's record contained extensive documentation from many sources. She had several opportunities to tell her side of the story. The decisionmakers undertook a comprehensive review of the record, and Deputy Executive Director Dulacki explained her reasoning in a detailed, lengthy report. Internal Affairs conducted its own separate investigation of Plaintiff's discrimination grievance.

C.      **Comparators**

Plaintiff contends that the question of whether Defendant treated her "less favorably than other probationary firefighters who were not Black women" remains in dispute. ECF 55 at 47. However, for a comparison to permit the inference of discriminatory motive, the situations must be similar. Plaintiff emphasizes how all probationary firefighters "were ostensibly subject to the same standard of rating shown, for example, by the daily summation reports that evaluated each employee in the same areas, using the same scale." ECF 55 at 47. The implication of Plaintiff's argument is that Defendant's use of standardized, objective performance criteria renders irrelevant the fact that many of her comparators had different supervisors and worked at different stations. For a comparison to have relevance, the Tenth Circuit requires both the plaintiff and the comparator to have the same supervisors. *Rodriguez*, 2022 WL 3453401 at *9 n.10; *Rivera*, 365 F.3d at 922. Even if the Court were to ignore the differences in supervisors and station assignments, the performance issues that were flagged for the comparator probationers are also too distinct to be relevant.

The evidence simply does not support Plaintiff's contention that the "mostly white male[] . . . probationary firefighters struggled with similar performance issues as [she]." ECF 55 at 48. No one had perfect ratings. Indeed, the entire daily summary report system seems geared towards providing both negative and positive feedback with the goal of improvement in all necessary skill sets. The simple fact that a white male probationer failed a quiz or received a "Below Standard" rating on a given task on a particular day without adverse consequence does not reveal discriminatory animus. What would be relevant is if a white male remained employed despite having the same overall record of negative ratings and memoranda, which is not evident here. Plaintiff identifies no comparator with the same *quantum* of performance deficiencies and ongoing

poor performance despite opportunities at improvement. Nor is there a comparator who made similar mistakes in handling a water connection issue at the scene of a purported structure fire. There is no indication of another probationary firefighter doing the same whether at the start of the probationary term or later as in Plaintiff's case. Without a similarly situated comparator, Plaintiff cannot show how Defendant treated her more harshly.

Plaintiff then takes the contrary position that the daily summation reports do *not* serve as an objective baseline of performance reviews because she was specially targeted and placed under hyper-scrutiny.[18] The mere fact that Plaintiff received more reports and was subject of memoranda than the other firefighters does not mean improper targeting. Nor does the evidence indicate disparately harsh treatment. There is no evidence of misuse of the daily summation report and memoranda system used for feedback and performance-tracking. There is no evidence that someone directed the various authors to write the reports and memoranda for an improper purpose. There is nothing inherently wrong about documenting an employee's performance. Plaintiff herself does not dispute the reports' contents. She does not say her performance was substantially better than described in those documents.

Instead, Plaintiff questions her record with the assertion that "her probationary supervisors had already pre-judged her as a bad firefighter before they ever saw her work." That contention lacks evidentiary support. At SADMF No. 46, Plaintiff relies on her husband's opinion that firehouse supervisors should not rely on others' negative comments. Even after accepting her

---

[18] This argument runs contrary to her other theories of discrimination. Accepting as true Plaintiff's argument that "many of [her] fellow probationary firefighters significantly struggled in areas in which Plaintiff did," (ECF 55 at 54) contradicts her claim of targeting or hyper-scrutiny. Conversely, her claim of targeting implies that there are no relevant comparators by which to show pretext.

husband's deposition testimony at face value, Plaintiff identifies at most *two* supervisors who reacted negatively to news of her incoming assignment. Plaintiff does not explain why the concerns that Captain Schauer voiced are illegitimate. Captain Schauer did not resist the assignment because he prejudged Plaintiff to be "bad," but rather he felt that her (undisputed) performance deficiencies and incomplete test record created safety risks. Plaintiff furthers that Captain Schauer described her as "lazy" before he even had met her. It is unclear how Plaintiff knows Captain Schauer made that comment. Nevertheless, it is not inherently discriminatory. While certainly not a polite way to describe *anyone*, a white male employee with a poor performance record could be described as lazy. Moreover, it was an isolated, one-time comment. Plaintiff does not allege whether Captain Schauer repeated the comment *after* the assignment. The same can be said of the hearsay allegation that Captain Schauer told Plaintiff that he had heard she is "disrespectful." According to her husband, Captain Powell complained about Plaintiff's assignment to his firehouse, but while negative of Plaintiff, the opinion allegedly expressed by him is not inherently discriminatory in nature. Plaintiff bases her "pre-judgment" argument on supervisors learning pre-existing negative information about her. However, she does not explain how simply learning of a new incoming probationer's record is illegitimate, and she does not challenge the truth of the information reported in those reports.

In further support of the argument that she worked under fundamentally different performance standards (and again implicitly rejecting the existence of any comparator), Plaintiff contends that no one else was "required to ride as the fifth member of the fire truck, an essentially superfluous position that made it impossible for her captain and other evaluators to consider her a qualified probationary firefighter." The evidence does not support that characterization. First, there is no evidence that the fifth rider arrangement was punitive or without legitimate basis. It was a

compromise solution so that Plaintiff could continue as a probationary firefighter despite concerns she posed to the safety of others and herself. Second, it was a requirement placed on her supervisor, not her, and that was after she chose the arrangement for herself after being given the choice. Third, Plaintiff does not explain exactly how being the fifth rider affected performance reviews in a way that contributed to the decision to terminate her. In other words, there is no showing that she still would be employed but for the fifth rider assignment.

###    D.    Procedural Irregularity

Plaintiff also casts her hyper-scrutiny argument in terms of a departure from regular procedure and practice. Plaintiff cites *Plotke*, 405 F.3d at 1102, for the general rule that an employer's action contrary to policy or practice can be used to show pretext. As explained above, the Court sees no evidence of hyper-scrutiny in the first place. Plaintiff relies on *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1155 (10th Cir. 2022), but its facts are distinguishable. In that case, the employer sent an official to observe the plaintiff-employees' performance on the job (after receiving complaints of rule violations). The official observed only the plaintiffs but not their co-workers on the same flight. *Id*. Here, by contrast, Defendant closely monitored the job performance and development of all probationary firefighters.

Nor does the record show any other potential procedure, policy, or practice from which Defendant departed in a way that was adverse to her interests. This case does not present the situation in *Stroup* in which the employer fired the plaintiff-employees without first following its system of "met[ing] out progressive, or gradually escalating, discipline." *Id*. Also distinguishable is *Trujillo*, 524 F.3d at 1160, in which the employer used unusual auditing procedures to show plaintiff's misconduct; immediately terminated plaintiff rather than follow the progressive discipline given to similarly situated employees; did not interview key witnesses; selectively relied

on evidence; and gave plaintiff no benefit of the doubt. In *Trujillo*, the very nature of the procedural departures and the investigation, itself, raised suspicion of pretext. The record in this case, by comparison, suggests that any such irregularity in handling disciplinary matters *benefitted* Plaintiff through additional remedial opportunities and continued employment despite acquiring the quantity of deficiency reports that the employee manual says would support termination.

### E. Subjective Criteria

Plaintiff argues that her supervisors took advantage of "the latitude provided in determining whether a probationary firefighter adequately performed a task," and judged her "more harshly than her peers." ECF 55 at 56. The use of subjective criteria is not improper per se, but courts are mindful of the ways in which they provide opportunity for discrimination. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002). Although Plaintiff relies on *Garrett* to support her pretext argument, that case concerns a materially different situation. First, Mr. Garrett, a computer engineer, worked for his employer for far longer, and for most of that time, he had received positive performance ratings. Mr. Garrett alleged that the start of negative ratings coincided with his participation in a diversity program. His employer did not take his discrimination concerns seriously. The circumstances of Mr. Garrett's employment and his discrimination claim differs from Plaintiff's. Second, Mr. Garrett's employer "offered virtually no evidence to support its characterization of its ranking system. It presented no set of objective criteria by which employees are differentiated. In fact, nowhere in the record [was] it shown how rankings were determined." *Id*. Indeed, a supervisor expressly "admitted [that] the evaluation and ranking system was wholly subjective." *Id*. at 1215. Here, by contrast, DFD officers defend its firefighter performance-tracking and ranking system as being objective as possible.

There are several other differences between *Garrett* and Plaintiff's situation. Unlike *Garrett*, the record here does not confirm Plaintiff's allegation of deliberate misuse of subjective criteria. The evaluative criteria at issue in this case served an instructional and developmental purpose for recent Academy graduates during their probationary employment period. Mr. Garrett, by contrast, was a long-time employee. Even if Defendant's performance-tracking and rating system involves some degree of subjectivity, Plaintiff does not dispute the occurrence of many of the skills and performance shortcomings that the reports discuss or areas in need of improvement that they flag.

### F.      Summary

Many instructors, supervisors, and command staff officers found Plaintiff's performance to be lacking in a variety of ways. Those deficiencies continued despite repeat consultations and offers of assistance and encouragement. Then there was a performance-related problem that occurred during a call to a reported structure fire. That incident was subject of deeper inquiry. The decision whether to terminate Plaintiff's employment was made by those much higher in the command structure, removed from her field supervisors. Based on the investigation of that incident in particular and her performance history overall, she was terminated. Plaintiff does not demonstrate how a jury could find the real motivator to be her race and gender. That may be her subjective perception of what happened, but no matter how earnestly held, that alone is insufficient to survive summary judgment. *Rodriguez*, 2022 WL 3453401 at *7. Plaintiff does not submit sufficient evidence by which she could prove disparate treatment as Tenth Circuit case law defines that cause of action.

The Court enters summary judgment against Plaintiff on her disparate treatment claims. As such, the Court resolves the Second and Fourth Claims for Relief in Defendant's favor.

III.     **Hostile Work Environment**

Plaintiff included in her First, Second, and Fourth Claims for Relief allegations of harassment and hostile work environment. Defendant argues for summary judgment in its favor of Plaintiff's hostile work environment theory. Plaintiff does not defend any such claim for relief. Instead, in regards to her "purposed 'hostile work environment' claim," Plaintiff denies in her Response "rely[ing] on hostile work environment to establish adverse action." ECF 55 at 46, n.7. Following that representation, Defendant asks this Court to dismiss "this apparently non-existent claim." ECF 64 at 43.

To the extent there is a confusion and for the sake of thoroughness, this Court briefly notes the elements that define a hostile work environment. "To establish actionable harassment, Plaintiff must show that "1) she is a member of a protected group, 2) she was subjected to unwelcome harassment, 3) the harassment was based on her protected trait(s), and 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment." *Rodriguez*, 2022 WL 3453401 at *11. The Court sees insufficient evidence that would support the fourth element.

To prevail, the workplace must have been permeated with discriminatory intimidation, ridicule, and insult to the degree it created an abusive environment. *Federspill v. Denver Pub. Sch*., No. 17-cv-01480-WJM-STV, 2020 WL 3620323, at *9 (D. Colo. Jan. 22, 2020). Her Complaint and Response could be read as describing her subjective perception of such. However, the conduct must be severe and persuasive from an objective perspective as well. The objective prong of the inquiry asks whether a reasonable person in Plaintiff's position would perceive it as such given the full circumstances. "More than a few isolated incidents of enmity [or] run-of-the-mill boorish,

juvenile, or annoying behavior" is needed. *Id.* "Title VII does not establish a general civility code for the workplace." *Id.* (internal citations omitted).

Plaintiff complains of varying comments made by different DFD employees over the course of her time as an Academy recruit and probationer. Plaintiff perceives them as discriminatory in nature in terms of race, gender, or both. However, as the Court explains above, the various comments are isolated from each other, made in different contexts, and mostly in regard to performance-related concerns. The surrounding circumstances and the contexts in which they were uttered are relevant to the inquiry. The comments are objectively insufficient to create a negative environment of the degree needed to prevail on this theory.

To the extent Plaintiff includes a claim of a hostile work environment, the Court enters summary judgment in Defendant's favor.

## IV.     Retaliation

Title VII protects an employee who opposes discrimination from retaliation. The elements of unlawful employment retaliation are: (1) Plaintiff engaged in protected activity, (2) Defendant took action that an objectively reasonable employee would have found adverse, and (3) a causal connection exists between the protected activity and the adverse action. *Rodriguez*, 2022 WL 3453401 at *12-13. For present purposes, this Court assumes that the letter Plaintiff's counsel sent Defendant on September 19, 2019 satisfies the first element, and her termination on October 24, 2019 establishes the second.

Defendant argues that Plaintiff does not establish the causation element. "A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." *Davis v. BAE Sys. Tech. Sols. & Servs., Inc.*, 764 F. App'x 741, 744 (10th Cir.

2019). The standard is the equivalent of the "but for" theory of causation. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014).

The same *McDonnell-Douglas* burden-shifting framework that the Court uses to analyze the above disparate treatment claim can be used to prove retaliation with indirect, circumstantial evidence. *Rodriguez*, 2022 WL 3453401 at *12-15. One aspect of the required causal relationship is awareness by the actor (the person who decided to take the adverse employment action) of the protected activity. *Hairston v. Costco Wholesale Corp.*, No. 19-cv-02801-PAB-KMT, 2022 WL 910955, at *10 (D. Colo. Mar. 29, 2022) (finding no prima facie case of retaliation without facts of how the decision-makers were aware of the plaintiff-employee's complaints). Deputy Executive Director Dulacki was the person who made the decision to terminate Plaintiff, and she denies knowing about the discrimination complaint. The overall evidence is consistent with her denial. Unlike many others in training and operations command staff, she was removed from the day-to-day matters of Plaintiff's job performance and informal complaints of discrimination. Plaintiff herself does not say she discussed his counsel's letter with any of her supervisors or officers with whom she was in contact. Nor did Deputy Executive Director Dulacki participate in DFD's investigation of Plaintiff's letter. That was handled by Internal Affairs, and they were unable to substantiate her grievance. While it is possible that a jury simply might choose to disbelieve Deputy Executive Director Dulacki's denial of personal knowledge, the mere potential of such is insufficient to defeat summary judgment.

The letter caused no observable change in DFD's conduct. The record of Plaintiff's performance problems already was well-developed before the letter's writing. Deficiencies of the same type continued to be documented contemporaneous with the letter and afterwards. They continued even after the hydrant issue, the incident most directly responsible for the termination

decision. The consistency of the performance concerns contradicts Plaintiff's argument that retaliation was the real reason for her termination. *Id*. at *14. Moreover, there is no indication that Plaintiff's informal discrimination complaints were ignored. She was given ample opportunity to be heard in discussions with supervisors and officers about both performance issues and *when raised* informal discrimination complaints. Her letter triggered an immediate Internal Affairs investigation.

As she explained in the detailed, written termination decision, Deputy Executive Director Dulacki fired Plaintiff for a history of poor performance but most notably the incident when she did not connect a hose to a hydrant. Not only should it have been a basic skill for a probationer of her experience, but she handled the situation poorly on the whole. Plaintiff does not contest the underlying fact record of performance issues. There is no indication that Plaintiff still would be employed had her attorney not sent Defendant the September 19, 2019 letter.

Plaintiff stresses the close temporal proximity between her grievance letter (dated September 19, 2019) and termination (October 24, 2019). The relatively short time period between those two acts is a factor that supports drawing an inference of discrimination. *Trujillo*, 524 F.3d at 1157. However, when considered in light of the overall circumstances, that month-long period is not dispositive. First, there is the unrefuted testimony of Deputy Executive Director Dulacki that she was unaware of the letter. In that sense, there is no time gap at all. Deputy Executive Director Dulacki did not know about the discrimination complaint in order to take quick retaliatory action. Second, there is an even shorter time gap between the hydrant connection incident (which occurred on October 1, 2019, *after* the grievance letter) and her termination. By Plaintiff's reasoning, that shorter gap implies a greater causal relationship between those two events. Deputy Executive

Director Dulacki also based her termination decision on other performance problems that have been documented over an extended period of time, before the grievance letter was sent.

In the absence of evidence from which a jury reasonably could find a causal relationship, the Court grants summary judgment on Plaintiff's retaliation allegations. As such, the Court resolves Plaintiff's Third and Fifth Claims for Relief in Defendant's favor.

## V.   Municipal Liability

For her First Claim for Relief, Plaintiff asserts that Defendant violated her Fourteenth Amendment right to equal protection. She brings that constitutional claim pursuant to 42 U.S.C. § 1983. She expresses her discrimination and retaliation claims in terms of contractual interference in violation of 42 U.S.C. § 1981, which comprise her Second and Third Claims for Relief.

The Section 1983 and Section 1981 causes of action concern a municipality's wrongdoing. *Randle*, 69 F.3d at 446 n.6 (10th Cir. 1995); *Tilghman v. Kirby*, 662 F. App'x 598, 603 (10th Cir. 2016). For that reason, Plaintiff contends that Defendant had a policy, custom, and practice of race and gender discrimination. She furthers that discrimination and harassment is sufficiently widespread and pervasive within DFD to constitute a de facto custom. Despite awareness of the discrimination, Plaintiff says Defendant took no corrective action, and it has not trained, supervised, or disciplined DFD staff to prevent discrimination.

Plaintiff's attempts to show either an overt policy, custom, or practice of discrimination or even indifference to discrimination is unavailing. The evidence upon which she relies, which she lists in her Response (ECF 55 at 58-59) is ambiguous at best. Even if there was, there is no evidence that any decision-maker acted pursuant to it. First, for the reasons the Court explains above, there is insufficient evidence that Defendant discriminated against *her*—despite the alleged broad custom of discrimination. Second, Plaintiff's attempt to identify other discrimination victims is

likewise unavailing. None of the lawsuits that are subject of SADMF Nos. 73-76 resulted in merits determination of disparate treatment by a court or jury. SADMF Nos. 96-107 discuss the declarations of three women, but they are limited to those individuals' opinions and allegations (with no judicial findings of discrimination). Co-Plaintiff Cassie as well as Plaintiff Allen's relatives express their own opinions and allegations of discrimination. That evidence falls short of establishing the existence of a custom or policy of terminating minorities. Moreover, their experiences are too isolated to suggest widespread discrimination when considered against the size of Defendant's total workforce. Nor is there much commonality either with Plaintiff's situation or between those persons' respective circumstances. The existence of a "custom" involves both *widespread* illegal practice and a group of *similarly* situated employees who were affected by it. *Carney v. City and County of Denver*, 534 F.3d 1269, 1274, 1277-78 (10th Cir. 2008).

Plaintiff relies on a gross statistical disparity argument to support her position. She cites the low number of African-Americans, females, and African-American females specifically who are currently working for DFD. As this Court already has ruled in this case, statistical data must be developed in a way that makes it a reliable indicator of discrimination. The relevant comparison is not between the number of DFD minority employees against the minority population at large. *Carney*, 534 F.3d at 1275. Moreover, the statistical data must be relevant to the discrimination theory. Plaintiff is not alleging a custom or policy of not *hiring* minorities. To the contrary, the evidence suggests affirmative action programs to encourage diversity. Rather, Plaintiff must show a (presumably illogical) custom or policy of *terminating* minority firefighters after they start.

The simple fact that the percentage of African-American and/or female firefighters is lower than the general population is insufficient by itself. The analysis must account for such factors as the number of such minorities who applied to become a firefighter in the first place; who graduated

the Academy; who passed all probationary requirements; and then who stayed with DFD. The statistical analysis also must account for potentially legitimate reasons for any resulting disparity. *Carney*, 534 F.3d at 1276. Plaintiff says DFD has a "culture" of racism and sexism. ECF 55 at 50. However, a plaintiff must do more than simply allege that bias permeates the workplace; there must be some corroborating basis to support the assertion. *Henderson v. Pennsylvania State Univ.*, No. 21-cv-00872, 2022 WL 838119, at *10 (M.D. Pa. Mar. 21, 2022).

As such, the Court finds no evidence of a custom or policy of discriminatory terminations or other adverse employment actions. Nor is there any evidence of a failure to train, supervise, or discipline DFD employees. Plaintiff points to no instance in which a discriminatory act resulted from a training, supervisory, or disciplinary shortcoming. Plaintiff may disagree with the conclusion reached by Internal Affairs investigation of her grievance, but that alone does not mean Defendant failed to act. To the contrary, the evidence shows that Defendant conducted a detailed investigation, and it yielded an equally detailed report.

It is the need to show the existence of a "custom or policy" that distinguishes Plaintiff's claims under Section 1981 and Section 1983 from those brought pursuant to Title VII. *Carney*, 534 F.3d at 1273. However, prevailing on her Section 1981 and Section 1983 claims also requires a demonstration of unlawful discrimination. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1014 (2020) (holding that "a plaintiff bears the burden of showing that race was a but-for cause of its injury" to prevail on a Section 1981 cause of action). Establishing discrimination involves the same elements as a Title VII claim. *Carney*, 534 F.3d at 1273. Therefore, Plaintiff's failure to submit sufficient evidence to support her Title VII disparate treatment and retaliation theories provides an additional reason for granting summary judgment in Defendant's favor on the municipal liability-based claims.

## VI.  CADA

Plaintiff expresses her allegations of unlawful employment conduct not just as violations of federal law (as discussed above), but also in violation of state law. Her Sixth and Seventh Claims for Relief are brough pursuant to Colo. Rev. Stat. § 24-34-306(15), the Colorado Anti-Discrimination Act ("CADA"). Citing *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1111 (D. Colo. 2021) and *Jackson v. City and County of Denver*, No. 11-cv-02293-PAB-KLM, 2012 WL 4355556, at *2 (D. Colo. Sept. 24, 2012), Defendant argues that this Court lacks jurisdiction over them because Plaintiff did not administratively exhaust her CADA claims. In her Response (ECF 55 at 59, n.13), Plaintiff voluntarily dismisses them.

Even if Plaintiff had not abandoned them, her two CADA claims would have failed on their merits. The same reasons the Court gives for resolving Plaintiff's Title VII discrimination and retaliation claims in Defendant's favor apply with equal force here.

## CONCLUSION

Plaintiff alleges that Defendant's termination of her employment was unlawful, an allegation which she expresses through several different causes of action. The element common to those causes of action is the need for a causal relationship between her termination and a discriminatory motive. The parties submit an extensive record, and after going through it, the Court sees insufficient evidence from which a reasonable jury could find that Defendant terminated her because she is Black and/or female. In granting summary judgment under similar facts in the recent case of *Young v. Colorado Judicial Dep't*, No. 20-cv-01687-SKC, 2022 WL 2158988, at *7 (D. Colo. June 15, 2022), the Court summarized that a plaintiff must rely on more than conclusory statements and subjective beliefs when the record contains evidence of poor performance.

Accordingly, the Court **grants** Defendant's Motion for Summary Judgment [filed April 13, 2022; ECF 45] as to all claims that Plaintiff Allen raises in the Complaint.

As Co-Plaintiff Cassie requests in her Response (ECF 54 at 2), the Court **denies** Defendant's Motion for Summary Judgment [ECF 45] without prejudice as to her claims. Defendant may renew that part of its Motion at the later appropriate time. By way of a separate Minute Order, this Court will schedule a Status Conference at which time it will consider whether the discovery deadline should be extended as to Co-Plaintiff Cassie; to set a deadline for her to amend her claims for relief; and to set a deadline for Defendant to file a new summary judgment motion.

Entered this 2nd day of September, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge