IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-02952-MEH

CHARMAINE CASSIE,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

      Defendant has filed a Motion for Summary Judgment. ECF 86. It is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication. For the following reasons and based on the submitted record, the Motion is granted.

## BACKGROUND

### I.    Claims for Relief

      Plaintiff Charmaine Cassie is an African American woman formerly employed by Defendant as a probationary firefighter for the Denver Fire Department ("DFD"). Plaintiff asserts that Defendant delayed her graduation from the fire academy based on her sex, race, and sex-plus-race. Plaintiff alleges she suffered a hostile work environment based on her protected classes and was subjected to retaliation for engaging in protected conduct. Further, Plaintiff claims that, as a result of her Non-line of Duty ("NLOD") injury sustained giving birth, Defendant allegedly failed to accommodate her and/or discriminated against her on the basis of her disability.

II.     **Statement of Undisputed Material Facts ("SUMF") (ECF 86)**

Unless otherwise stated, the following facts are not in dispute.

1. Individuals who want to be firefighters with the DFD and most other metro fire departments must pass a written test and a rigorous physical exam. [ECF 45-1 at ¶ 3]. Those recruits then enter the DFD Training Academy for an eighteen-week intensive training program. *Id.* Recruits must pass the Fire Fighter I test, written and practical, and obtain their emergency medical technician (EMT) and HAZMAT Operations certificates. *Id.* After that, recruits rotate through up to four fire stations as probationary firefighters for another nine months, as stated in the Charter. *Id.* To pass probation, they must then pass their Fire Fighter II exam, written and practical, and DFD specific examination. *Id.*

2. Fire Training Academy attendees receive and sign for a manual which governs everything that occurs during the Academy. [ECFs 45-1 at ¶ 4, 45-2, 45-5 at ¶ 3].

3. That manual explains that Deficiency Reports ("DRs") are a tool to correct below-standard performance of skills and/or tasks and are also issued for safety violations but are not used for disciplinary or personnel issues. [ECF 45-2 at CCD1126, 1178]. Former[1] Plaintiff Da Lesha Allen testified DRs are "to let you know what you're doing wrong and see if you have a plan to correct it." [ECF 45-3 at 43:9-12]. Plaintiff Cassie stated they are "to give the recruit awareness and opportunity to change their performance." [ECF 45-4 at 68:1-2, 20-21].

4. According to the Recruit Manual, after seven total DRs, a recruit will receive a written notice for failure to meet standards and a plan of action. [ECF 45-2 at CCD1127, 1179]. After thirteen total DRs, a recruit will receive a second written notice for failure to meet standards and a coaching and counseling session. [ECF 45-2 at CCD1127-28, 1180]. Dismissal may be

---

[1] On September 2, 2022, the Court granted Defendants' motion for summary judgment as to all of Ms. Allen's claims. ECF 69.

considered after thirteen DRs. *Id.* A final formal written notice will be issued after the thirteenth DR. *Id.* Dismissal is strongly considered for DRs numbered fourteen through seventeen and recommended at the eighteenth DR, absent mitigating circumstances that would provide grounds for the attendee's continuation in the academy. *Id.*

5. Attendees sign and initial each DR verifying they understood what they were being taught, the instructors were clear, the instruction given was adequate, whether they need help or clarification, if they understand the area of deficiency, whether they are comfortable working in drill teams, and whether they have any questions. [ECFs 45-1 at ¶ 5, 45-5 at ¶ 4].

6. Denver firefighters must be able to put on their personal protective equipment ("PPE") or bunker gear (including boots, pants, jacket, gloves, hood, and helmet) and their self-contained breathing apparatus (SCBA) and "go on air" in one minute and forty-five seconds. [ECF 45-5 at ¶ 5]. This is termed "donning." *Id*. When the gear is donned, there should be no skin showing. *Id.*

7. Plaintiff Cassie started in the Training Academy 18-02 on July 23, 2018. [ECF 45-2 at CCD1095, 1131]. Early on, she missed one week of training after a death in her family. [ECF 45-4 at 107:3-6].

8. In Academy 18-02, Cassie received six DRs, Michael Aylor (Caucasian male) received ten, Alicia Benham (Caucasian female) received eight, Damien Dean (Hispanic male) received six, and Laura Resch (unspecified female) received nine. [ECFs 45-5, 55-19 at 4 & 6].

9. Cassie injured her shoulder during Academy 18-02 on October 17, 2018 – twelve weeks into the Academy. [ECFs 45-1 at ¶ 7, 45-16 at CCD2877]. She was not medically cleared to return prior to the end of the Academy and, therefore, was unable to complete it. [ECF 45-4 at 28:8-24]. Her doctor returned her to full duty in time to attend Academy 19-01 in January 2019.

[ECF 45-4 at 110:15-18].  According to Plaintiff, DFD still had discretion to allow Ms. Cassie, who had completed fourteen of eighteen of weeks of the Academy, to graduate, like it did for other recruits. *See* Statement of Additional Disputed Material Facts ("SADMF") [ECF 93 at 6-24], ¶¶ 17, 20, 22.

10. Rather than end her employment, DFD offered Cassie a modified duty position and granted a medical deferment to the next Academy which began on January 22, 2019, Academy 19-01. [ECF 45-1 at ¶ 8]. This did not involve a change in pay or benefits. *Id.*

11. Cassie reinjured her shoulder on February 12, 2019. [ECFs 45-1 at ¶ 9; 45-4 at 120:5-11; 45-16 at CCD2889-91]. Cassie's medical providers did not clear her to continue Academy 19-01 [ECF 45-4 at 121:12-122:2 & 125:10-15], so she was again offered modified duty and allowed to keep working [ECF 45-4 at 124:9-11 & 128:23-25] without being laid off in between, without having to use her own accrued leave, and without having to take leave without pay. [ECF 45-1 at ¶ 9]. This did not involve a change in pay or benefits. *Id.* Defendant again granted her a medical deferment to the next regular academy, Academy 19-03, starting September 16, 2019. [ECFs 45-1 at ¶ 9; 45-2 at CCD1248 & 1286].

12. Generally, recruits are allowed one medical deferment, and depending on the injury (seriousness and whether it is an on-duty or off-duty injury) and the availability of modified assignments, they may or may not be given a modified assignment in the interim. [ECF 45-1 at ¶ 10]. If they need a second deferment, generally the recruit is laid off until the next Academy starts. *Id.*  Plaintiff denies this on the grounds that Chief Fulton's assertion is self-serving.

13. There was an Academy for lateral firefighters from June 24, 2019, to August 8, 2019 – Academy 19-02. [ECFs 45-1 at ¶ 11; 45-2 at CCD1200 & 1231]. Pursuant to the City Charter and Civil Service Rules, to be qualified for that Academy, recruits had to have three years of

fulltime firefighting experience, which would necessarily also require that the recruit had passed the Fire Fighter I and II exams and have their EMT and HAZMAT certifications. [ECF 45-1 at ¶ 11]. Plaintiff denies this on the grounds that Chief Fulton's assertion is self-serving.

14. Cassie was not qualified to attend this lateral Academy because she had no firefighting experience [ECF 45-4 at 130:11-15] and had not passed her Fire Fighter II exams. [ECF 45-1 at ¶ 12]. Neither Chief Fulton nor Assistant Chief Carly Helwick made the decision that Cassie could not attend the lateral Academy 19-02, because those qualifications are dictated by the City Charter and Civil Service Rules. *Id.* Plaintiff denies this on the grounds that Chief Fulton's assertion is self-serving.

15. Cassie was informed on May 28, 2019, that she would be attending Academy 19-03 and not the lateral Academy, 19-02. [ECF 45-1 at ¶ 13].

16. Academy 19-03 started on September 16, 2019. [ECF 65-1 at CCD 3049].

17. For the first time, on September 18, 2019, DFD received a complaint of discrimination and harassment based on race and gender from Cassie. [ECF 45-4 at 136:2-17; ECF 45-9]. DFD assigned the complaint to Internal Affairs (IA) who immediately contacted Plaintiff Cassie to schedule a meeting to understand her allegations and set up an interview. [ECF 45-10 at ¶¶ 2-3].

18. Cassie's complaints were investigated by DFD IA as well as a Department of Safety Human Resources Department Employee Relations Specialist who completed an independent EEO inquiry. [ECF 45-10 at ¶¶ 3-5]. Plaintiff Cassie and former Plaintiff Allen were interviewed, as were fourteen other members of DFD. *Id.* The investigations were completed in November 2019. [Def. Exh. 36 at ¶ 14]. Cassie's complaints were deemed unsubstantiated. [ECF 45-10 at ¶ 6].

19. During her third Academy (Academy 19-03), Cassie was injured again and on modified duty assignments from December 24, 2019, to February 13, 2020, subject to restrictions based on her medical condition. [ECFs 45-1 at ¶ 14; 45-4 at 131:15-18; 45-16 at CCD2841 & 2846].

20. Cassie reported to the DFD she was pregnant on or around December 30, 2019, towards the end of Academy 19-03. [ECF 45-4 at 132:14-16; Def. Exh. 37, CCD2838-2840].

21. Cassie graduated with her class from Academy 19-03 on January 17, 2020. [ECFs 45-2 at CCD1286; 45-4 at 132:14-20].

22. Following Academy graduation, graduates are required to complete a probationary period of at least nine months, as required by the City Charter. See Denver City Charter § 9.5.5; Denver Civil Service Commission Rule 94 ("The probation period shall include . . . the time necessary to successfully complete the Police or Fire Academy and a nine (9) month period thereafter."). [ECF 45-2 at CCD1286].

23. The probationary period is not complete until academy graduates meet all DFD requirements and certifications and rotate through a minimum of four firehouse assignments. [ECF 45-1 at ¶ 3; Def. Exh. 38 at CCD 706]. "Failure to successfully complete four firehouse assignments may be grounds for extending probation and dismissal." *Id.*

24. Following graduation from Academy 19-03, as an option in the alterative to accepting an assignment to a firehouse rotation related to her pregnancy, Cassie was offered a reassignment to an administrative role (also referred to as modified duty) during her pregnancy pursuant to the Maternity Policy. [Def. Exh. 39 at CCD10070-71].

25. Cassie elected to accept an assignment to the warehouse and then transferred to fire prevention during her pregnancy. [ECF 45-4 at 132:21-25, 133:1-6 & 25; 134:1-5 & 16-25; Def. Exh. 39 at CCD10070-71; Def. Exh. 40 at CCD2845].

6

26. Cassie was cleared for full duty from restrictions based on her knee injury incurred during her third Academy (Academy 19-03) on February 14, 2020. [Def. Exh. 41 at CCD 2846-47].

27. Cassie filed EEOC Charge No. 541-2020-01689C, on March 10, 2020, alleging retaliation and discrimination based on race and sex. [ECF 45-19 at CCD3322-26].

28. Beginning after the birth of her child on July 23, 2020, Cassie exercised leave for eighty-four days (equivalent to twelve weeks) pursuant to the Family and Medical Leave Act (FMLA) for care and bonding following childbirth through October 15, 2020. [Def. Exh. 42 at CCD11559-64].

29. On October 14, 2020, Cassie submitted information from her medical provider that she could not return to full duty as a firefighter without restrictions, due to a NLOD injury to her back (related to childbirth on July 23, 2020) preventing her from assignment to a firehouse rotation until at least April 1, 2021. [Def. Exh. 43 at CCD10283; ECF 55-8 at 141:16-20; Def. Exh. 44 at CCD11573-75, ¶ 11].

30. As an accommodation under the Americans with Disabilities Act (ADA) for her NLOD injury, Defendant offered to let Cassie continue her temporary administrative transfer to an assignment with fire prevention from October 14, 2020, through April 1, 2021—169 days—which Cassie accepted. [ECF 55-8 at 142:1-25; Def. Exh. 42 at CCD11559-64].

31. On January 21, 2021, the EEOC issued a determination and notice of right to sue on Charge 541-2020-01689, stating that the EEOC "will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute . . . . The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge." [Def. Exh. 45 at CCD3058].

32. On March 17, 2021, Cassie met with Assistant Fire Chief Patrick Hynes regarding the plan to engage Cassie in the DFD's Return to Active Suppression Program in preparation to begin her firehouse rotations. [Def. Exh. 46 at CCD2968-70].

33. DFD's Safety and Training Division developed a detailed training plan, working within known medical restrictions, to assist Cassie to be as prepared as possible to begin firehouse rotations. [Def. Exh. 47 at CCD 2980-81].

34. Cassie was scheduled to be transferred to her first firehouse rotation in the DFD Operations Division effective April 25, 2021. [Def. Exh. 46 at CCD 2968-70].

35. On April 5, 2021, Cassie's medical provider extended her work restrictions. [Def. Exh. 48 at CCD10285].

36. On April 21, 2021, Cassie's medical provider again extended her work restrictions through at least May 5, 2021, preventing her from assignment to a firehouse rotation on schedule. [Def. Exh. 49 at CCD10286].

37. On April 28, 2021, Cassie received notice that "because [she had] not provided a physician's release to return to work with no restrictions [her] temporary re-assignment [would] end as of [April 28, 2021], and [she] would be sent home." [Def. Exh. 50 at CCD2984].

38. Cassie was asked to provide a physician's release to return to work with no restrictions by May 5, 2021, or the DFD would initiate the Interactive Process ("IAP") under the ADA. [Def. Exh. 50 at CCD2984].

39. On May 7, 2021, after 205 days of modified duty following the expiration of eighty-four days (twelve weeks) of FMLA leave, Defendant formally initiated the IAP to determine if Cassie's ongoing medical condition (due to a NLOD injury) preventing her assignment to a firehouse rotation was a qualified disability under the ADA, and, if so, if there was a reasonable

job accommodation available to assist her in performing the essential functions of her position as a probationary firefighter. [Def. Exh. 51 at CCD10344].

40. Defendant received information from Cassie's medical provider on June 3, 2021 (dated May 26, 2021) indicating that Cassie could not perform the essential functions of her position, such as "lifting more than 50 pounds" or "reaching with twisting to the left more than 45 degrees" for the indeterminate future. [Def. Exh. 52 at CCD10287-90]. According to Plaintiff, Ms. Cassie's medical providers listed these restrictions but asserted that Ms. Cassie could perform the essential functions of her job. *See* Def.'s Motion for Summary Judgment, Ex. 52.

41. Defendant followed up with Cassie's medical provider on June 15, 2021, and again on June 16, 2021, to request clarification on Cassie's medical restrictions and clarify Cassie's essential job functions as a probationary firefighter. [Def. Exh. 53 at CCD10291-94].

42. In addition to the job description, the essential functions of a firefighter (notwithstanding probationary status) include:

a.    Donn [sic] full bunker gear and air apparatus weighing approximately 50 pounds within 2 minutes;

b.    In full bunker gear and air apparatus, carry a 72-pound, 24 foot ladder, 75 feet and raise it to the appropriate height and angle;

c.    In full gear, use a 10-pound sledgehammer to generate 850 pounds of force against an object;

d.    Wear a high-rise pack weighing approximately 25 pounds in addition to the full bunker gear and air apparatus and climb 30 steps;

e.    In full gear, pick up from the floor and carry 15 pounds of equipment in each hand 75 feet and set it down, and then pick up and carry 33 pounds of equipment 75 feet and put it down;

f.    In full gear, use a 9.5-pound sledge hammer to move a metal "sled" weighing 147 pounds 36 inches; and

g.    In full gear, draw 165-pound rescue mannequin 75 feet.

[Def. Exh. 54 at CCD909-13 & 3014; Def. Exh. 36 at ¶ 5; Def. Exh. 64 at ¶ 3]. Plaintiff, as set forth below, denies that these listed requirements are essential functions of a firefighter position.

43. Cassie's work restrictions from a NLOD injury disqualified her from enrollment in the Re-Kindle program or the Firefighter Return to Active Suppression Program required for returning to active suppression as part of a firehouse rotation assignment necessary for graduation from probationary firefighter status. [Def. Exh. 55 at CCD10117-20].

44. Temporary administrative assignment (also referred to as modified duty) is a short-term employment position typically available only to non-probationary firefighters injured in the line of duty. [Def. Exh. 36 at ¶ 6; Def. Exh. 56 at CCD10056-60 & 10068-69].

45. "[Firefighters] with Non-line of Duty conditions are not entitled to modified duty." [Def. Exh. 36 at ¶ 7; Def. Exh. 57 at CCD10057].

46. Regardless, Cassie was offered and accepted 195 days of continuous modified duty between October 15, 2020, and April 28, 2021, related to her NLOD injury sustained during childbirth as an accommodation. [Def. Exh. 36 at ¶ 7].

47. On June 16, 2021, based on the information received from Cassie's medical provider on June 3, 2021, disqualifying her from assignment to a firehouse rotation, Cassie was placed into the job reassignment process. [Def. Exh. 58 at CCD3015-16].  According to plaintiff, Defendant chose not to provide Ms. Cassie a reasonable accommodation of unpaid leave through December 2021; accordingly, the exercise of Defendant's discretion disqualified Ms. Cassie from her position, not Ms. Cassie's medical provider.

48. The job reassignment process is a formal process outlined in the City and County of Denver Career Service Rule 12. *Id*.

49. The goal of the job reassignment process is to work together to identify a vacant position at or below Cassie's current pay grade by matching her skills, education, and experience with positions approved to be filled. *Id.*

50. On August 3, 2021, Cassie provided her resume as confirmation that she agreed to participate in the job reassignment process. [Def. Exh. 59 at CCD10326-27].

51. Over a period of ninety days from June 16, 2021, to September 13, 2021, Cassie was offered twenty-nine positions to consider for reassignment. [Def. Exh. 60 at CCD3043-47, 3051-52 & 10319-25].

52. Cassie did not express interest in any position offered, and the IAP was concluded on September 13, 2021. [Def. Exh. 61 at CCD10349].

53. On September 17, 2021, Cassie was notified that the DFD was contemplating disqualifying her from her position as a probationary firefighter in accordance with Civil Service Rule 12, Section 1(A). [Def. Exh. 62 at CCD 261-89 & 3043-47].

54. Cassie's medical provider submitted revised information dated July 15, 2021, indicating that her continued work restrictions disqualifying her from a firehouse rotation as a probational firefighter may possibly resolve after December 27, 2021. [Def. Exh. 63 atCCD10303-06].  According to plaintiff, her medical provider stated that her anticipated date of return to work without restrictions was December 27, 2021; nowhere did the provider use the phrase "her continued work restrictions disqualifying her from a firehouse rotation as a probational firefighter may possible resolve after December 27, 2021."

55. The DFD, along with the Police Department and the Sheriff's Department, is overseen by Defendant's Department of Safety. [ECF 45-14 at ¶ 1].

56. In October 2021, Mary Dulacki (Caucasian female) was the Defendant's Chief Deputy Executive Director of Safety with authority to discipline sworn members of the Department of Safety. *Id.*

57. Ms. Dulacki reviewed the qualifications necessary to perform the essential functions of a probationary firefighter position including: the Essential Job Tasks of a firefighter as set forth by the National Fire Protection Association (NFPA) Standard 1001 – Standard for Firefighter Professional Qualifications, Essential Job Tasks and Job Performance Requirements (CCD11687-11771); and NFPA Standard 1582 Standard on Comprehensive Occupational Medical Program for Fire Departments Essential Job Tasks and Descriptions (CCD11772-11879).  She also reviewed Cassie's employment, leave, and accommodation history; and the history of positions offered to Cassie as part of the interactive process in an attempt at job reassignment in conformity with the rules in Defendant's City Charter and Civil Rule 12, Section 1(A). [Def. Exh. 36 at ¶ 4; ECF 65-1 atCCD3051-54; Def. Exh. 64 at ¶ 2].  Plaintiff denies this, but without factual support.

58. At no time did Plaintiff Cassie's work restrictions allow for minimum standards of physical strength or stamina under the NFPA Standard 1582 or 1001 as a probationary firefighter. [Def. Exh. 64 at ¶ 7].

59. As further accommodation, Plaintiff Cassie exercised an additional 169 days of continuous leave from April 28, 2020, until October 13, 2021, recovering her NLOD injury. Only two other firefighters, a Caucasian male (sixty-one days) and Caucasian female (seventy-two days), were offered and exercised an accommodation of continuous leave to recover from a NLOD injury over thirty days while on probation and prior to successfully performing work at a mandatory firehouse rotation required for release from probationary status. [Def. Exh. 36 at ¶ 8]. Plaintiff denies this without factual support.

60. In total, Plaintiff Cassie was accommodated for 364 days of modified duty and/or continuous leave for her NLOD injury sustained during childbirth. [Def. Exh. 36 at ¶ 9].

61. DFD accommodated Plaintiff Cassie with over twice the number of days (169 days) of the continuous leave for a NLOD injury than any other probationary firefighter that had not served a day in a firehouse rotation. [Def. Exh. 36 at ¶ 9]. Plaintiff denies this without factual support.

62. Overall, fifty-six firefighters (in addition to Plaintiff Cassie) have been offered and exercised continuous leave for at least thirty consecutive days related to a recognized NLOD injury between 2015 and 2022. [Def. Exh. 36 at ¶ 11]. Continuous leave periods ranged from thirty days to 174 days. [Def. Exh. 36 at ¶ 11]. Plaintiff denies this without factual support.

63. Effective October 13, 2021, Ms. Dulacki determined that "[p]ursuant to the ADA, the Department and the City are under no obligation to continue offering Probationary Firefighter Cassie job reassignment" and Cassie is "dismissed by disqualification from the Classified Service of the Denver Fire Department" pursuant to Defendant's City Charter Section 9.4.6 and Civil Service Commission Rule 9, Section 2.5 [ECF 65-1 at CCD3051-53].

64. Cassie filed Amended EEOC Charge No. 541-2022-876, on December 9, 2021, re-alleging retaliation and discrimination based on race and sex and adding allegations of disability discrimination and failure to provide a reasonable accommodation. [Def. Exh. 44 at CCD11573].

65. On July 15, 2022, the EEOC issued a letter responding to Cassie's counsel requesting a Notice regarding rights to sue on Charge 541-2022-876. The letter stated that "more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by the Department . . . . This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious." [ECF 65-10].

66. Defendant currently, and at all times relevant to Plaintiff's claims, had a policy against discrimination and retaliation and a procedure for employees to complain about such conduct and training on these issues. [ECFs 45-1 at ¶ 16 & 19:4-5; 45-17 at 17:1-10; 45-18, 20:21-21:17].

## IV.    Plaintiff's Statement of Additional Disputed Material Facts ("SADMF") (ECF 93)

For the sake of thoroughness and to the extent it adds context to the discrimination claims, the Court reviews the fact statements that Plaintiff includes in her Response [ECF 93]. This Court follows the same numbering as Plaintiff does.  Defendant raises several objections, two of which the Court summarizes below for brevity.

Defendant's primary objection concerns Plaintiff's reliance on hearsay. It adds that Plaintiff does not present an exception that would permit consideration of the out-of-court statements. Certain statements are out-of-court statements not offered for the truth of the matter asserted.  Fed. R. Evid. 801(c). Another exception relevant here is Fed. R. Evid. 801(d)(2)(D), which concerns a party opponent. To qualify, Plaintiff must show how the declarant DFD employee was "involved" in the termination decision. *Cruz v. Farmers Ins. Exchange*, — F.4th —, 2022 WL 3051064 (10th Cir. 2022) (explaining that the speaker must have some general involvement, construed broadly, in the decision-making process that affected the disputed employment action to qualify as a party-opponent).

Defendant's second principal objection is that a party may not rely on unsubstantiated allegations, *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004), second-hand knowledge, *Hart v. UPS Freight*, No. 15-cv-01441-RPM, 2017 WL 3058026, at *6 (D. Colo. July 19, 2017), or conclusory allegations that lack a supporting foundation, *Dalvit v. United Air Lines, Inc.*, No. 07-cv-00726-WDM-CBS, 2008 WL 3468703, at *8 (D. Colo. Aug. 11, 2008), to oppose summary judgment. *See also* Section III.F, Court Practice Standards. Such "testimony, without

14

specific details or corroborating evidence, is [the kind of] unsubstantiated allegation that carries no probative weight in summary judgment proceedings." *Tang v. HSS, Inc.*, No. 13-cv-02636-PAB-NYW, 2015 WL 1345319, at *7 (D. Colo. Mar. 20, 2015). Defendant likewise objects to Plaintiff's reliance on the experiences of others unrelated to her situation. These objections having been noted, the fact statements that Plaintiff includes in her Response [ECF 93] are as follows.

1. Ms. Cassie has been a dedicated firefighter for DFD since she started with the DFD Academy as a recruit in July 2018.

2. Although she struggled with injuries during her time in the Academy, she successfully graduated at the end of 2020. As conceded by DFD Chief Fulton, DFD had no issues with Ms. Cassie's performance at the Academy. Ex. 1, Fulton dep. 45:5-20; *see also* Ex. 2, (Chief Wendi) Moeder dep. 119:14-20 (testifying that Ms. Cassie's performance at the Academy was not considered in the decision to end her temporary modified duty assignment).

3. Throughout her time at DFD, Ms. Cassie was subject to racist and sexist comments.

4. For example, at the end of December 2018, a DFD captain told her she "was going to have problems in the academy just because of DFD culture, but if [she] wanted to get through the academy, [she] needed to keep [her] head down and be like a slave." Ex. 3, Cassie dep. 79:20-81:19. The captain specified that he was giving her this advice because she was "a minority." *Id.* at 80:16-81:2.

5. Additionally, Chief Carly Helwick said something to Ms. Cassie to the effect of, "[y]ou know it's not that people mean to, but when you have one thing that's not like the other, it's just certainly going to be singled out. You know, looked at differently. Plus, you're female so you will get singled out." Ex. 4, Cassie EEOC Charge, 3. Chief Fulton then added, "It's just human nature for people to be like that. I don't think we mean anything by it but it happens. People are always

going to single others out, especially when they are different." *Id*. Chief Fulton also said that Ms. Cassie "did not look like us." *Id.* Ms. Cassie understood Chief Helwick and Chief Fulton's comments to be directed at the fact Ms. Cassie is Black. *See* Ex. 3, Cassie dep. 83:8-20.

6. In approximately 2019, when Chief Helwick saw Ms. Cassie with her hair straightened rather than in braids or twists in the way many Black women style their hair, she told Ms. Cassie that Ms. Cassie actually "look[ed] human." Ex. 3, Cassie dep. 82:82:8-14.

7. In February 2019, when Ms. Cassie was leaving the office after she had been called in to discuss her performance, she was instructed to send in another female recruit who was waiting outside. Ex. 4, Cassie EEOC Charge, 3. As she was leaving, Chief Helwick commented to the other officer present, "Why in the hell am I having to speak to all the females?" *Id*. Chief Helwick then turned to Ms. Cassie and asked her, "Why, Cassie?" *Id.* Chief Helwick conceded that she made the statement. *See* Ex. 5, Helwick dep. 78:25-79:20.

8. Chief Helwick also testified that she had a special conversation with female firefighters that they needed to be good ambassadors of female firefighters; she did not have a similar conversation with male firefighters. Ex. 5, Helwick dep. 77:1-78:21.

9. Chief Moeder testified that "being part of the team" was challenging for female firefighters because DFD is a male-dominated workplace. Ex. 2, Moeder dep. 51:5-9.

10. In June 2019, while Ms. Cassie was helping Lieutenant Burke carry a weight rack, Ms. Cassie carried it behind her and briefly used her butt as a shelf on which to rest the rack. Lieutenant Burke then said, "that thing's gotta be good for something." This was not the first time Lieutenant Burke commented on Ms. Cassie having a big butt; for instance, she once asked Ms. Cassie if she could teach her how to "twerk" because "we"—meaning Black people— "all know how to do

that." The sexist and racist connotations of the remark were extremely painful to Ms. Cassie. *See* Ex. 3, Cassie dep. 82:22-84:21.

11. Ms. Cassie testified that DFD employees, including her supervisors, told her that because she was a woman, she would not always be welcomed at DFD; some DFD employees would not like her because of who she is; and older firefighters are stuck in their ways and don't like female firefighters. *See* Ex. 3, Cassie dep. 87:7-89:20, 91:8-94:24, 158:12-25.

12. Ms. Cassie was also targeted for negative treatment by DFD because of her sex and/or race and was subjected to hyper-scrutiny by her Academy instructors. This included discipline for the same conduct for which male and/or Caucasian recruits were not disciplined. This hyper-scrutiny has continued throughout her employment.

13. When male and/or Caucasian classmates were injured, Academy staff supported and encouraged them. As an example, in July 2018, when Earl Storm, a Caucasian male classmate, had an injured shoulder, the Academy staff "vocally rooted him on" but did not offer such support to Plaintiff. Ex. 3, Cassie dep. 113:15-114:24.

14. Conversely, when Ms. Cassie injured her shoulder during an Academy drill in October 2018, her instructors, offered very little, if any, in the way of support. *Id.*

15. Then, in February 2019, despite Ms. Cassie having orders from her doctor to avoid certain physical exercises so her shoulder injury would not worsen, one of her instructors issued Ms. Cassie a write-up for her inability to pass a twenty-pound ball around while running. The instructor told Ms. Cassie she was an "extra load" on Lieutenant Burke's class. Ex. 4, Cassie EEOC Charge, ¶ 8.

16. Adding insult to injury, other instructors of Ms. Cassie at DFD Academy prohibited her from completing certain drills for which her doctor had given her no restrictions, unnecessarily putting her further behind her Academy class. *See* Ex. 3, Cassie dep. 85:20-86:12; 117:1-118:9.

17. After Ms. Cassie's shoulder injury, her DFD Academy supervisors decided, before her doctor had made a determination whether and when she could return to full duty, that she would not graduate with her prior Academy class and would need to repeat the Academy—even though she had completed fourteen weeks of eighteen weeks of the Academy before her injury. Her supervisor told Ms. Cassie that even if the doctor cleared her to return to duty, she was not going to be able to continue with her class or do required drills, even though her doctor had not yet determined whether her injury prohibited her from doing them. Ex. 3, Cassie dep. 23:18-24:13, 105:16-11:22, 122:8-126:4; Ex. 4, Cassie EEOC Charge, ¶ 9.

18. Conversely, two other Caucasian and/or male recruits in the same situation were told that DFD would wait to hear from their doctors before determining whether or not they would continue with their Academy class. Ex. 4, Cassie EEOC Charge, ¶ 10.

19. Another recruit, Kristine Suddath, a Latina woman, who also missed some Academy time due to injury, was similarly not allowed to graduate with the class. Like Ms. Cassie, Ms. Suddath instead was required by DFD to return for the January 2019 Academy class, and she ultimately resigned because she felt she was treated unfairly. Ex. 4, Cassie EEOC Charge, ¶ 14.

20. On the other hand, several Caucasian recruits who attended 2019 Academies but also missed Academy time due to injuries were allowed to graduate with their classes. In fact, one Caucasian recruit whose injury required them to miss four consecutive weeks of the Academy was still allowed to graduate. Ex. 3, Cassie dep. 116:2-12, 159:9-160:18.

21. At the end of May 2019, Ms. Cassie told her supervisors she was released from light duty to full duty. Yet again, however, her supervisors inexplicably decided to hold her back; she was informed that DFD Assistant Chief ("AC") Carly Helwick decided that rather than allowing Ms. Cassie to join the lateral recruits in the June 2019 Academy, she needed to join the new recruits in the September 2019 Academy and repeat a full Academy rather than the shorter Academy for the lateral recruits. Ex. 4, Cassie EEOC Charge, ¶ 16.

22. DFD Captain Kamstra testified that DFD has discretion whether an individual who has spent some of the Academy injured would nevertheless graduate. *See* Ex. 6, Kamstra dep. 38:5-39:4, 78:1-11.

23. One of Ms. Cassie's instructors and supervisors, who is now DFD Chief, Desmond Fulton, told Ms. Cassie that one good reason for her not to attend the lateral Academy was she would be one of the only women in that class. Ex. 3, Cassie dep. 85:3-14.

24. Ms. Cassie's Academy instructors' disparate treatment of her was not limited to their decision that she needed to repeat the Academy. For example, in October 2018, during a drill which involved lifting a ladder, she was paired with a Caucasian recruit who struggled with maintaining the ladder stable while Ms. C assie attempted to lift it. The instructor yelled at Ms. Cassie for struggling to lift the ladderbut encouraged the Caucasian recruit to continue doing what she was doing, despite the fact that it made Ms. Cassie's part of the drill almost impossible. Ex. 4, Cassie EEOC Charge, ¶ 19. DFD command staff did not take any or have an adequate response regarding Ms. Cassie's discriminatory treatment.

25. On September 18, 2019, Ms. Cassie's attorneys sent a letter on her behalf to Denver. See [Doc. 45-9]. The letter included numerous examples of discrimination to which she had been subjected by DFD. *See id.*

26. On September 26, a DFD IA investigator interviewed Ms. Cassie regarding her complaints of discrimination. During the interview, Ms. Cassie reiterated the examples of discrimination her attorneys had previously shared with DFD and also shared other examples of discriminatory treatment she had experienced by her DFD supervisors. *See* Ex. 7, Internal Affairs Report.

27. The complaints by Ms. Cassie were deemed "unsubstantiated," *id.*, meaning the IA investigator determined that "[t]here was insufficient evidence to either prove or disprove the allegation." DFD Directive Topic No. 1057: DFD Discipline Handbook, available at https://denverfireonline.com/wp-content/uploads/2021/10/1057.00-DFD-Discipline-Handbook. The IA investigator explained that if other parties disagree with Ms. Cassie's assertions, or claim they do not remember the events, the complaint is deemed unsustained. Ex. 3, Cassie dep. 200:2-16. Assistant Chief Moeder conceded that the result of an IA investigation is based on a credibility determination. Ex. 2, Moeder 131:13-25. Defendant's asserted reasons for firing Ms. Cassie are pretext to cover up unlawful discrimination and retaliation.

28. In January 2020, Ms. Cassie requested and was granted temporary modified duty due to pregnancy, which lasted through July 23, 2020, when she gave birth. *See* Ex. 8, Disqualification Letter, 2.

29. From July 23, 2020, through October 14, 2020, Ms. Cassie was on leave under the Family Medical Leave Act. *Id.*

30. Ms. Cassie suffered a back injury while giving birth, and her physician placed restrictions on her return to work through April 1, 2021. *See* Ex. 9, October 14, 2020, Physician Return to Work Form.

31. In the second half of March 2021, Ms. Cassie met with DFD staff to start preparing her return to active duty as a DFD firefighter. *See* Ex. 10, Emails re Return to Work; Ex. 11, Emails re Training Plan.

32. Unfortunately, Ms. Cassie was not fully recovered from her injury by April 1, 2021, and the Center for Occupational Safety & Health ("COSH") physician to whom DFD sent Ms. Cassie continued her restrictions through May 5, 2021. *See* Ex. 12, April 21, 2021, Physician Return to Work Form.

33. At the end of April, DFD ended Ms. Cassie's temporary reassignment—meaning she was placed on leave without pay—due to her failure to provide a physician's release to return to work with no restrictions. *See* Ex. 13, April 28, 2021, Memo – End of Temporary Reassignment.

34. On May 4, 2021, the COSH physician extended Ms. Cassie's restrictions through May 31, 2021. *See* Ex. 14, May 4, 2021, Physician Return to Work Form.

35. On approximately May 6, 2021, DFD initiated the under the ADA to determine whether Ms. Cassie could perform the essential functions of her job with or without reasonable accommodation. Ex. 8, Disqualification Letter, 3.

36. Chief Moeder testified that DFD's policy is to provide firefighters with up to two years to recover postpartum on modified duty. Ex. 2, Moeder dep. 78:9-79:1, 80:20-23, 81:9-20. Defendant objects to this statement (and others, *infra*) on the grounds that the testimony was provided in her individual capacity, rather than as an organizational representative.  Fed. R. Civ. P. 30(b)(6).

37. Chief Moeder further testified that female firefighters choose how long after giving birth they need to recover before going back to active duty. Ex. 2, Moeder dep. 83:25-84:5.

38. Two years after Ms. Cassie gave birth was July 23, 2022; Denver thus did not provide Ms. Cassie even one year, much less two years, to recover postpartum before initiating the IAP. *See* Ex. 2, Moeder 116:22-118:16 (testifying that Ms. Cassie would not have been allowed to remain on modified duty even if she had wanted to because DFD had decided to initiate the IAP).

39. On May 26, 2021, Ms. Cassie's physician completed the Reasonable Accommodation Questionnaire ("RAQ"), stating that Ms. Cassie had been diagnosed with, among other things, lumbar spinal stenosis and chronic lower back pain. For this reason, Ms. Cassie could not lift more than fifty pounds or reach while twisting to the left more than forty-five degrees. Ex. 15, May 26, 2021, RAQ.

40. On approximately June 16, 2021, DFD determined that Ms. Cassie could not perform the essential functions of her job, and there was no reasonable accommodation, including unpaid leave, that would allow her to do so. *See* Ex. 8, Disqualification Letter, 3.

41. On July 15, 2021, Ms. Cassie's physician completed an updated RAQ listing the same diagnosis and restrictions but also providing an anticipated return to work date of December 27, 2021. *See* Ex. 16, July 15, 2021, RAQ.

42. On July 21, 2021, Denver informed Ms. Cassie that it was unable to grant her unpaid leave through December 27, 2021. Denver did not provide a reason why it was unable to make this accommodation. *See* Ex. 17, July 21, 2021, Email from Safety HR re updated RAQ.

43. Chief Fulton testified he was not aware of any DFD policy that if injured for a certain amount of time, an individual could no longer be a firefighter. Ex. 1, Fulton dep. 47:3-13, 51:9-25.

44. Chief Moeder, who had recommended initiating the IAP, testified that even though Ms. Cassie's physician said that her restrictions would be lifted by the end of 2021, Denver's (COSH's)

doctor and the Denver City Attorney's Office decided that Ms. Cassie would not be able to do the job. *See* Ex. 2, Moeder dep., 16:4-17:3, 98:10-101:25, 102:18-103:25, 115:12-116:2.

45. In September 2021, Denver concluded the IAP and notified Ms. Cassie that it was contemplating disqualifying her from her position. In its letter regarding the contemplation of disqualification, Denver stated that "[it had] received no information indicating when or if [Ms. Cassie's restrictions] will end." It also stated that Ms. Cassie was scheduled for a contemplation of disqualification meeting on September 28, 2021, at which she could "correct any errors in [DFD's] information or facts, . . . tell [her] side of the story, and…present any mitigating information as to why disqualification should not be taken." Ms. Cassie was informed that "[her] statement and the information [she] present[ed] will be given full consideration before a final decision is made regarding disqualification." Ex. 18, Contemplation of Disqualification Letter, 3, 5.

46. Despite Ms. Cassie's correcting Denver that her physician had provided a date on which her restrictions were anticipated to end, Denver terminated her employment on October 13, 2021. *See* Ex. 8, Disqualification Letter.

47. Chief Moeder testified that no information that Ms. Cassie would have presented at the contemplation of disqualification meeting could have affected the outcome, because the decision to disqualify her had already been made. *See* Ex. 2, Moeder dep. 111:21-114:21. DFD has a long history of sex and racial discrimination, which continues to persist today.

## DFD Alleged History of Race and Sex/Gender Bias

48. Denver clearly has a problem with blatantly racist, sexist, and racial-stereotyping comments such as those made to Ms. Cassie. Denver's ratification of and support for these

comments shows the large extent to which racism and sexism is tolerated by DFD and has been for years.

49. For example, in a 2013 case, Charles McMillan (who retired in 2010 as the Division Chief of Administration) testified that women and Black people were made to feel unwelcome by DFD. *See Lewis v. Denver Fire Dep't*, 943 F. Supp. 2d 1173, 1181 (D. Colo. 2013) (finding Chief McMillan's testimony credible).

50. In 2015, Camilla VonBurkhardt, then a DFD recruit, faced pervasive sexual harassment and gender discrimination by DFD. *See* Ex. 19, VonBurkhardt EEOC Charge (providing specific examples of sexist treatment to which she was subject). Ultimately, Ms. VonBurkhardt was forced to resign because the sexual harassment and discrimination she experienced was so severe. *Id.* Denver later settled the case for $75,000.

51. Before her resignation, when she was a probationary firefighter, Ms. VonBurkhardt told Captain Kamstra something like, "she wanted to do better so that the men would treat her better or differently." Ex. 6, Kamstra dep. 12:14-13:24. Captain Kamstra denied that Ms. VonBurkhardt's statement indicated she was being treated less favorably by male firefighters. *Id.* at 13:25-14:22.

52. In January 2019, Denver paid former DFD Captain Colley Fisher almost $1 million to settle her claims against it after a federal jury found that DFD terminated Ms. Fisher because of her complaints about sex discrimination; Captain Fisher testified that she was victim of bullying and harassment and DFD's culture was a "boys club." *See* John Murray, "Denver tees up nearly $1 million settlement for fired firefighter who claimed sex discrimination," THE DENVER POST (Oct. 21, 2019, updated Oct. 22, 2019); *see also* Ex. 20, Fisher EEOC Charge and Attachment.

Defendant objects to the admissibility of the article on the well founded ground that newspaper articles are inadmissible hearsay, and further, an EEOC charge is hearsay.

53. In response to Ms. Fisher's case, Denver did not provide additional training to DFD employees on discrimination and retaliation. *See* Ex. 1, Fulton dep. 16:22-17:3, 19:3-9.

54. Also in and around 2019, DFD employees made discriminatory comments to Ms. Allen, an Academy recruit at the time.

55. For example, before Ms. Allen began the Academy, the Denver civil service employee assigned to do her background check told her that DFD had "concerns [regarding] people like [her]." Ex. 21, Allen dep. 14:19-16:24. When Ms. Allen asked him what he meant by the statement "people like [her]," he said "[y]ou know, your age, and you know." *Id.* After pressing further, he stated that "the concern [was] about you being modable," specifically, that "you're not modable, open to change…. You know what they say." *Id.* She asked him if he was referring to the myth of the "angry Black woman." *Id.* He never denied that he was referencing this myth, and in response to her inquires, merely just kept repeating, "[you] know what they say." *Id.*

56. Ms. Allen told DFD Captain Pixley that she was uncomfortable with the civil service employee's racist comments and could not believe he said it. Ex. 21, Allen dep. 20:22-22:6. Captain Pixley agreed the comments were inappropriate, but no further action was taken by the DFD. *See id.*

57. On or around February 5, 2019, one of Ms. Allen's instructors, DFD Captain Kamstra (formerly known as Captain Stewart), told Ms. Allen, in the presence of another instructor, DFD Lieutenant Radke, something to the effect of "[d]on't you have a lot of kids? You should go home and raise those kids. You're just trying to collect a paycheck for your kids with the [DFD]. You should consider doing something else." Ex. 21, Allen dep. 87:21-88:2. Captain Kamstra concluded

by saying that Ms. Allen should "reconsider just being a mom and not a firefighter. *Id.* at 131:4-15.

58. Ms. Allen never heard of any of her instructors telling a male firefighter anything similar. *See* Ex. 22, Allen EEOC Charge, ¶ 10.

59. DFD Lieutenant Burke constantly talked to Ms. Allen about "how big [her butt] was." Ex. 21, Allen dep. 124:17-21, 125:22-126:6. One day, Burke asked Ms. Allen and Ms. Cassie, the only two Black women in the class, to teach her how to "twerk." *Id.* at 126:7-17; Ex.7, Internal Affairs Report re: Plaintiffs, 11 (Burke admitted she told Ms. Cassie "[t]hat's a good use for a butt.").

60. When Ms. Allen began the Academy and went to pick up her uniform at the warehouse, the DFD captain there told Ms. Allen something to the effect of that he knew how "you people [are] always [putting] those things in your hair, and I feel like you need to really rethink that and think about what you're going to do with it." Ex. 21, Allen dep. 124:22-125:21, 128:11-25. His comments were a reference to stereotypes about how Black women style their hair in braids, even though at the time Ms. Allen was wearing her hair down and not in braids. *See id*. Ms. Allen told Academy instructor Lieutenant Radke about the comment by the warehouse captain, stating that "[t]his is beginning to be overwhelming, like, dealing with all of this. I feel like I'm racially being targeted." *Id.* at 134:14-135:17.

61. After graduating to become a probationary firefighter, Ms. Allen's new supervisors continued to treat her according to negative stereotypes about women, and often specifically Black women.

62. For example, Captain Schauer, who was in charge of the firehouse to which Ms. Allen was first assigned as a probationary, called Ms. Allen "lazy" before he had observed any of her performance. Ex. 21, Allen dep. 148:2-16.

63. In 2020, Eric Tade, who was then the Chief of the DFD, stepped down from his position as Chief but remained as a DFD employee. Ex. 2, Moeder dep. 28:8-17. Rumors at DFD were that Chief Tade stepped down because of an occurrence at the annual firefighters' ball. *See id.* at 28:21-29:6. In 2019, a dildo was passed around the ball, and in 2020, a comedian made jokes about the incident. *See* Ex. 5, Helwick dep. 35:4-39:2. Defendant objects to the reliance on rumors (here, and elsewhere) which are inadmissible hearsay.

64. There were also rumors that the comedian at the 2020 ball made remarks that a division chief at the time thought were disparaging against him because he is Latino; however, nothing was investigated about the asserted racism because the division chief, after discussion with Chief Tade and the deputy chief, decided not to pursue an IA case or the like. *See* Ex. 2, Moeder dep. 29:23-32:17.

65. DFD did not provide any communication with its employees condemning the conduct at either the 2019 or 2020 balls. *See* Ex. 5, Helwick dep. 35:4-39:2; Ex. 2, Moeder dep. 33:2-9.

66. Also in 2019, a recruit from a 2018 Academy class who did not graduate after sustaining an injury and then chose not to start another Academy in 2019, told an IA investigator that the female firefighters in her 2018 class "relayed that they [were] having to 'play the game' in order to fit in. Ex. 23, Feb 4 2019 IA Case Summary. One of these female firefighters told the former recruit that "the first day she arrived at her assigned firehouse, [a] male officer asked her, 'So do you know how to work with me?'" *Id.* When the female firefighters from the former recruit's class

who were then probationary firefighters were interviewed by IA, they did not provide "[any] examples of inappropriate behavior related to their treatment." *Id.*

67. In 2021, DFD Lieutenant Flesner was arrested after he was caught secretly recording a female firefighter changing clothes. Ex. 2, Moeder dep. 33:10-34:4; *see also* Ex. 24, July 21, 2021, memo re IA case.  Flesner was allowed to retire, rather than be terminated, and Denver did not conduct an IA investigation into the incident because he retired. Ex. 2, Moeder dep. 34:8-35:35:4.

68. Shortly afterward, a DFD chief was starting a GoFundMe page to raise money for Lt. Flesner's defense, and some of the female firefighter's colleagues told her that Flesner was "a good guy" and she "should really go easy on him" and "he just made a mistake." Ex. 24, July 21, 2021, memo re IA case. Another DFD chief told the female firefighter that "if she was going to be on this job then she was going to need to get thicker skin," and Flesner was "hurting, as well." *Id.* Further, a captain warned the female firefighter that "[she should] to be the girl that sues, because there are two sides to every story." *Id.* And a lieutenant told her "I would have believed [Flesner] because how can you not believe a guy like that?" *Id.*

69. The IA complaint based on these comments was closed as "unsubstantiated" because the other firefighters did not recall making these exact statements and so "it's going to be he said versus she said." Ex. 2, Moeder dep. 37:9-39:3.

70. Chief Fulton testified that essentially, he did not view Flesner's conduct as harassment based on gender, and even if the allegations were true about the statements made to the female firefighters by other DFD employees, including high-ranked officers, that would be a concern for the whole Department and not affect female employees in any way specifically because they are female. *See* Ex. 1, Fulton dep. 118:13-128:10.

71. Karlos Allen, Ms. Allen's father and also a DFD firefighter, testified that he is the only Black firefighter 99% of the time at any firehouse he goes to, and at least once or twice a year, conversation stops when he walks into a room, when the conversation is about something like politics or police and Black people getting shot. Ex. 25, Karlos dep. 44:5-45:1. He believes based on his experience that there is a "double standard," and "when you're a black person on [DFD] you've got to do everything twice as good." *Id.* at 34:5-11.

72. Mr. Allen further testified that DFD has an issue with women; for instance, the only female recruit in his Academy class was assigned to work in District 2 in approximately 2017-2019, but the chief in that district did not want a woman working in his district, so she was sent elsewhere. Ex. 25, Karlos dep. 20:25-21:2, 40:1-41:2. He also believes she has been discriminated against because he has heard people talk about how she is incompetent as an engineer, even though she "was number one on the engineer's list." *Id.* at 43:21-44:4.

73. Twannia Clark, who worked for DFD for 14 years "as the first female African American engineer the Department had" stated that "[a]s soon as [she] joined the Academy, and ever after, [she] felt discriminated against." Ex. 26, Clark dec. ¶¶ 2-3. Ms. Clark "believe[s] the culture is changing and [she] hope[s] it does, but [would] still not allow her daughter to work there because of how women and people of color were treated when I was there." *Id.* at ¶ 2. Defendant objects to this declaration and asks that it be stricken because it contains hearsay, is conclusory, and is vague.

74. Ms. Clark also experienced retaliation after dealing with a captain's constant and unbearable harassment, some of which Ms. Clark believed occurred because she is Black. *See id.* at ¶ 4. The captain was placed on probation, but it was a secret, and nothing was made public about her getting in trouble and why. *See id.* The captain made sure that Ms. Clark knew the captain was

being investigated because of her; as a result, Ms. Clark was retaliated against and removed from her fire station. *See id.*

75. Ms. Clark was assigned to another station but "was told command staff did not want her there because [she] did not have enough experience." *Id.* at ¶ 5. When she was transferred to yet another station, she was replaced by a white male who had the same amount of experience. *See id.*

76. DFD Academy instructors and officers also targeted Ms. Clark for write-ups and other criticism because she is a Black woman; they did not target other recruits and probationary firefighters who were not Black women. *See id.* at ¶¶ 6-7.

77. Ms. Clark further had issues with a firefighter who always made comments about her hair being "disgusting and offensive," which other firefighters observed; at the time, she was wearing her hair in braids, "which is a common style for Black women." *Id.* at ¶ 8. She also had issues with a firefighter who accused of her of stealing money from him, an accusation that at least one other firefighter witnessed; she believed he made the accusation based on the stereotype that Black people steal. *See id.* at ¶ 9.

78. When she was working at DFD, Ms. Clark observed that everyone in the Department knew about a certain chief who "hate[d] and discriminate[d] against women" and had "made it very clear that '[n]o women would work on a rescue fire truck as long as he [was] in charge of this Fire Department.'" *Id.* at ¶ 10. The chief kept his job despite this common knowledge. *See id.*

79. Ms. Clark observed that Ms. Day was "mistreated" by the Department and "was set up for failure by the officers and [c]hiefs who were overseeing her," and "the way they [Ms.Allen] was something that was talked about around the [D]epartment." *Id.* at ¶ 14.

80. Jennifer Florez, a technician with DFD, is the Black woman who has been with the Department the longest; she has worked for the Department for twenty-five years. Ex. 27, Florez dec. ¶ 2. Technician Florez stated that she has "[n]o reason to disbelieve what [Ms. Cassie and Ms. Allen have] said about being discriminated against for being African American women." *Id.* at ¶ 3. Technician Florez noted that "[t]he things that [Ms. Allen had] told [her] about what [Ms. Allen] experienced at the Department did have [Technician Florez] in tears at times, to the point that [she] couldn't even look at some of [her] peers the same." *Id.* at ¶ 4. Ms. Allen also told Technician Florez that "when she was at the Academy, people would mess with her equipment causing her problems and not allowing her to pass, and the staff required her to do things that they did not require other people to do to succeed." *Id*. at ¶ 14. Defendant objects to this declaration and asks that it be stricken because it contains hearsay, is conclusory and vague.

81. Technician Florez "believe[s] that the indifference [Ms. Allen and Ms. Cassie] received from the Department was because leadership at the time did not understand the culture. As a strong Black woman, [Technician Florez has] had to defend [herself] in many instances." *Id.* at ¶ 7. "Based on [Technician Florez's] experience, sometimes white people feel threatened when people of color tell them 'no' or correct them, and they feel challenged." *Id.* Technician Florez thought "this is what happened" with Ms. Allen and Ms. Cassie. *Id.*

82. Tamara ("Tammy") Cowgill, a white female who was in the Academy in 2019, was terminated by DFD while still a recruit. Ms. Cowgill stated that "[a]s soon as [she] joined the academy [she] was treated differently for a number of reasons," including because she is a woman." Ex. 28, Cowgill dec. ¶ 3. DFD fired Ms. Cowgill for "dropping a ladder in the [F]irefighter 1 test," and it did not allow her to retake the test even though it "allowed others to

retake it." *Id.* at ¶ 2; *see also id.* at ¶¶ 19, 21-22 (describing other instances in which she was harassed and treated disparately than men in her class).

83. Ms. Cowgill described the Department as a "good old boys' club" where if women did not fit into it, they would be picked on. *See id.* at ¶¶ 13, 16. Ms. Cowgill remembered a comment made by Chief Helwick that "there was no pretty in [the] fire academy," a comment that Ms. Cowgill felt was "very sex[ist]." *Id.* at ¶ 17.

84. Statistics showing recent demographic breakdowns establish the disproportionality of women and Black firefighters in the DFD. From 2016 through 2019, on average, approximately only 5% of DFD employees were Black, and only between 4.6% and 5.4% of DFD employees were women. *See* Ex. 29, 2016-2019 DFD Employee Data. While in each year DFD had a total of approximately 1,000 employees, only two or three employees each year were Black women, between 0.2% and 0.3% of all DFD firefighters. *See id.* Out of the total of the 2018 and 2019 Academy's classes, three firefighters were terminated or dismissed, all of them were women, and two of them were Black (excluding Ms. Cassie). *See* Ex. 30, Acad. demographics & statuses. All four Black female recruits in the 2018 and 2019 Academy classes, including Ms. Allen and Ms. Cassie, are no longer with the Department. *See id.*  Defendant objects to the relevance of these statistics as this is not a failure to hire case or pattern and practice case and further, the statistics do not establish a custom.

85. Despite this persistent disparity, the Academy has no initiatives or programs to increase retention of minority and female firefighters. *See* Ex. 1, Fulton dep. 63:15-19; Ex. 5,Helwick dep. 28:14-17; Ex. 31, Radke dep. 32:13-24; Ex. 6, Kamstra dep. 26:9-22.

86. Chief Fulton testified he did not think there was a problem with retention of minority and female firefighters, but he could not explain why there was such a low percentage of Black

firefighters and female firefighters, nor why there were only two Black female firefighters. *See* Ex. 1, Fulton dep 63:20-23, 67:25-69:9, 69:1-5; *see also* Ex. 2, Moeder dep. 26:21-24 (testifying the retention of Black female firefighters was not an issue).

## LEGAL STANDARDS

### I.     Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.     Disparate Treatment

#### A.     Non-ADA Claims (Race, Gender, Intersectionality)

Plaintiff contends that Defendant delayed her graduation from the fire Academy because she is Black and/or a woman. She expresses her disparate treatment claim through three different statutory causes of action: 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 2000e-5 (Title VII). The elements that define unlawful discrimination are the same for all three. *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995). The first element is membership in a protected class, which Plaintiff meets on the basis of both race and gender. Plaintiff also raises an "intersectionality" argument that Defendant discriminated against her because she is a Black woman. Indeed, the primary protected class type on which Plaintiff bases her Response is that of a Black woman specifically and the unique discrimination that they face distinct from either African American men or white women. ECF 93 at 37-38, 43. The Tenth Circuit recognizes

discrimination claims based on multiple protected traits. *Rodriguez v. Brown*, No. 21-1124, 2022 WL 3453401, at *8 n.8 (10th Cir. Aug. 18, 2022). The remaining elements are: (2) an adverse employment action, (3) qualification for the position and satisfactory job performance, and (4) less favorable treatment than others not in the protected class. *Anderson v. Academy Sch. Dist. 20*, 122 F. App'x 912, 915 (10th Cir. 2004); *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

It is intentional, discriminatory animus that is unlawful under those statutes. "Plaintiff has the ultimate burden of proving, either directly or indirectly, that defendant intentionally discriminated against [her]." *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). In other words, Plaintiff must show how it was the protected trait(s) that motivated Defendant's adverse employment action or had a determinative influence on that decision. *McDonald v. Sch. Dist. No. 1*, 83 F. Supp. 3d 1134, 1148 (D. Colo. 2015) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). "Proof of discriminatory motive is critical" to prevailing on a disparate treatment theory. *Rodriguez*, 2022 WL 3453401 at *7.

The record contains no direct evidence of discrimination by the relevant decisionmakers in the form of express statements of bias by them in connection to Plaintiff's deferred attendance at the Academy (or even generally). Nor is she proceeding on a direct evidence theory. Plaintiff relies upon, as she may, circumstantial evidence pursuant the three-step burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). The *McDonnell-Douglas* framework provides the means by which intentional discrimination can be inferred from the evidence.

1.  Prima Facie Showing

The first step in that process requires Plaintiff to make a prima facie showing of unlawful employment conduct. To do so, Plaintiff must demonstrate how the circumstances of her termination permit the inference of discrimination, and there must be some logical connection between that inference and the elements of the cause of action. *Plotke*, 405 F.3d at 1099. The standard is "not onerous" to meet, but neither is it "empty or perfunctory." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323-24 (10th Cir. 1997). Plaintiff must go beyond mere allegations and point to evidence in the record that if believed—and left unchallenged by Defendant—would entitle her to judgment as a matter of law. *Morgan*, 108 F.3d at 1324.

For present purposes, the Court leaves any issue regarding job qualification or performance for the third step of the *McDonnell-Douglas* framework. Case law permits such an approach to simplify the analysis. *E.g.*, *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800 n.5 (10th Cir. 2007). For the same reason, this Court postpones until the third step consideration of whether Defendant treated other similarly situated workers who are outside the protected class(es) more favorably than Plaintiff. *Watts*, 270 F.3d at 1292-93; *Kendrick*, 220 F.3d at 1229, 1232. Considering these additional factors at the first step risks compressing the full analysis into one step and depriving Plaintiff the opportunity to argue pretext. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193-95, n.7 (10th Cir. 2000).

Having postponed consideration of any argument concerning job qualification, job performance, or treatment of similarly situated co-workers, and "without passing on the merits or credibility of any Party's evidence," *Jackson v. Stonebridge Hospitality Assocs., LLC*, No. 18-cv-01397-NYW, 2019 WL 5622645, at *6 (D. Colo. Oct. 31, 2019), the Court finds that Plaintiff meets her burden at the first *McDonnell-Douglas* step. She is a member of protected groups (Black

and/or female), and she experienced an adverse employment action. A presumption of discrimination therefore arises. *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005). That causes the burden to shift to Defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.*

### 2.    Legitimate Non-Discriminatory Reason(s)

The burden on Defendant at the second step is light. *Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1363 (10th Cir. 1997). Defendant has met its burden of showing a legitimate non-discriminatory reason for not allowing her to attend Academy 19-02 and requiring her to complete Academy 19-03. Defendant is not required to explain any differences between Plaintiff and similarly situated others. *Stinnett v. Safeway, Inc*., 337 F.3d 1213, 1218 (10th Cir. 2003).

The record evidence supports Defendant's articulated reason*, i.e.* she did not meet the clear qualifications of the lateral Academy 19-02, as dictated by the City Charter and the Civil Service Rules. After Plaintiff reinjured her shoulder on February 12, 2019, she was not medically cleared to continue Academy 19-01, and she was granted medical deferment to the next Academy, 19-03, starting September 16, 2019. The Academy dated June 24, 2019 to August 8, 2019 (for lateral firefighters, Academy 19-02) required recruits to have had three years of full-time firefighting experience, which necessarily would include other certifications. There is no dispute that Plaintiff lacked this requisite experience. She attended Academy 19-03, during which time she was again injured. She eventually graduated from that Academy and was required to complete the probationary period of at least nine months, mandated by the City Charter and Civil Service Commission rules. Her NLOD injury prevented her from fulfilling the firehouse rotation requirements. The documented work restrictions prevented her from returning to the active suppression program, and firefighters with NLOD injuries are not entitled to modified duty.

Plaintiff participated in the job reassignment process and did not express interest in any of the twenty-nine positions offered.  She was given notice on September 17, 2021 that Defendant may disqualify her.  After reviewing the essential functions of a probationary firefighter, and the work restrictions dated October 14, 2020 (extended to December 2021), Chief Deputy Executive Director of Safety Dulacki determined that her work restrictions would not allow for a minimum standard of physical strength or stamina under the NFPA Standard 1582 or 1001 for safe work as a probationary firefighter.  ECF 88-29 at 2-3. Defendant disqualified her for not being able to perform essential tasks of the position, This is a legitimate reasons to terminate a probationary firefighter's employment.

Thus, the burden shifts back to Plaintiff to show that Defendant's stated reason is actually pretext for unlawful discrimination.

### 3.  Pretext

Pretext is shown through "evidence of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its termination decision." *McDonald*, 83 F. Supp. 3d at 1148-49 (citing *Crowe v. ADT Security Servs., Inc*., 649 F.3d 1189, 1196 (10th Cir. 2011)). *See also DeWitt v. Sw. Bell Tel. Co*., 845 F.3d 1299, 1307 (10th Cir. 2017). An invidious discriminatory purpose may be inferred from totality of the relevant facts, taking the evidence into consideration on the whole. *Danville v. Reg'l Lab Corp*., 292 F.3d 1246, 1250 (10th Cir. 2002).

One way to show pretext is with evidence suggesting that Defendant's reason is either a post hoc fabrication or otherwise played no actual motivating role, *Plotke*, 405 F.3d at 1099, sufficient to cause a reasonable jury to disbelieve Defendant, *Riggs v. AirTran Airways, Inc*., 497 F.3d 1108, 1119 (10th Cir. 2007). That includes substantive inconsistencies in Defendant's

explanations, *Paup v. Gear Prods., Inc.*, 327 F. App'x 100, 113-14 (10th Cir. 2009), so long as those changes occur in a way that implies dishonesty or bad faith, *Rutledge v. Bd. of Cnty. Comm'rs of Johnson County*, No. 20-2012-DDC-GEB, 2022 WL 910724, at *17 (D. Kan. Mar. 29, 2022) (citing *Litzsinger v. Adams Cnty. Coroner's Office*, 25 F.4th 1280, 1290 (10th Cir. 2022) and *Mueggenborg v. Nortek Air Sols. LLC*, No. 20-6147, 2021 WL 4807176, at *8 (10th Cir. Oct. 15, 2021)). A meaningful procedural irregularity in Defendant's standard investigatory and disciplinary processes also may support the inference of pretext, *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008); *Rutledge*, 2022 WL 910724 at *19, such as falsifying or manipulating criteria. However, the mere fact of a procedural deviation may not suffice. *Rutledge*, 2022 WL 910724 at *20-21. The use of subjective criteria may suggest pretext. *Simms v. Okla. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999). Discriminatory actions or remarks may be relevant, but only if there is a nexus between them and the termination. The subject conduct must have been by those involved in the decision and must have occurred proximate in time to it. *Hare v. Denver Merchandise Mart, Inc.*, 255 F. App'x 298, 303 (10th Cir. 2007); *Rutledge*, 2022 WL 910724 at *20-21.

Another potential indicator[2] supporting pretext is if Defendant treated similarly situated employees who do not belong to the protected class differently (i.e., more favorably) despite an equivalent work rule violation. *Riggs*, 497 F.3d at 1120. For other employees' experience to be relevant, they must have answered to the same supervisor; were held to the same performance and

---

[2] The Tenth Circuit summarizes the foregoing potential ways of showing pretext as: "(1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Drury v. BNSF Railway Co.*, 657 F. App'x 785, 789-90 (10th Cir. 2016).

discipline standards; and their conduct must have been of comparable seriousness. Moreover, the inquiry is limited to those other employees who share similar relevant circumstances of employment such as work history and company policies. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). Plaintiff may not "cherry pick" comparators, omitting those who were treated equivalently or more harshly. *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1012 (10th Cir. 2001).

An employer's pattern of conduct toward a protected class may permit the inference of that employer's discrimination against an individual class member. *See Owens v. Unified Gov't of Wyandotte County*, No. 21-2185-KHV, 2022 WL 2131117, at *11 (D. Kan. June 14, 2022). In relying on such evidence, Plaintiff must account for and eliminate non-discriminatory reasons for statistical observations. *See Owens*, 2022 WL 2131117 at *10 (noting how statistics "are refutable and depend on the surrounding circumstances," thereby heightening the need to show not only a significant degree of statistical disparity but also to eliminate non-discriminatory reasons for it). Even statistics that show a "prolonged and marked imbalance may not be controlling in [an] individual discrimination case" if the employer's reason is legitimate. *Id*. (citing *McDonnell-Douglas*, 411 U.S. at 805).

Not relevant to the pretext inquiry is the wisdom, fairness, or correctness of the stated reason. Instead, the focus is on whether Defendant honestly believed it and acted in good faith on that belief. *McDonald*, 83 F. Supp. 3d at 1150 (citing *Rivera v. Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004)). In other words, the facts are considered from how they appeared to the person who made the termination decision at the time. *Kendrick*, 220 F.3d at 1231; *Rutledge*, 2022 WL 910724 at *18-19. The Court's "role is to prevent intentional discriminatory [employment] practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if

erroneous) business judgments." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)).

To defeat summary judgment, Plaintiff must show a genuine dispute of material fact over whether Defendant's explanation is pretextual. *McDonald*, 83 F. Supp. 3d at 1149 (citing *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006)). Doing so entails more than just disbelieving Defendant; there must be sufficient evidence from which the factfinder could conclude that *discrimination* was a *determinative* factor in Defendant's adverse employment decision. *McDonald*, 83 F. Supp. 3d at 1149 (citing *Young*, 468 F.3d at 1250). Viewed from a different perspective, a stated reason may be legitimate if the adverse employment action is "unsurprising" under the circumstances. *Litzsinger*, 25 F.4th at 1290. It is by rebutting Defendant's stated reason as pretext that Plaintiff shows the possibility of how the jury might infer discriminatory motive. *Randle*, 69 F.3d at 452-53. If Plaintiff survives summary judgment, then it will be for her to prove illegal discrimination to the factfinder "either (1) *inferentially* by showing that the proffered reason is a pretext for *discrimination*; [] and/or (2) *directly* by offering direct evidence of discrimination." *Id*. at 453 (emphasis in the original). The true state of Defendant's mind and questions of intent and credibility "are best left for trial and are within the province of the jury." *Id*.

Plaintiff argues that her supervisors' intent to discriminate against her can be inferred because they used "terms . . . associated with stereotypes of Black women" and states "the numerous discriminatory comments directed to [Plaintiff] and the other witnesses discussed above, along with the other evidence of the Department's issues with racism and sexism, show the culture of the Denver Fire Department." ECF 93 at 41-42. From its own review of the record, the Court sees no use of discriminatory terminology by any supervisor who was consulted regarding the

decision to medically disqualify her, and Ms. Dulacki's decision was grounded in un-met objective criteria for the job reassignment.

Plaintiff relies upon comments that she or others heard DFD instructors, supervisors, and command staff say either to her or about her. Because many of those comments are hearsay, she must show how they can enter the record as admissible evidence. Pursuant to Rule 801(d)(2)(D), there is a hearsay exception that covers declarations by the opposing party. However, as the Court held in *Cruz v. Farmers Ins. Exchange*, — F.4th —, 2022 WL 3051064 (10th Cir. 2022), the speaker must have some general involvement, construed broadly, in the decision-making process that affected the disputed employment action. It is not limited only to those who exercised ultimate decision-making authority. A low-level district manager may be sufficiently "involved" in decision-making process if he served as the principal investigator of the underlying incident and as the channel of communication between them and the plaintiff-employee, two functions he carried out at the middle-level manager's direction. Because of his "key role in the process," the district manager "participate[d] in the process leading to the termination decision." *Id*. at *7. Consequently, a comment by the district manager was not hearsay.

*Cruz* provides a helpful guidepost. At one end of the involvement spectrum are those who played no role whatsoever. As applied here, this includes instructors and training officers who interacted with Plaintiff (or former Plaintiff Allen) or worked for DFD during her time at the Academy but played no direct role in the decision to terminate her during her later time as a probationary firefighter. At the other end of *Cruz*'s involvement spectrum are those who actually made the termination decision or otherwise had ultimate authority over it. Clearly, Deputy Executive Director Dulacki made the decision here.

However, even after construing *Cruz* broadly in Plaintiff's favor, she still must show how any such comments are relevant to the analysis. For her disparate treatment claim, it is only the motivations of those involved in the adverse employment decision that counts. Discriminatory comments allegedly made by DFD employees at large do not prove that those who decided to terminate Plaintiff acted with discriminatory motive. There is no evidence of any potentially discriminatory comment uttered by Deputy Executive Director Dulacki. Many of the challenged comments (assuming that they indeed were uttered and constitute admissible evidence) were made in the context of either legitimate safety concerns, pre-judgment (in the sense of being made before meeting Plaintiff personally), or offers of help or reassurance. Most of them occurred well before Plaintiff was put on notice that she may be disqualified. The extent to which they reflect discriminatory animus is ambiguous. Importantly, *none* of these declarants played a *direct* role in the termination decision.

Plaintiff contends that the question of whether Defendant treated her "less favorably than other probationary firefighters who were not Black women" remains in dispute. However, for a comparison to permit the inference of discriminatory motive, the situations must be similar. For a comparison to have relevance, the Tenth Circuit requires both the plaintiff and the comparator to have the same supervisors. *Rodriguez*, 2022 WL 3453401 at *9 n.10; *Rivera*, 365 F.3d at 922. Plaintiff posits that similarly situated employees were treated differently, which in her view, raises an inference of discrimination. Yet there is scant record evidence to support this argument. Without a similarly situated comparator, Plaintiff cannot show how Defendant treated her more harshly. Defendant has shown there is no genuine dispute that other firefighters have been offered and exercised continuous leave as an accommodation between 2015 and 2022, and this list includes blacks, Hispanics, and females. Def. Exh. 36 at 4-5.

4.      Cat's Paw Theory of Liability

Certain supervisors and training officers may have written performance-related reports which became part of the record that the decision-makers reviewed. As such, Plaintiff argues that they are relevant because they played an *indirect* role in her termination. In other words, Plaintiff relies on a "cat's paw" or "rubber stamp" theory of subordinate bias.

Under such a theory, an employer who acted without discriminatory intent still can be held liable if she uncritically relied on the reports and recommendations of a biased subordinate when deciding to take the adverse employment action. *Rodriguez*, 2022 WL 3453401 at *7. To survive summary judgment on a cat's paw theory, Plaintiff must establish (1) a biased subordinate, (2) who influenced the decision-making process, and (3) the employer's adoption of the biased recommendation without an independent investigation. *Id*. Plaintiff does not demonstrate how the evidence would support liability on this basis.

Construing the record broadly in Plaintiff's favor, the supervisors potentially relevant to Plaintiff's argument would include Chief Vrendenburgh and Chief Fulton. However, as the Court addresses above, Plaintiff shows no comments by them (assuming no hearsay admissibility bar) that suggest bias against Plaintiff. Even at face value, the alleged statements are ambiguous, and the contexts in which they were made detract further from what bias they may imply.

Even if this Court were to assume for present purposes that Plaintiff could establish the first element, her theory fails on the remaining two.  Plaintiff does not allege she was medically disqualified after any of the comments.  Nor can it be said that a decisionmaker "uncritically" relied on a particular subordinate.  Deputy Executive Director Dulacki undertook a comprehensive review of the record and explained her reasoning in a detailed, lengthy report. There is no record evidence that any of her supervisors were consulted or asked for a recommendation on the issue

of her medical disqualification, or that they intended to cause an adverse employment action. And there is no dispute that Internal Affairs conducted its own separate investigation of Plaintiff's discrimination grievance.

B.      ADA Discrimination

Plaintiff next alleges that Defendant discriminated against her on the basis of her disability when it disqualified her.  *See* 42 U.S.C. § 12112(a) (prohibiting discrimination "against a qualified individual on the basis of disability in regard to . . . discharge of employees"). Different than her failure-to-accommodate claim, discussed *infra*, to recover on her discrimination claim, Plaintiff must prove that the Defendant acted with a discriminatory animus against her because she had a disability. *See Lincoln v. BNSF Railway Company*, 900 F.3d 1166, 1204 (10th Cir. 2018). At the first step of that analysis, she has "to establish a prima facie case of discrimination by showing (1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he is qualified for the job held or desired; and (3) that [s]he was discriminated against because of h[er] disability." *Id.* (internal quotation marks omitted). Again, establishing a prima facie claim is not onerous. *See Osborne*, 798 F.3d at 1266. Plaintiff has succeeded in asserting a prima facie claim here. Presuming that Plaintiff was disabled, and further, that she presented sufficient evidence that she was otherwise qualified, as for the third element, the ADA defines "discrimination" to include "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A); *see also Smith*, 180 F.3d at 1161.

The determination of whether the requested accommodation is reasonable is specific to each case, and a court must consider the nature of the employee's disability and the requirements of the job. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017). Paid or unpaid leave for a reasonable period of time may qualify as reasonable accommodation. *See E.E.O.C. v. C.R.*

*England, Inc.*, 644 F.3d 1028, 1048-49 (10th Cir. 2011) ("We have held that, under the appropriate circumstances, '[a]n allowance of time for medical care or treatment may constitute a reasonable accommodation.'" (quoting *Rascon v. USW. Commc'ns, Inc.*, 143 F.3d 1324, 1333-34 (10th Cir. 1998))); *see also Hudson v. MCI Telecommc'ns Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) ("This court agrees with plaintiff that a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation."). In cases where employee requests leave as an accommodation, the employee has the burden to produce evidence as to the expected duration of the requested leave to establish when the employee is likely to resume his regular duties. *Hudson*, 87 F.3d at 1169. "Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future and therefore whether the leave request is a 'reasonable' accommodation." *Punt,* 862 F.3d at 1051 (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000)).

Here, the expected duration of plaintiff's impairments was indeterminate. The RAQ completed by Plaintiff's provider, dated May 26, 2021, instructs the provider to read the attached job description (enclosed). Def. Exh. 52 (ECF 88-17 at 2). While Dr. Ravdel reported that Plaintiff *could perform* all the essential functions of her current position, notably, she also listed as work restrictions lifting no more than fifty pounds or reaching with twisting to the left more than forty-five degrees. *Id.* In a follow-up letter to Dr. Ravdel, Michelle Pena, a member of the Safety Human Resources Leave Team, listed the physical requirements of the firefighter position to include, *inter alia*, the ability to don full bunker gear and air apparatus weighing approximately fifty pounds within two minutes, as well as in full bunker gear and air apparatus, carry a seventy-two pound, twenty-four foot ladder, seventy-five feet and raise it to the appropriate height and angle. *Id.,* ECF

88-19 at 6. Chief Fulton of DFD (who was formerly Deputy Chief of DFD and Division Chief over DFD Safety and Training) confirmed in his Declaration that these are accurate essential functions of a probational firefighter.  Def. Exh. 36 (ECF 88-1).

Plaintiff argues that the Defendant should have considered the information from her medical provider on July 15, 2021, when he completed an updated RAQ listing the same prior diagnosis and restrictions but also providing an anticipated return to work date of December 27, 2021.  She speculates that putting her on unpaid leave until then would allow her to recover and return to work without restrictions on that date.   Dr. Ravdel's answers to the follow-up questionnaire indicate that Plaintiff was *not* able to perform all the essential functions of her current position.  The doctor also stated her work restrictions, described as temporary with an anticipated end date of December 27, 2021, include the *inability* to lift more than fifty pounds. When asked to describe what accommodations would assist the patient in performing the essential functions of her job, Dr. Ravdel wrote "N/A", and then described the time off work as "continuous."  Plaintiff argues that additional unpaid leave would allow her to return to work, but there is no record evidence to support this speculation.  Regardless, Plaintiff was given the opportunity to participate in the job reassignment process, offered twenty-nine job reassignments, and after the IAP was concluded, she was terminated pursuant to the City Charter and Civil Service Commission Rules.

The Tenth Circuit has held that "an employee who isn't capable of working for [six months] isn't an employee capable of performing a job's essential functions—and that requiring an employer to keep a job open for so long doesn't qualify as a reasonable accommodation." *Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014). In *Hwang*, plaintiff sought more than six months leave from her employer and alleged discrimination based on the employer's failure to accommodate the request. Because the leave sought was an unreasonable accommodation, it meant

that plaintiff could not "perform the essential functions of her job" and, therefore, the court concluded that she was not "otherwise qualified." *Id.*

Here, Plaintiff's accommodation request for seven months and twenty-nine days (or 243 days) of continuous unpaid leave is undisputed. This is not a plausible reasonable accommodation. An employer does not have to retain a disabled employee on unpaid leave indefinitely or for excessive time. *Aubrey*, 975 F.3d at 1011 Therefore, any request for such a lengthy accommodation was unreasonable. Plaintiff has not presented evidence that she was "otherwise qualified" at the time of the alleged discriminatory activity. Accordingly, the Defendant's motion for summary judgment is granted as to the ADA claim.

C.      Summary

The decision whether to terminate Plaintiff's employment was made by Ms. Dulacki, with no evidence that any other individuals who made alleged discriminatory comments then provided a recommendation to Ms. Dulacki. Based on the investigation of her work restrictions and essential job duties, and given the indefinite nature of her physical limitations, she was terminated. Plaintiff does not demonstrate how a jury could find the real motivator to be her race, gender or disability. That may be her subjective perception of what happened, but no matter how earnestly held, that alone is insufficient to survive summary judgment. *Rodriguez*, 2022 WL 3453401 at *7. Plaintiff does not submit sufficient evidence by which she could prove disparate treatment as Tenth Circuit case law defines that cause of action.

The Court enters summary judgment in Defendant's favor on Plaintiff's disparate treatment claims.

## II.     Hostile Work Environment

Plaintiff included in her First and Fourth Claims for Relief allegations of race and sex harassment and hostile work environment under Title VII and § 1983, and in the First Claim, racial harassment and hostile work environment under § 1981.  ECF 84 at ¶¶ 4, 117, 118, 121, 131, and 149. Defendant argues for summary judgment in its favor on Plaintiff's hostile work environment theory. Plaintiff does not defend any such claim for relief and instead, indicates she "does not rely on hostile work environment to establish adverse action."  ECF 93 at p. 38, n. 3.  Following that representation, the Court to dismisses these claims and enters summary judgment in Defendant's favor.

## III.    Retaliation

Title VII and §1981 protects an employee who opposes discrimination from retaliation. The elements of unlawful employment retaliation are: (1) Plaintiff engaged in protected activity, (2) Defendant took action that an objectively reasonable employee would have found adverse, and (3) a causal connection exists between the protected activity and the adverse action. *Rodriguez*, 2022 WL 3453401 at *12-13. For present purposes, this Court assumes that the following are instances of protected conduct:  (1) Plaintiff's lawyers sent a letter to the DFD dated September 18, 2019, including complaints of discrimination and harassment based on race and gender; (2) Plaintiff filed a Charge of Discrimination with the EEOC, Charge No. 541-2020-01689C, on March 10, 2020, alleging retaliation and discrimination based on race and sex; (3) Plaintiff filed this lawsuit on September 30, 2020; and (4) Plaintiff filed an amended Charge of Discrimination with the EEOC, Charge No. 541-2022-876, on December 9, 2021, re-alleging retaliation and discrimination based on race and sex and adding allegations of disability discrimination and failure

to provide a reasonable accommodation. In addition, there is no dispute that she the second element is established by the fact that she was terminated on October 13, 2021.

Defendant argues that Plaintiff does not establish the third element, causation. "A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." *Davis v. BAE Sys. Tech. Sols. & Servs., Inc.*, 764 F. App'x 741, 744 (10th Cir. 2019). The standard is the equivalent of the "but for" theory of causation. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014).

The same *McDonnell-Douglas* burden-shifting framework that the Court uses to analyze the above disparate treatment claim can be used to prove retaliation with indirect, circumstantial evidence. *Rodriguez*, 2022 WL 3453401 at *12-15. One aspect of the required causal relationship is awareness by the actor (the person who decided to take the adverse employment action) of the protected activity. *Hairston v. Costco Wholesale Corp.*, No. 19-cv-02801-PAB-KMT, 2022 WL 910955, at *10 (D. Colo. Mar. 29, 2022) (finding no prima facie case of retaliation without facts of how the decision-makers were aware of the plaintiff-employee's complaints). Deputy Executive Director Dulacki was the person who made the decision to disqualify Plaintiff, and there is no record evidence that she knew about Plaintiff's protected conduct or the investigation.  Plaintiff merely speculates, without citation to the evidence, that certain employees knew about Plaintiff's complaint and that Ms. Dulacki merely rubber stamped their recommendations. While it is possible that a jury simply might choose to disbelieve Deputy Executive Director Dulacki's denial of personal knowledge, the mere potential of such is insufficient to defeat summary judgment.

Nor is there close temporal proximity between the protected activities and the disqualification.  "A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999). "A six-

week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004).  Here, Plaintiff's lawyers sent a letter two years prior to her termination, the charge of discrimination was filed a year and a half prior to her termination, the lawsuit was filed a year before her termination, and the amended charge EEOC charge was filed over a year after this case was filed. Cf. *McGowan v. City of Eufala*, 472 F.3d 736, 744 (10th Cir.2006) (finding evidence of causation where plaintiff gave deposition testimony in her Title VII lawsuit the day before she was fired).

In the absence of evidence from which a jury reasonably could find a causal relationship, or to infer a retaliatory motive, the Court grants summary judgment on Plaintiff's retaliation allegations. As such, the Court resolves Plaintiff's Third and Fifth Claims for Relief in Defendant's favor.

## IV.   Municipal Liability

Defendant argues that summary judgment should be granted in its favor as to Plaintiff's First, Second, and Third Claims for relief to the extent they allege municipal liability.  Plaintiff asserts that Defendant violated her Fourteenth Amendment right to equal protection pursuant to 42 U.S.C. § 1983, which subjects municipalities to liability for official policies or customs, and failure to adequately train, discipline or supervise staff. She expresses her discrimination and retaliation claims in terms of contractual interference in violation of 42 U.S.C. § 1981, which comprise her Second and Third Claims for Relief.

Defendant correctly notifies the court that Plaintiff's response to its arguments is identical to former Plaintiff Allen's argument in response to the City's prior motion for summary judgment.

ECF 93 at 47-48, ECF 55 at 57-59, respectively.  In my prior ruling, I dismissed former Plaintiff

Allen's municipal liability claims:

> The Section 1983 and Section 1981 causes of action concern a municipality's wrongdoing. *Randle*, 69 F.3d at 446 n.6 (10th Cir. 1995); *Tilghman v. Kirby,* 662 F. App'x 598, 603 (10th Cir. 2016). For that reason, Plaintiff contends that Defendant had a policy, custom, and practice of race and gender discrimination. She furthers that discrimination and harassment is sufficiently widespread and pervasive within DFD to constitute a de facto custom. Despite awareness of the discrimination, Plaintiff says Defendant took no corrective action, and it has not trained, supervised, or disciplined DFD staff to prevent discrimination.
>
> Plaintiff's attempts to show either an overt policy, custom, or practice of discrimination or even indifference is unavailing. The evidence upon which she relies . . . is ambiguous at best. Even if there was, there is no evidence that any decision-maker acted pursuant to it. First, for the reasons the Court explains above, there is insufficient evidence that Defendant discriminated against her—despite the alleged broad custom of discrimination. Second, Plaintiff's attempt to identify other discrimination victims is likewise unavailing. None of the lawsuits . . . resulted in merits determination of disparate treatment by a court or jury. [The] SADMF[s] discuss the declarations of three women, but they are limited to those individuals' opinions and allegations (with no judicial findings of discrimination). Co-Plaintiff Cassie as well as Plaintiff Allen's relatives express their own opinions and allegations of discrimination. That evidence falls short of establishing the existence of a custom or policy of terminating minorities. Moreover, their experiences are too isolated to suggest widespread discrimination when considered against the size of Defendant's total workforce. Nor is there much commonality either with Plaintiff's situation or between those persons' respective circumstances. The existence of a "custom" involves both widespread illegal practice and a group of similarly situated employees who were affected by it. *Carney v. City and County of Denver*, 534 F.3d 1269, 1274, 1277-78 (10th Cir. 2008).
>
> Plaintiff relies on a gross statistical disparity argument to support her position. She cites the low number of African-Americans, females, and African-American females specifically who are currently working for DFD. As this Court already has ruled in this case, statistical data must be developed in a way that makes it a reliable indicator of discrimination. The relevant comparison is not between the number of DFD minority employees against the minority population at large. *Carney*, 534 F.3d at 1275. Moreover, the statistical data must be relevant to the discrimination theory. Plaintiff is not alleging a custom or policy of not hiring minorities. To the contrary, the evidence suggests affirmative action programs to encourage diversity. Rather, Plaintiff must show a (presumably illogical) custom or policy of terminating minority firefighters after they start.
>
> The simple fact that the percentage of African-American and/or female firefighters is lower than the general population is insufficient by itself. The analysis must account for such factors as the number of such minorities who applied

to become a firefighter in the first place; who graduated the Academy; who passed all probationary requirements; and then who stayed with DFD. The statistical analysis also must account for potentially legitimate reasons for any resulting disparity. *Carney*, 534 F.3d at 1276. Plaintiff says DFD has a "culture" of racism and sexism. ECF 55 at 50. However, a plaintiff must do more than simply allege that bias permeates the workplace; there must be some corroborating basis to support the assertion. *Henderson v. Pennsylvania State Univ.*, No. 21-cv-00872, 2022 WL 838119, at *10 (M.D. Pa. Mar. 21, 2022).

As such, the Court finds no evidence of a custom or policy of discriminatory terminations or other adverse employment actions. Nor is there any evidence of a failure to train, supervise, or discipline DFD employees. Plaintiff points to no instance in which a discriminatory act resulted from a training, supervisory, or disciplinary shortcoming. Plaintiff may disagree with the conclusion reached by Internal Affairs investigation of her grievance, but that alone does not mean Defendant failed to act. To the contrary, the evidence shows that Defendant conducted a detailed investigation, and it yielded an equally detailed report.

It is the need to show the existence of a "custom or policy" that distinguishes Plaintiff's claims under Section 1981 and Section 1983 from those brought pursuant to Title VII. Carney, 534 F.3d at 1273. However, prevailing on her Section 1981 and Section 1983 claims also requires a demonstration of unlawful discrimination. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1014 (2020) (holding that "a plaintiff bears the burden of showing that race was a but-for cause of its injury" to prevail on a Section 1981 cause of action). Establishing discrimination involves the same elements as a Title VII claim. *Carney*, 534 F.3d at 1273. Therefore, Plaintiff's failure to submit sufficient evidence to support her Title VII disparate treatment and retaliation theories provides an additional reason for granting summary judgment in Defendant's favor on the municipal liability-based claims.

ECF 69 at 88-90. Defendant asks for the same result here.  ECF 99 (Reply) at 36.

Like Ms. Allen, Plaintiff contends Defendant had a policy, custom, and practice of race and gender discrimination, and that the discrimination and harassment is so widespread as to constitute a de facto custom. She argues that a custom or policy may be inferred from the conduct of a municipality after an incident when no steps are taken in response to plainly unlawful conduct. She cites to record evidence that DFD has not addressed the low number of Black female firefighters. Here, as in *Allen*, Plaintiff is not alleging a custom or policy of not hiring minorities and has not shown a failure to act on prior incidents or evidence sufficient to rebut that Defendant had a legitimate non-discriminatory reason for her separation from the Academy.  Plaintiff has not

submitted sufficient evidence to support the municipal liability-based claims, and accordingly, summary judgment will be granted as to these First, Second, and Third claims for relief.

## VI.   ADA

Plaintiff's Sixth Claim for Relief is brought pursuant to the ADA, as amended, 42 U.S.C. § 12111, *et seq*. based on DFD's alleged failure to accommodate her NLOD injury sustained during childbirth.

The ADA prohibits a "covered entity" from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). The ADA defines "discriminate against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." Id. § 12112(b)(5)(A).

There are generally four elements Plaintiff must show to establish a prima facie failure-to-accommodate claim: 1) she was disabled, 2) she was otherwise qualified, 3) she requested a plausibly reasonable accommodation, and 4) the Defendant refused to accommodate her disability. *Aubrey v. Koppes,* 975 F.3d 995, 1005 (10th Cir. 2020). Whether an accommodation is reasonable is a mixed question of law and fact. *See Osborne*, 798 F.3d at 1267. To determine whether an accommodation is reasonable, the Tenth Circuit prescribes another burden-shifting formula. *See id.* at 1267-68 (citing *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995)). "First, the employee 'need only show that an "accommodation" seems reasonable on its face, i.e., ordinarily or in the run of cases.'" *Id.* at 1267 (quoting *US Airways, Inc. v. Barnett,* 535 U.S. 391, 401,

(2002)). "A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." *Id.* (citing 29 C.F.R. § 1630.2(o)(1)(ii)).

"Second, if the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate. The employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Id.* (quoting *Barnett*, 535 U.S. at 402) (citation, further internal quotation marks, alteration omitted). "Third, if the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Id.* at 1268 (internal quotation marks, alteration omitted).

The same reasons the Court gives for resolving Plaintiff's Title VII discrimination and retaliation claims in Defendant's favor apply with equal force here.   She was not qualified for the essential functions of her job, and after repeated accommodations (and unpaid leave requests) and delays in returning to the probationary firefighter position, to grant her further unpaid leave was not a reasonable accommodation.  She did not establish, nor did Defendant have a basis to find, that she could perform the essential functions of her position in the near future.  We need not reach the second  (undue hardship) or third step (rebuttal accommodation).  Defendant has shown that her ADA claims fail as a matter of law.

## CONCLUSION

Plaintiff alleges that Defendant's termination of her employment was unlawful, an allegation which she expresses through several different causes of action. The element common to those causes of action is the need for a causal relationship between her termination and a discriminatory motive. The parties submit an extensive record, and after going through it, the Court

sees insufficient evidence from which a reasonable jury could find that Defendant terminated her because she is Black and/or female or disabled.

Accordingly, the Court **grants** Defendant's Motion for Summary Judgment [filed February 16, 2023; ECF 86] as to all claims that Plaintiff raises in the Complaint.

Entered this 25th day of August, 2023, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge